3-11-2

## IN THE CHANCERY COURT OF THE FIRST JUDICIAL DISTRICT
## OF HINDS COUNTY, MISSISSIPPI

GEORGE DALE, COMMISSIONER OF
INSURANCE OF THE STATE OF MISSISSIPPI                    PLAINTIFF

V.                                                       CIVIL ACTION NO. G99-908S2

FIRST NATIONAL LIFE INSURANCE COMPANY
OF AMERICA, A MISSISSIPPI DOMICILED
INSURANCE COMPANY                                        DEFENDANT

### PETITION FOR DECLARATORY RELIEF OF
### HUFF-COOK, INC., PEOPLES BENEFIT LIFE INSURANCE COMPANY
### AND VETERANS LIFE INSURANCE COMPANY

Huff-Cook, Inc. ("Settlers"), Peoples Benefit Life Insurance Company ("Peoples"), and

Veterans Life Insurance Company ("Veterans") (collectively, the "Petitioners") submit this Petition

seeking a declaration by this Court that certain property owned by the Petitioners in which the

Honorable George Dale, Commissioner of Insurance for the State of Mississippi (the "Liquidator"),

in his capacity as Liquidator of First National Life Insurance Company ("First National Life"), asserts

an interest is not part of the estate of First National Life. Instead, that property is impressed with a

constructive or other equitable trust in favor of the Petitioners. In the alternative, Petitioners seek

a declaration by this Court that Petitioners are secured creditors of First National Life. In further

support, Petitioners allege as follows:

### JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to Mississippi Insurers

Rehabilitation and Liquidation Act. Miss. Code Ann.

2.      This Court also has jurisdiction over this matter pursuant to Mississippi Rule of Civil

Procedure 57.

## THE PARTIES

3.      Huff-Cook, Inc. is a corporation organized and existing under the laws of the Commonwealth of Virginia. At all relevant times, Huff-Cook, Inc. (then known as the Settlers Companies, Inc.) was the sole shareholder of the Settlers Life Insurance Company, a corporation organized as a life insurance company under Virginia law. On April 9, 1999, First National Life defrauded Settlers Life Insurance Company of $44.8 million pursuant to a scheme described below. As a direct result of First National Life's fraud, Settlers Life Insurance Company was placed in receivership on May 14, 1999 by order of the Circuit Court of Richmond, Virginia, with the State Corporation Commission of Virginia as Receiver, and the Insurance Commissioner, the Honorable Alfred W. Gross, as deputy Receiver. On December 1, 1999, the State Corporation Commission, as Receiver of Settlers Life Insurance Company, assigned to Huff-Cook, Inc. (then known as the Settlers Companies, Inc.) the right to prosecute the claims of Settlers Life Insurance Company arising out of the activities of Martin Frankel ("Frankel"), Frankel's associates and associated entities (including First National Life).

4.      Peoples Benefit Life Insurance Company is a corporation organized and existing under the laws of the State of Iowa with its principal place of business at 20 Moores Road, Frazer, Pennsylvania.

5.      Veterans Life Insurance Company is a corporation organized and existing under the laws of the State of Illinois with its principal place of business at 20 Moores Road, Frazer, Pennsylvania.

-2-

6.      Plaintiff George Dale is the duly-appointed Liquidator of the Mississippi domiciled First National Life Insurance Company of America, pursuant to an Order of Liquidation entered on June 29, 1999, by this Court. Prior to being placed into liquidation, First National Life had been subject to an Order of Rehabilitation entered on May 10, 1999.

7.      Defendant First National Life Insurance Company is a Mississippi domiciled insurance company. First National Life Insurance Company of America is subject to an Order of Liquidation entered on June 29, 1999, by this Court.

## STATEMENT OF FACTS

### A.      Background Information

8.      From at least 1991 until 1999, Frankel, John Hackney ("Hackney"), Gary Atnip ("Atnip") and others executed a scheme to defraud companies out of hundreds of millions of dollars. The fraudulent scheme included the use of various corporations and corporate entities including Liberty National Securities, Inc. ("LNS"), Bloomfield Investments, Ltd., and Devonshire Technologies Ltd. The fraudulent operations focused primarily on ostensibly investing, through LNS, the assets of certain insurance companies. In truth, Frankel, Hackney, Atnip, through First National Life and other companies, systematically drained the assets of the insurance companies through various transfers into and out of numerous domestic and international accounts.

9.      In approximately 1993, Frankel established the Thunor Trust in Tennessee. Hackney was the sole trustee of the Thunor Trust. The Thunor Trust was established to acquire ownership of insurance companies, including Franklin American Life Insurance Company ("Franklin American Life") in 1993 and First National Life in 1997 Hackney was a trustee of the Thunor Trust from the

first. The purpose in acquiring these companies, and others, was to loot the assets of these and other companies, including the Petitioners.

10.    Hackney also was the president and chairman of the board of directors of First National Life.

11.    Atnip was the chief financial officer of Franklin American Corporation who, together with Hackney, served as the investment committee for First National Life.

12.    The fraudulent operations began to unravel after the Greenwich (Connecticut) Police Department searched a residence of Frankel that had been the scene of a fire on May 5, 1999. The search revealed that the house in Greenwich had apparently been used as brokerage office with an active trading floor and 80-plus computers and various telecommunications equipment providing a continual flow of financial and trading market information. Records obtained during the search identified various business entities that had been operated by Frankel from the house. Also recovered from the residence were astrological charts created to answer questions such as "Will I go to prison?" and "Should I wire money back from overseas?" Included among documents recovered from the fire at the house was a "to do" list, with the first item listed as "Launder money."

13.    On September 22, 2000, Hackney pled guilty to multiple counts of wire fraud and money laundering based, in part, on his role in First National Life's theft of approximately $60 million from Settlers, Peoples and Veterans, some of which was a significant component of the approximately $200 million stolen from these and other entities. Hackney has confessed that he personally received almost $8 million over the years from the fraudulently obtained funds.

14.     Frankel and Atnip have been indicted by a federal grand jury and charged with numerous counts of wire fraud and money laundering, as well as participating in a Racketeer Influenced and Corrupt Organization, conspiracy to participate in a Racketeer Influenced and Corrupt Organization, and securities fraud based, in part, on their role in First National Life's theft of approximately $60 million from Settlers, Peoples and Veterans.     Atnip improperly received approximately $700,000 directly from Account 70026 at Banque SCS Alliance in Geneva, Switzerland.

15.     Pursuant to a number of warrants, the United States has seized a number of assets that are proceeds of the fraudulent scheme.     These assets are the subjects of a number of forfeiture proceedings currently pending before Judge Burns in the United States District Court for the District of Connecticut including United States v. $29,035,500.00, Civil No. 3:01CV1515(EBB) and United States v. $11,014,165.20, Civil No. 3:99CV02589(EBB).

16.     The Petitioners have filed Verified Statements of Interest or Right and sought to intervene in a number of these forfeiture proceedings.

17.     The forfeiture proceedings have been consolidated before Judge Burns in the United States District Court for the District of Connecticut.  By order dated October 31, 2000, Judge Burns denied Peoples and Veterans motion to intervene in the forfeiture proceedings.  United States v. One 1995 Turbo Commander, No. 3:99-CV-2590, No. 3:99-CV-2589, 2000 WL 18388334, *2.  The United States Court of Appeals for the Second Circuit affirmed the denial of Peoples and Veterans' motion to intervene and directed Peoples and Veterans to pursue their constructive trust claims in the

present First National Life receivership proceeding.  United States v. Peoples Benefit Life Ins. Co.,
271 F.3d 411, 416-17 (2d Cir. 2001).

      18.    Through bank records, the Petitioners can trace substantial portions of the funds stolen
from them by First National Life to assets in these forfeiture proceedings initiated by the United
States government in federal court in Connecticut.

    **B.**    <u>**First National Life Defrauded Settlers Out of Nearly $44.8 Million**</u>

      19.    As of the beginning of 1998, Settlers had a group of existing policies (a "book of
business") of burial insurance called the "Care Plan" book.  Settlers had discontinued selling this type
of policy and was holding approximately $46 million as reserves for the payment of claims of the
policyholders for this "book of business."  As Settlers no longer sold this type of policy, it was
interested in selling this book to another insurance company.

      20.    In early 1999, representatives of First National Life approached Settlers regarding
entering into an agreement with Settlers to acquire the Care Plan book of business by an assumption
reinsurance transaction.  First National Life agreed to pay $1.75 million for the Care Plan book of
business.  This payment was to take the form of a "ceding commission" which would be deducted
from the reserves for the book, which Settlers would transfer to First National Life.  In other words,
Settlers would transfer to First National Life approximately $46 million in liabilities associated with
the Care Plan business and $44,795,000 in cash reserves (the "Settlers Reserve Fund").

      21.    Settlers was fraudulently induced to enter into the assumption reinsurance agreement
("Settlers Agreement," a copy of which is attached hereto as Exhibit A), in part by First National
Life's misrepresentations that it was a solvent and prosperous company.  More important, First

National Life also fraudulently represented that any funds transferred to First National Life under the Settlers Agreement would be used to administer the book of business and pay policyholder claims, when in fact, First National Life intended that the Reserve Funds would be misappropriated immediately for the personal use of Frankel, Hackney, Atnip and their accomplices and associates. Settlers entered into the Settlers Agreement in reliance on these representations.

22.    The Settlers Agreement required approval from regulators, including the Mississippi Department of Insurance, before assumption of the book of business could become effective. The Settlers Agreement specifically provided that it was "subject to and contingent upon receipt by Ceder [Settlers] and Reinsurer [First National Life] of any required regulatory approvals of the transaction."

23.    Before seeking the required regulatory approvals, First National Life requested that Settlers transfer the Settlers Reserve Fund. On Friday, April 9, 1999, Settlers complied and transferred a total of $44,795,476.00 to First National Life's account no. 100057727 at First Tennessee Bank in Memphis, Tennessee. First National Life never obtained the approval of regulators for the Settlers Agreement, and could never have properly obtained that approval. More significant, First National Life had intended from the first to defraud Settlers and to immediately misappropriate the Settlers Reserve Fund for the benefit of certain of First National Life's insiders, e.g., Frankel, Hackney and Atnip. First National Life acted quickly to consummate the fraud.

24.    The Settlers Reserve Fund remained in First National Life's bank account for less than three hours. At 13:11 central daylight time on April 9, 1999, First National Life caused the $44,795,000 Settlers Reserve Fund to be transferred from First National Life's First Tennessee account to an account at the Bank of New York, in New York, New York, for the benefit of Dreyfus

Cash Management Plus ("Dreyfus Account"), with a notation "Attention: Lion System DDA #8900052252/AC-719-079- 1438435 OBI=Reference FNL Co. of America Receiving Dealer #2552."

25.    The Dreyfus Account was in the name of "FNL CO OF AMERICA REC ACCT." The Dealer was identified as #002552, and the "REP" was identified as "LNS, Inc.; 405 Tarrytown Road, Suite 212, White Plains, NY 10807 1326." This account was controlled by Frankel.

26.    The Dreyfus Account was a sham. Any securities transferred to the account were to be redeemed, and, together with any cash in the account, were to be wire transferred to UBS Bank in New York, for further credit to Banque SCS Alliance SA, in Geneva, Switzerland, sub account no. 70026, for further credit to "BENEFICIARY BLOOMFIELD INV LTD FC TO FNL CO OF AMERICA."

27.    On April 12, 1999, the Monday after the Settlers Reserve Fund was wired to the Dreyfus account, Dreyfus wired the Reserve Fund of $44,795,000.00, together with $17,640.49 in accrued interest, to Banque SCS Alliance SA, Geneva, via UBS as primary bank.

28.    Before the Settlers Reserve Fund was wired to the Bloomfield Investments, Ltd. account at Banque SCS Alliance SA in Geneva, the balance of that account had dwindled to $931,946.62.

29.    After the April 12, 1999 wire transfer of the Settlers Reserve Fund, plus interest, to the Bloomfield Investments, Ltd.'s account at Banque SCS Alliance SA, and continuing until the date this account was frozen, the $44,795,000 of proceeds of the Settlers Reserve Fund constitutes the overwhelming bulk of new funds deposited in the account.

30.    First National Life's immediate misappropriation of that Fund for the use of First National Life's insiders, rather than as a reserve to pay claims and administer the book of business, was disastrous for Settlers.  Settlers was still liable to the policyholders on the subject book of business, even though First National Life had stolen the Reserve Fund.  As a result, Settlers was forced into liquidation proceedings in Virginia only two months later, and its individual owners (who had built up Settlers over the course of nearly half a century) lost a company that had had an estimated $20 million in equity prior to the fraud perpetrated by First National Life.

C.    **Tracing the Settlers Reverse Fund**

31.    Much of the Settlers Reserve Fund can be traced directly to assets currently subject to civil forfeiture proceedings in Connecticut.

(a)    **$29 Million of the Settlers Reserve Fund are Directly Traceable to Banque SCS Alliance Account 70026**

32.    As set forth above, the Settlers Reserve Fund was deposited in Account 70026 on April 12, 1999.

33.    On May 7, 1999, Frankel caused $28,000,000 to be transferred from Account 70026 to Bank Monte dei Paschi di Siena in Florence, Italy, to the order of Sanita PIU, S.P.A., for an alleged investment in a corporation.

34.    On May 14, 1999, Account 70026 had a balance of $30,384.30.

35.    On June 27, 1999, Account 70026 was frozen pursuant to a request of the United States Government in accordance with a Mutual Legal Assistance Treaty between Switzerland and the United States.

36.    On July 7, 1999, the amount of $26,499,980 was returned to Account 70026 by wire transfer from Bank Monte dei Paschi di Siena, order of Sanity PIU, S.P.A., as repayment of an investment in a corporation resulting from the execution of a cancellation agreement.

37.    In 1999, all funds in Account 70026 were frozen by the Swiss government pursuant to an order entered by Magistrate Barbey in Geneva, Switzerland.  After months of negotiations with the United States Department of Justice, on or about June 28, 2000, the funds contained in Account 70026, $29,035,500, finally were wire transferred to Account 20X6875(06), held in the name of U.S. Customs Suspense Account, at the Federal Reserve Bank of New York.

38.    On July 6, 2001, the Internal Revenue Service Criminal Investigation seized the $29,035,500 pursuant to a seizure warrant issued by the Honorable Joan G. Margolis, United States Magistrate Judge of the United States District Court for the District of Connecticut.

39.    Most of the funds seized from Account 70026 are clearly traceable to the Settlers Reserve Fund.  On April 11, 1999, Account 70026 had $931,946.62.  Immediately prior to the deposit of the Settlers' Reserve Fund, Account 70026 had been virtually emptied.  From April 12, 1999 through the date Account 70026 was frozen, few other amounts were credited to the account. The majority of the funds in the account at the time it was seized could only have come from the Settlers Reserve Fund.

40.    These assets are currently the subject of a civil forfeiture action pending before Judge Burns in the United States District Court for the District of Connecticut in a case entitled United States v. $29,035,500.00, Civil No. 3:01CV1515(EBB).

-10-

**(b)    Other Transfers from Account 70026 are Traceable to the Settlers Reserve Fund.**

41.    Martin Frankel made the following additional wire transfers from his Bloomfield

Investments, Ltd. account number 70026 at Banque SCS Alliance:

(1)    On May 14, 1999, Frankel wire transferred $160,000.00 into Account Number 026-015-0998, held in the name of Jacqueline A. Ju, at People's Bank, Bridgeport, Connecticut.

(2)    Frankel made the following wire transfers into Account Number 641-7028470, held in the name of Beng Tan, at Putnam Trust Company, Greenwich, Connecticut:
    (a)    the amount of $88,000.00 on May 3, 1999;
    (b)    the amount of $20,000.00 on May 6, 1999; and
    (c)    the amount of $4,500.00 on May 17, 1999.

(3)    Frankel made the following wire transfers into Account Number 4461533, held in the name of Gomberg, Kane & Fisher, Ltd., Client Fund Account, at Northern Trust, Chicago, Illinois:
    (a)    the amount of $100,000.00 on May 6, 1999, for the benefit of Karen Timmins;
    (b)    the amount of $400,000.00 on May 6, 1999, for the benefit of Martin Frankel; and
    (c)    the amount of $100,000.00 on May 6, 1999, for the benefit of Sonia Howe.

(4)    On May 5, 1999, Frankel wire transferred $75,000.00 into Account Number 0000267694, held in the name of Thomas A. Bolan, at Bank of New York, New York, New York.

(5)    On May 5, 1999, Frankel wire transferred $50,000.00 into Account Number 4705/6255, held in the name of Jiro and Yasuko Nakamura, at Citibank, New York, New York.

(6)    On May 3, 1999, Frankel wire transferred $50,000.00 into Account Number 29692637, held in the name of Beng Tan, at Citibank, White Plains, New York.

-11-

(7)     On April 23, 1999, Frankel wire transferred $750,000.00 into Account Number 96968953, held in the name of Victor C. Moses, at Seafirst Bank, Seattle, Washington.

(8)     On May 7, 1999, Frankel wire transferred $10,000.00 into Account Number 110114, held in the name of Highland Industrial Park, at Hudson Valley Bank, Pickle, New York.

(9)     On April 21, 1999, Frankel wire transferred $542,850.00 into Account Number 0111146957, held in the name of Fausto Fausti, at Chase Manhattan Bank, New York, New York.

(10)    On April 14, 1999, Frankel wire transferred $650,000.00 into Account Number 42535468, held in the name of Bruce I. Weiser, at Citibank, Stamford, Connecticut.

(11)    On April 16, 1999, Frankel wire transferred $1,395,000.00 into Account Number 70134101, held in the name of North Mississippi Aviation, Inc., at Falkner Bank, Falkner, Mississippi.

(12)    Frankel made the following wire transfers into American Express Credit Card Number 37383880008008, in the name of K. Schuchter, at American Express, New York, New York:
(a)     the amount of $100,000.00 on May 5, 1999; and
(b)     the amount of $200,000.00 on May 6, 1999.

(13)    Frankel made the following wire transfers into Account Number 1080305385, held in the name of Park Avenue Travel Services, at Bank of New York, New York, New York:
(a)     the amount of $50,000.00 on May 5, 1999;
(b)     the amount of $400,000.00 on May 6, 1999; and
(c)     the amount of $500,000.00 on May 7, 1999.

42.     These monies are directly traceable to the Settlers Reserve Fund. The transfers listed above totaled $5,645,350.00. As set forth above, as of April 11, 1999, Account 70026 only had $931,946.62, and each of the transfers enumerated in paragraph 41 above was made after that date. Accordingly, the additional amounts in Account 70026 were largely made from the Settlers Reserve Fund deposited in the account on April 12, 1999. The proceeds of the transfers set forth in paragraph

41 are currently the subject of a civil forfeiture pending before Judge Burns in the United States District Court for the District of Connecticut in an action entitled United States v. $11,014,165.20, Civil No. 3:99CV02589(EBB).

### (c)    $10 Million in Diamonds are Traceable to the Settlers Reserve Fund

43.    On or about May 3, 1999, Frankel bought $10 million worth of diamonds from World Wide Diamonds in Los Angeles via a wire transfer of $9,999,985 from the account at Banque SCS Alliance.

44.    On information and belief, Frankel had approximately $8 million in diamonds in his possession when he was apprehended by the German authorities on September 4, 1999.  On information and belief, these diamonds are currently being held by the German authorities awaiting return to the United States.

45.    On information and belief, on or about May 4, 1999, one of Frankel's accomplices, David Rosse, stole an unknown number of diamonds purchased by Frankel with a portion of the Settlers Reserve Fund that were en route to Frankel.  As part of a guilty plea, Rosse turned over some but not all of these diamonds to the United States government.

46.    As set forth above, the Settlers Reserve Fund constituted the overwhelming majority of the funds in Account 70026 on May 3, 1999.  The funds used to purchase the $10 million in diamonds could only have come from the Settlers Reserve Fund.

**D.**    **First National Life Defrauded Peoples and Veterans Out of $14.7 Million**

47.     In June 1998, a broker put Peoples and Veterans in touch with Franklin American Life to explore the possibility of Franklin American Life's reinsuring certain blocks of insurance business originally underwritten by Peoples and Veterans.  However, Peoples and Veterans objected to such a transaction with Franklin American Life because Franklin American Life's financial rating was not high enough to assure regulatory approval of the proposed transaction.  As an alternative, Franklin American Life officials offered a substitute deal with First National Life ▯ Franklin American Life's highest-rated affiliate and another company within the fold of the Thunor Trust.

48.     Relying on the false representations regarding the financial condition of First National Life and also relying on the crucial representation that First National Life would continue to use the Reserve Fund for its intended purpose, namely the administration of the book of business and the payment of policyholder claims, Peoples and Veterans entered into a set of agreements with First National Life.  On or about October 30, 1998, Peoples and Veterans entered into a Master Agreement, Reinsurance Agreement, and Assumption Agreement with First National Life (collectively, the "Peoples and Veterans Agreements" copies of which are attached hereto as Exhibit B) to transfer certain blocks of insurance business from Peoples and Veterans to First National Life, as well as the corresponding $14,689,593 Reserve Fund ("Peoples and Veterans Reserve Fund") that accompanied those blocks of insurance business.

49.     Pursuant to the Peoples and Veterans Agreements, Peoples and Veterans transferred the Peoples and Veterans Reserve Fund to First National Life's bank account at First Tennessee Bank in three separate installments in November 1998 and early 1999.

-14-

50.    First National Life never had any intention of honoring the Peoples and Veterans Agreements and intended from the first to defraud Peoples and Veterans out of the Peoples and Veterans Reserve Fund.  First National Life did just that.

51.    On November 6, 1998, Peoples and Veterans wired the first installment of the Peoples and Veterans Reserve Fund in the amount of $7,287,504.00 from their affiliate s account at First National Bank of Maryland to First National Life's account at First Tennessee Bank, account no. 100057727.

52.    On November 10, 1998, First National Life wired $5,000,000.00 of the Peoples and Veterans Reserve Fund from First National Life's account at First Tennessee Bank to the Dreyfus Cash Management Plus account at The Bank of New York, account no. 719-079-1438435.

53.    The Dreyfus Account was a sham.  Any securities transferred to the account were to be redeemed, and, together with any cash in the account, were to be wire transferred to UBS Bank in New York, for further credit to Banque SCS Alliance SA, in Geneva, Switzerland, sub account no. 70026, for further credit to "BENEFICIARY BLOOMFIELD INV LTD FC TO FNL CO OF AMERICA."

54.    On November 17, 1998, $5,004,936.51 (the $5 million wired on November 10, 1998, plus accrued interest) was transferred from the Dreyfus Cash Management Plus account at The Bank of New York to Banque SCS Alliance s U.S. Dollar account at Swiss Bank Corporation (now, UBS AG), account no. 101-WA-206626-000.

55.    On November 18, 1998, $5,004,936.51 was credited to the Bloomfield Investments, Ltd. account at Banque SCS Alliance, Account No. 70026. Prior to this transfer, Account 70026 had a balance of $149,667.13.

56.    On January 19, 1999, Peoples and Veterans wired the second installment of the Peoples and Veterans Reserve Fund in the amount of $2,134,101.00 from their affiliates account at First National Bank of Maryland to First National Life's account at First Tennessee Bank, account no. 100057727.

57.    On January 20, 1999, First National Life wired $2,134,000.00 of the Peoples and Veterans Reserve Fund from First National Life's account at First Tennessee Bank to the Dreyfus Cash Management Plus account at The Bank of New York, account no. 719-079-1438435.

58.    the Peoples and Veterans Reserve Fund in the amount of $5,267,988 from their affiliates account at First National Bank of Maryland to First National Life s account at First Tennessee Bank, account no. 100057727.

59.    On March 2, 1999, First National Life wired $5,400,000, which included $5,267,988 of the Peoples and Veterans Reserve Fund, from First National Life's account at First Tennessee Bank to the Dreyfus Cash Management Plus account at The Bank of New York, account no. 719-079-1438435.

60.    On March 10, 1999, $7,553,786.84 (the $2,134,000.00 wired on January 20, 1999, plus the $5,400,000.00 wired on March 2, 1999, plus dividend reinvestments and accruals of $3,450.53, $8,032.51 and $8,303.80) was transferred from the Dreyfus Cash Management Plus

account at The Bank of New York to Bank SCS Alliance s U.S. dollar account at Swiss Bank Corporation (now, UBS AG), account no. 101-WA-206626-000.

61.     On March 11, 1999, $7,553,786.84 was credited to the Bloomfield Investments, Ltd. account at Banque SCS Alliance, account no. 70026.  Prior to this transfer, Account 70026 had a balance of $880,340.39.

62.     As of March 11, 1999, the entire Peoples and Veterans Reserve Fund had been deposited by First National Life in an account controlled by Frankel at Banque SCS Alliance.

63.     First National Life's fraud forced Peoples and Veterans to take responsibility for policyholder claims that the Reserve Fund would have paid for if First National Life had used that Reserve Fund for its intended purpose rather than stealing it.  First National Life stole the Reserve Fund, but left Peoples and Veterans to the pay policyholders.  Peoples and Veterans have resumed that responsibility, and have been administering the book of business and paying policyholder claims since the summer of 1999.

**E.     Part of the Peoples and Veterans Reserve Fund is Directly Traceable to Gold Coins that are the Subject of Forfeiture Proceedings.**

64.     On April 6, 1999, approximately $16 million of cash assets in Account 70026 were transferred to another account held under Frankel's control at Banque SCS Alliance, in the name of Devonshire Technologies, Ltd. (another entity created by Frankel to further his fraudulent schemes). These cash assets were transferred to Monex, a gold commodities brokerage business, to account number 1-2627980-0, in the name of Devonshire Technologies, Inc. and/or Devonshire Technologies, Ltd.  Frankel placed orders with Monex for Vienna Philharmonic gold coins, of a total value of $16 million.

-17-

65.    By memorandum dated May 3, 1999, Martin Frankel, as President and Secretary of Devonshire Technologies, Ltd., directed Monex Deposit Company to deliver 12,000 one-ounce Austrian Vienna Philharmonic .9999 fine gold coins purchased by Devonshire from Monex Deposit Company to the custody of Banque SCS Alliance in Geneva, Switzerland.

66.    At Frankel's direction, some of the Vienna Philharmonic gold coins were sent to Banque SCS Alliance. By letter dated May 3, 1999, Monex Deposit Company notified Banque SCS Alliance that 12,000 Vienna Philharmonic gold coins for the account of Devonshire would be shipped directly from the Austrian Mint in Vienna to Banque SCS Alliance s offices on May 5, 1999. On May 5, 1999, 12,000 Vienna Philharmonic Gold Coins were shipped from the Vienna Mint at the instruction of Frankel s broker, Monex, to Banque SCS Alliance s custodian bank for precious metals, Union Bank of Switzerland, Acacias branch, 35, rue des Noirettes, Geneva. These coins represent proceeds of the fraud and were held in the name of Devonshire Technologies, Ltd.

67.    These gold coins were seized by the Swiss authorities. These gold coins were liquidated and converted to currency in the amount of $3,241,500. On or about June 28, 2001, pursuant to negotiations between the Swiss authorities and the United States Department of Justice, Banque SCS Alliance wire transferred the amount of $3,241,500 to Account 00008114, held in the name of the Seized Asset Deposit Fund, at the Federal Reserve Bank.

68.    On July 5, 2001, the Federal Bureau of Investigation seized $3,241,500 pursuant to a seizure warrant issued by the Honorable Joan G. Margolis, United States Magistrate Judge for the District of Connecticut, on July 5, 2001. The converted currency is currently the subject of a civil

forfeiture action pending before Judge Burns in the United States District Court for the District of Connecticut entitled United States v. $29,035,500.00, Civil No. 3:01CV1515(EBB).

69.     On or about June 1, 1999, special agents of the Federal Bureau of Investigation executed a seizure warrant issued by the Honorable Stephen J. Hillman, United States Magistrate Judge for the Central District of California, for the remaining Vienna Philharmonic gold coins contained in account number 1-2627980-0, held in the name of Devonshire Technologies, at Monex, Newport Beach, California.  On June 1, 1999, the gold coins constituting the remainder of the $16 million dollars in gold coins were converted into $11,014,165.20 in United States currency and later deposited with the United States Marshall's Service for the District of Connecticut.  The converted currency is currently the subject of a civil forfeiture action pending before Judge Burns in the United States District Court for the District of Connecticut entitled, United States v. $11,014,165.20, Civil No. 3:99CV2589 (EBB).

## COUNT I

### DECLARATORY JUDGMENT OF CONSTRUCTIVE TRUST FOR SETTLERS

70.     Settlers incorporates each of the preceding paragraphs of this Petition as if fully set forth herein.

71.     Settlers is entitled to the return of its Reserve Fund.

72.     Settlers entered into the Settlers Agreement and transferred the Settlers Reserve Fund to First National Life in reliance on First National Life's misrepresentations that it was a solvent and prosperous company and that any funds transferred to First National Life under the Settlers Agreement would be used to administer the book of business and pay policyholder claims.

73.     Property that is obtained by fraud is subject to a constructive trust and remains the property of the original owner.  The Settlers Reserve Fund was taken from Settlers through the fraudulent scheme of First National Life.  These assets belong to Settlers and are not part of the First National Life estate.

74.     Furthermore, the Liquidator is seeking through the various forfeiture proceedings in other courts to bring property that rightfully belongs to Settlers into the First National Life estate.

75.     The Settlers Reserve Fund was obtained by First National Life by fraud and First National Life should not, in good conscience, hold the Reserve Fund.

76.     A constructive trust confers on the true owners, Settlers, an interest in the property that is superior to the Liquidator, who stands in the shoes of First National Life who obtained the Reserve Funds by fraud.  Settlers is entitled to reclaim the Reserve Fund.

77.     Furthermore, the Settlers Agreement should be rescinded *ab initio* because Settlers was fraudulently induced into entering the Agreement.  First National Life intentionally defrauded Settlers of the Reserve Fund.  First National Life never had any intention of complying with the terms of the Settlers Agreement.  The Agreement was never fully executed.  Moreover, the Liquidator has effectively rescinded the Settlers Agreement by not accepting and paying policyholder claims under the ceded insurance policies.  Rescission is an appropriate remedy for fraud.

78.     As set forth above, Settlers can trace substantial portions of the Reserve Fund to the assets currently subject to forfeiture proceedings in Connecticut.

-20-