Care Plans
Paid-Up Business
3/31/99

| Code | Count | Coverage | Stat Res |
|------|-------|----------|----------|
| C01 | 64 | 213,000 | 223,490 |
| C02 | 89 | 274,750 | 282,695 |
| C03 | 61 | 200,500 | 193,259 |
| C05 | 183 | 410,450 | 671,756 |
| C06 | 71 | 234,000 | 210,707 |
| C07 | 34 | 117,000 | 107,868 |
| C08 | 1 | 4,000 | 3,210 |
| C20 | 162 | 562,815 | 725,020 |
| C21 | 9 | 24,404 | 33,053 |
| C22 | 22 | 62,543 | 83,765 |
| C23 | 38 | 140,297 | 181,283 |
| C24 | 5 | 14,509 | 18,006 |
| C25 | 283 | 1,107,316 | 1,423,336 |
| C26 | 6 | 11,477 | 14,604 |
| C27 | 13 | 65,096 | 77,915 |
| C29 | 2 | 9,400 | 10,681 |
| C2A | 9 | 29,570 | 36,399 |
| C2F | 3 | 12,114 | 8,939 |
| C30 | 3,760 | 12,943,804 | 17,301,737 |
| C31 | 60 | 163,748 | 218,681 |
| C32 | 57 | 129,732 | 173,099 |
| C33 | 95 | 312,595 | 406,488 |
| C34 | 47 | 133,815 | 176,507 |
| C35 | 627 | 2,411,325 | 3,150,917 |
| C36 | 17 | 56,778 | 76,170 |
| C37 | 28 | 113,180 | 147,167 |
| C38 | 9 | 29,395 | 37,442 |
| C39 | 1 | 5,321 | 4,998 |
| C3A | 22 | 70,388 | 83,312 |
| C3C | 1 | 2,360 | 1,727 |
| C3F | 12 | 41,690 | 33,153 |
| C55 | 897 | 2,961,642 | 4,106,807 |
| C56 | 98 | 311,100 | 429,605 |
| C57 | 27 | 74,285 | 103,783 |
| C58 | 1 | 5,000 | 5,960 |
| C60 | 1 | 946 | 581 |
| C65 | 2 | 7,436 | 3,265 |
| C70 | 21 | 81,698 | 62,070 |
| C72 | 1 | 1,388 | 1,067 |
| C74 | 2 | 4,042 | 1,431 |
| C75 | 7 | 21,457 | 13,832 |
| C7F | 1 | 3,277 | 555 |
| U20 | 53 | 171,447 | 215,415 |
| U22 | 6 | 17,925 | 22,387 |
| U23 | 7 | 31,835 | 39,673 |
| U24 | 5 | 14,123 | 17,765 |
| U25 | 49 | 235,558 | 294,828 |
| U28 | 1 | 4,758 | 4,329 |
| U30 | 2,476 | 8,504,606 | 10,794,885 |
| U31 | 18 | 40,446 | 50,817 |
| U32 | 51 | 171,336 | 215,626 |
| U33 | 23 | 87,145 | 110,989 |
| U34 | 11 | 33,473 | 42,485 |
| U35 | 79 | 286,703 | 362,872 |
| U36 | 6 | 23,932 | 26,896 |
| U37 | 4 | 13,182 | 15,719 |
| U3A | 1 | 2,034 | 1,456 |
| U70 | 25 | 141,857 | 100,631 |
| U74 | 1 | 1,742 | 1,138 |
| U75 | 2 | 6,466 | 4,379 |

9,667  33,168,211  43,168,632

**Settlers Life Insurance Company**
**Care Plans**
**Reduced Paid-Up Business**
**3/31/99**

| Code | Count | Coverage | Res Run | Stat Res |
|------|-------|----------|---------|----------|
| C25 | 1 | 413 | 559 | 246 |
| C27 | 1 | 2,434 | 3,082 | 1,625 |
| C2A | 4 | 9.223 | 7,766 | 3,935 |
| C2F | 6 | 9,260 | 6,726 | 2,783 |
| C33 | 3 | 6,979 | 8,990 | 4,130 |
| C35 | 4 | 4,286 | 5,459 | 2,320 |
| C37 | 1 | 2.629 | 3,478 | 1,718 |
| C38 | 1 | 1,542 | 1,649 | 775 |
| C39 | 2 | 2.195 | 1,993 | 1,488 |
| C3A | 2 | 6.230 | 5,378 | 3,941 |
| C3D | 2 | 808 | 717 | 562 |
| C3F | 4 | 8.713 | 6,496 | 3,065 |
| U35 | 2 | 3.000 | 3,797 | 2,148 |
| U3F | 1 | 2.171 | 1,352 | 649 |
| | 34 | 59.883 | 57,442 | 29,385 |

Settlers Life Insurance Company
Care Plans
Extended Term Business
3/31/99

| Code | Count | Coverage | Res Run | Stat Res |
|------|-------|----------|---------|----------|
| C02 | 3 | 10,750 | 5,456 | 1,069 |
| C03 | 5 | 11,500 | 6,903 | 3,220 |
| C04 | 8 | 22,500 | 9,435 | 5,742 |
| C06 | 3 | 8,500 | 9,659 | 2,357 |
| C07 | 10 | 34,000 | 27,288 | 4,873 |
| C08 | 10 | 26,500 | 17,161 | 5,755 |
| C25 | 17 | 47,881 | 59,587 | 6,248 |
| C26 | 1 | 5,160 | 6,579 | 126 |
| C27 | 3 | 12,681 | 14,719 | 810 |
| C29 | 1 | 3,505 | 3,100 | 378 |
| C2A | 15 | 53,239 | 57,021 | 9,964 |
| C2C | 1 | 5,000 | 3,467 | 192 |
| C2F | 48 | 177,223 | 113,510 | 14,579 |
| C32 | 2 | 2,368 | 3,027 | 721 |
| C33 | 3 | 4,759 | 6,184 | 1,332 |
| C34 | 2 | 3,281 | 4,135 | 126 |
| C35 | 15 | 42,691 | 53,966 | 9,677 |
| C37 | 7 | 28,660 | 30,236 | 2,930 |
| C38 | 4 | 12,761 | 14,388 | 897 |
| C3A | 20 | 61,629 | 66,469 | 12,180 |
| C3E | 2 | 4,700 | 3,099 | 388 |
| C3F | 53 | 170,620 | 110,133 | 20,578 |
| C56 | 2 | 8,000 | 10,388 | 1,194 |
| C57 | 2 | 5,000 | 6,761 | 514 |
| C58 | 1 | 3,500 | 3,371 | 857 |
| C75 | 1 | 3,289 | 2,547 | 827 |
| U25 | 4 | 19,614 | 24,406 | 5,325 |
| U2F | 1 | 3,000 | 1,909 | 121 |
| U32 | 1 | 6,453 | 8,207 | 2,381 |
| U33 | 1 | 943 | 1,215 | 476 |
| U35 | 6 | 10,936 | 13,870 | 1,371 |
| U37 | 1 | 1,216 | 1,253 | 35 |
| U39 | 1 | 2,393 | 1,871 | 81 |
| U3F | 7 | 21,296 | 11,897 | 3,539 |
| | 261 | 835,548 | 713,218 | 120,859 |

Settlers Life Insurance
Deficiency Reserves
Valuation Date 12/31/98

| Class Code | Issue Year | Issue Age | Benefit Amount | Gross Premiums | Net Premium | Diff in Prem | PPP | Tally | Def V |
|---|---|---|---|---|---|---|---|---|---|
| C2A | 1993 | 43 | 3,599 | 121.20 | 129.87 | 8.67 | 10 | 1 | 127.58 |
| C2A | 1993 | 45 | 3,666 | 236.90 | 260.68 | 23.78 | 10 | 2 | 177.85 |
| C2A | 1993 | 46 | 15,707 | 374.39 | 391.83 | 17.44 | 10 | 3 | 372.10 |
| C2A | 1993 | 48 | 4,000 | 246.10 | 262.52 | 16.42 | 10 | 2 | 133.44 |
| C2A | 1993 | 49 | 6,099 | 259.17 | 263.28 | 4.11 | 10 | 2 | 50.85 |
| C2F | 1993 | 16 | 2,000 | 90.00 | 95.61 | 5.61 | 15 | 1 | 86.74 |
| C2F | 1993 | 28 | 2,968 | 90.00 | 95.73 | 5.73 | 15 | 1 | 131.20 |
| C2F | 1993 | 29 | 5,000 | 90.00 | 95.79 | 5.79 | 15 | 1 | 223.19 |
| C2F | 1993 | 39 | 2,300 | 90.00 | 97.07 | 7.07 | 15 | 1 | 123.90 |
| C2F | 1993 | 41 | 6,258 | 180.01 | 195.02 | 15.01 | 15 | 2 | 356.52 |
| C2F | 1993 | 42 | 6,934 | 182.40 | 195.50 | 13.10 | 15 | 2 | 344.02 |
| C2F | 1993 | 43 | 1,000 | 91.20 | 98.03 | 6.83 | 15 | 1 | 51.61 |
| C2F | 1993 | 44 | 4,090 | 92.39 | 98.32 | 5.93 | 15 | 1 | 182.77 |
| C2F | 1993 | 46 | 23,745 | 561.57 | 594.06 | 32.49 | 15 | 6 | 962.92 |
| C2F | 1993 | 49 | 7,500 | 97.20 | 100.32 | 3.12 | 15 | 1 | 173.21 |
| C2F | 1993 | 50 | 4,300 | 99.60 | 100.86 | 1.26 | 15 | 1 | 39.92 |
| C2F | 1993 | 66 | 6,069 | 242.41 | 244.28 | 1.87 | 15 | 1 | 35.18 |
| C2F | 1993 | 67 | 15,000 | 494.40 | 499.68 | 5.28 | 15 | 4 | 120.18 |
| C2F | 1993 | 68 | 5,000 | 378.00 | 384.00 | 6.00 | 15 | 3 | 59.35 |
| C2F | 1993 | 69 | 5,600 | 259.20 | 262.84 | 3.64 | 15 | 2 | 59.06 |
| C2F | 1993 | 70 | 5,000 | 268.80 | 270.40 | 1.60 | 15 | 2 | 22.61 |
| C27 | 1993 | 46 | 5,602 | 153.61 | 172.63 | 19.02 | 7 | 1 | 156.90 |
| C27 | 1993 | 54 | 5,012 | 171.60 | 175.63 | 4.03 | 7 | 1 | 29.67 |
| C28 | 1993 | 39 | 2,298 | 136.81 | 153.69 | 16.88 | 8 | 1 | 93.00 |
| C28 | 1993 | 49 | 2,298 | 147.62 | 155.94 | 8.32 | 8 | 1 | 45.63 |
| C3A | 1993 | 26 | 7,500 | 120.00 | 127.87 | 7.87 | 10 | 1 | 243.26 |
| C3A | 1993 | 39 | 5,000 | 120.00 | 128.79 | 8.79 | 10 | 1 | 180.23 |
| C3A | 1993 | 40 | 4,685 | 120.00 | 128.92 | 8.92 | 10 | 1 | 171.26 |
| C3A | 1993 | 41 | 4,557 | 120.00 | 129.07 | 9.07 | 10 | 1 | 169.26 |
| C3A | 1993 | 43 | 2,666 | 121.22 | 129.40 | 8.18 | 10 | 1 | 89.16 |
| C3A | 1993 | 48 | 2,986 | 128.40 | 130.57 | 2.17 | 10 | 1 | 26.33 |
| C3A | 1993 | 49 | 6,262 | 129.60 | 130.89 | 1.29 | 10 | 1 | 32.77 |
| C3F | 1993 | 9 | 3,243 | 89.99 | 95.22 | 5.23 | 15 | 1 | 131.21 |
| C3F | 1993 | 12 | 3,243 | 89.99 | 95.38 | 5.39 | 15 | 1 | 135.11 |
| C3F | 1993 | 19 | 2,000 | 90.00 | 95.45 | 5.45 | 15 | 1 | 84.29 |
| C3F | 1993 | 23 | 3,000 | 90.00 | 95.44 | 5.44 | 15 | 1 | 126.16 |
| C3F | 1993 | 25 | 3,000 | 90.00 | 95.48 | 5.48 | 15 | 1 | 127.01 |
| C3F | 1993 | 28 | 3,000 | 90.00 | 95.59 | 5.59 | 15 | 1 | 129.37 |
| C3F | 1993 | 30 | 3,000 | 90.00 | 95.71 | 5.71 | 15 | 1 | 131.97 |
| C3F | 1993 | 31 | 5,000 | 90.00 | 95.79 | 5.79 | 15 | 1 | 222.84 |
| C3F | 1993 | 33 | 6,000 | 180.00 | 191.94 | 11.94 | 15 | 2 | 275.18 |
| C3F | 1993 | 34 | 5,000 | 90.00 | 96.08 | 6.08 | 15 | 1 | 233.28 |
| C3F | 1993 | 37 | 9,000 | 270.00 | 289.44 | 19.44 | 15 | 3 | 445.78 |
| C3F | 1993 | 38 | 3,000 | 90.00 | 96.64 | 6.64 | 15 | 1 | 152.03 |

### Settlers Life Insurance
### Deficiency Reserves
### Valuation Date 12/31/98

| Class Code | Issue Year | Issue Age | Benefit Amount | Gross Premiums | Net Premium | Diff in Prem | PPP | Tally | Def V |
|---|---|---|---|---|---|---|---|---|---|
| C3F | 1993 | 39 | 3,000 | 90.00 | 96.81 | 6.81 | 15 | 1 | 155.67 |
| C3F | 1993 | 42 | 3,244 | 91.18 | 97.41 | 6.23 | 15 | 1 | 153.08 |
| C3F | 1993 | 44 | 6,000 | 184.80 | 195.84 | 11.04 | 15 | 2 | 249.59 |
| C3F | 1993 | 46 | 3,205 | 93.60 | 98.53 | 4.93 | 15 | 1 | 118.33 |
| C3F | 1993 | 47 | 5,295 | 189.50 | 197.78 | 8.28 | 15 | 2 | 163.58 |
| C3F | 1993 | 49 | 4,090 | 97.20 | 99.72 | 2.52 | 15 | 1 | 76.29 |
| C3F | 1993 | 50 | 5,500 | 199.20 | 200.40 | 1.20 | 15 | 2 | 24.32 |
| C37 | 1993 | 29 | 3,395 | 148.81 | 170.32 | 21.51 | 7 | 1 | 107.73 |
| C37 | 1993 | 33 | 4,835 | 297.63 | 340.96 | 43.33 | 7 | 2 | 154.50 |
| C37 | 1993 | 35 | 3,695 | 148.81 | 170.61 | 21.80 | 7 | 1 | 118.79 |
| C37 | 1993 | 37 | 995 | 148.82 | 170.76 | 21.94 | 7 | 1 | 32.19 |
| C37 | 1993 | 41 | 3,395 | 148.81 | 171.16 | 22.35 | 7 | 1 | 111.83 |
| C37 | 1993 | 46 | 5,874 | 153.61 | 171.89 | 18.28 | 7 | 1 | 158.12 |
| C37 | 1993 | 48 | 4,158 | 157.20 | 172.31 | 15.11 | 7 | 1 | 92.47 |
| C37 | 1993 | 50 | 11,358 | 323.99 | 345.66 | 21.67 | 7 | 2 | 181.02 |
| C37 | 1993 | 51 | 3,992 | 164.40 | 173.13 | 8.73 | 7 | 1 | 51.25 |
| C37 | 1993 | 52 | 10,681 | 333.59 | 346.92 | 13.33 | 7 | 2 | 104.65 |
| C37 | 1993 | 53 | 12,340 | 338.41 | 347.62 | 9.21 | 7 | 2 | 83.50 |
| C37 | 1993 | 54 | 3,690 | 171.61 | 174.19 | 2.58 | 7 | 1 | 13.98 |
| C37 | 1993 | 55 | 18,560 | 696.02 | 698.44 | 2.42 | 7 | 4 | 16.49 |
| | | | 350,489 | | | | | | 9.433 |

**Settlers Life Insurance
Deficiency Reserves
12/31/98 Inforce**

| Val Year | Reserve |
|----------|---------|
| 1998 | 9,433 |
| 1999 | 7,581 |
| 2000 | 6,134 |
| 2001 | 5,146 |
| 2002 | 4,133 |
| 2003 | 3,293 |
| 2004 | 2,635 |
| 2005 | 1,937 |
| 2006 | 1,196 |
| 2007 | 407 |

Settlers Life Insurance
Paid-Up Reserves
Valuation Date 12/31/98

| Class | Issue Age | Mortality | Issue Year | Face Amount | Att Age | Reserve Current | Next | Reserve |
|-------|-----------|-----------|------------|-------------|---------|-----------------|------|---------|
| C2F | 30 | G 1980 CSO ALB 5.5% | 1992 | 802 | 36 | 137 | 143 | 140 |
| C3D | 70 | G 1980 CSO ALB 5.5% | 1991 | 404 | 77 | 277 | 282 | 280 |
| C3D | 70 | G 1980 CSO ALB 5.5% | 1991 | 404 | 77 | 277 | 282 | 280 |
| C3F | 50 | G 1980 CSO ALB 5.5% | 1992 | 1,081 | 56 | 407 | 422 | 415 |
| C35 | 40 | G 1980 CSO ALB 5.0% | 1993 | 1,875 | 45 | 517 | 537 | 527 |
| C2F | 1 | G 1980 CSO ALB 5.0% | 1993 | 779 | 6 | 50 | 51 | 51 |
| C33 | 81 | G 1980 CSO ALB 5.5% | 1991 | 649 | 88 | 528 | 534 | 531 |
| C2A | 62 | G 1980 CSO ALB 5.5% | 1992 | 2,330 | 68 | 1,285 | 1,321 | 1,303 |
| C2A | 62 | G 1980 CSO ALB 5.0% | 1993 | 1,366 | 67 | 770 | 790 | 780 |
| C2F | 32 | G 1980 CSO ALB 5.5% | 1992 | 804 | 38 | 149 | 156 | 153 |
| U35 | 72 | G 1980 CSO ALB 5.0% | 1993 | 891 | 77 | 629 | 641 | 635 |
| U35 | 72 | G 1980 CSO ALB 5.0% | 1993 | 2,109 | 77 | 1,489 | 1,516 | 1,503 |
| C25 | 63 | G 1980 CSO ALB 5.5% | 1991 | 413 | 70 | 240 | 247 | 244 |
| C3A | 53 | G 1980 CSO ALB 5.5% | 1990 | 664 | 61 | 297 | 306 | 302 |
| U3F | 43 | G 1980 CSO ALB 5.5% | 1992 | 2,171 | 49 | 630 | 655 | 643 |
| C2A | 34 | G 1980 CSO ALB 5.5% | 1991 | 3,169 | 41 | 667 | 695 | 681 |
| C3F | 64 | G 1980 CSO ALB 5.5% | 1991 | 2,286 | 71 | 1,366 | 1,401 | 1,384 |
| C2F | 65 | G 1980 CSO ALB 5.5% | 1990 | 2,721 | 73 | 1,708 | 1,748 | 1,728 |
| C3F | 25 | G 1980 CSO ALB 5.5% | 1991 | 3,306 | 32 | 474 | 495 | 485 |
| C33 | 55 | G 1980 CSO ALB 5.5% | 1992 | 2,996 | 61 | 1,338 | 1,382 | 1,360 |
| C2F | 26 | G 1980 CSO ALB 5.0% | 1993 | 873 | 31 | 139 | 145 | 142 |
| C35 | 76 | G 1980 CSO ALB 5.0% | 1993 | 2,194 | 81 | 1,658 | 1,684 | 1,671 |
| C39 | 66 | G 1980 CSO ALB 5.5% | 1992 | 1,360 | 72 | 833 | 854 | 844 |
| C39 | 76 | G 1980 CSO ALB 5.0% | 1993 | 835 | 81 | 631 | 641 | 636 |
| C2A | 57 | G 1980 CSO ALB 5.5% | 1992 | 2,358 | 63 | 1,123 | 1,158 | 1,141 |
| C37 | 67 | G 1980 CSO ALB 5.5% | 1991 | 2,629 | 74 | 1,689 | 1,727 | 1,708 |
| C3A | 68 | G 1980 CSO ALB 5.5% | 1992 | 5,566 | 74 | 3,576 | 3,657 | 3,617 |
| C35 | 58 | G 1980 CSO ALB 5.5% | 1992 | 171 | 64 | 84 | 87 | 86 |
| C35 | 58 | G 1980 CSO ALB 5.5% | 1992 | 46 | 64 | 23 | 23 | 23 |
| C38 | 58 | G 1980 CSO ALB 5.5% | 1992 | 1,542 | 64 | 757 | 780 | 769 |
| C2F | 29 | G 1980 CSO ALB 5.5% | 1992 | 3,281 | 35 | 535 | 559 | 547 |
| C27 | 69 | G 1980 CSO ALB 5.5% | 1992 | 2,434 | 75 | 1,599 | 1,633 | 1,616 |
| C3F | 49 | G 1980 CSO ALB 5.5% | 1992 | 2,040 | 55 | 742 | 769 | 756 |
| C33 | 69 | G 1980 CSO ALB 5.5% | 1992 | 3,334 | 75 | 2,190 | 2,237 | 2,214 |

29.195

04/07/99

Settlers Life Insurance
· Paid-Up Reserves
Valuation Date 12/31/99

| Class | Issue Age | Mortality | Issue Year | Face Amount | Att Age | Reserve | | Reserve |
|-------|-----------|-----------|------------|-------------|---------|---------|------|---------|
| | | | | | | Current | Next | |
| C2F | 30 | G 1980 CSO ALB 5.5% | 1992 | 802 | 37 | 143 | 149 | 146 |
| C3D | 70 | G 1980 CSO ALB 5.5% | 1991 | 404 | 78 | 282 | 287 | 285 |
| C3D | 70 | G 1980 CSO ALB 5.5% | 1991 | 404 | 78 | 282 | 287 | 285 |
| C3F | 50 | G 1980 CSO ALB 5.5% | 1992 | 1,081 | 57 | 422 | 437 | 430 |
| C35 | 40 | G 1980 CSO ALB 5.0% | 1993 | 1,875 | 46 | 537 | 557 | 547 |
| C2F | 1 | G 1980 CSO ALB 5.0% | 1993 | 779 | 7 | 51 | 53 | 52 |
| C33 | 81 | G 1980 CSO ALB 5.5% | 1991 | 649 | 89 | 534 | 540 | 537 |
| C2A | 62 | G 1980 CSO ALB 5.5% | 1992 | 2,330 | 69 | 1,321 | 1,356 | 1,339 |
| C2A | 62 | G 1980 CSO ALB 5.0% | 1993 | 1,366 | 68 | 790 | 810 | 800 |
| C2F | 32 | G 1980 CSO ALB 5.5% | 1992 | 804 | 39 | 156 | 162 | 159 |
| U35 | 72 | G 1980 CSO ALB 5.0% | 1993 | 891 | 78 | 641 | 652 | 647 |
| U35 | 72 | G 1980 CSO ALB 5.0% | 1993 | 2,109 | 78 | 1,516 | 1,543 | 1,530 |
| C25 | 63 | G 1980 CSO ALB 5.5% | 1991 | 413 | 71 | 247 | 253 | 250 |
| C3A | 53 | G 1980 CSO ALB 5.5% | 1990 | 664 | 62 | 306 | 316 | 311 |
| U3F | 43 | G 1980 CSO ALB 5.5% | 1992 | 2,171 | 50 | 655 | 681 | 668 |
| C2A | 34 | G 1980 CSO ALB 5.5% | 1991 | 3,169 | 42 | 695 | 724 | 710 |
| C3F | 64 | G 1980 CSO ALB 5.5% | 1991 | 2,286 | 72 | 1,401 | 1,435 | 1,418 |
| C2F | 65 | G 1980 CSO ALB 5.5% | 1990 | 2,721 | 74 | 1,748 | 1,788 | 1,768 |
| C3F | 25 | G 1980 CSO ALB 5.5% | 1991 | 3,306 | 33 | 495 | 516 | 506 |
| C33 | 55 | G 1980 CSO ALB 5.5% | 1992 | 2,996 | 62 | 1,382 | 1,426 | 1,404 |
| C2F | 26 | G 1980 CSO ALB 5.0% | 1993 | 873 | 32 | 145 | 151 | 148 |
| C35 | 76 | G 1980 CSO ALB 5.0% | 1993 | 2,194 | 82 | 1,684 | 1,709 | 1,697 |
| C39 | 66 | G 1980 CSO ALB 5.5% | 1992 | 1,360 | 73 | 854 | 874 | 864 |
| C39 | 76 | G 1980 CSO ALB 5.0% | 1993 | 835 | 82 | 641 | 650 | 646 |
| C2A | 57 | G 1980 CSO ALB 5.5% | 1992 | 2,358 | 64 | 1,158 | 1,193 | 1,176 |
| C37 | 67 | G 1980 CSO ALB 5.5% | 1991 | 2,629 | 75 | 1,727 | 1,764 | 1,746 |
| C3A | 68 | G 1980 CSO ALB 5.5% | 1992 | 5,566 | 75 | 3,657 | 3,734 | 3,696 |
| C35 | 58 | G 1980 CSO ALB 5.5% | 1992 | 171 | 65 | 87 | 89 | 88 |
| C35 | 58 | G 1980 CSO ALB 5.5% | 1992 | 46 | 65 | 23 | 24 | 24 |
| C38 | 58 | G 1980 CSO ALB 5.5% | 1992 | 1,542 | 65 | 780 | 803 | 792 |
| C2F | 29 | G 1980 CSO ALB 5.5% | 1992 | 3,281 | 36 | 559 | 583 | 571 |
| C27 | 69 | G 1980 CSO ALB 5.5% | 1992 | 2,434 | 76 | 1,633 | 1,666 | 1,650 |
| C3F | 49 | G 1980 CSO ALB 5.5% | 1992 | 2,040 | 56 | 769 | 796 | 783 |
| C33 | 69 | G 1980 CSO ALB 5.5% | 1992 | 3,334 | 76 | 2,237 | 2,282 | 2,260 |

29,933

## MASTER AGREEMENT

THIS MASTER AGREEMENT made this 30ᵗʰ day of October, 1998, effective as of that same date (the "Agreement Effective Date"), is by and among FIRST NATIONAL LIFE INSURANCE COMPANY OF AMERICA, of Jackson, Mississippi (hereinafter referred to as "BUYER"), and PEOPLES BENEFIT LIFE INSURANCE COMPANY (formerly known as Providian Life And Health Insurance Company) of Missouri, and VETERANS LIFE INSURANCE COMPANY of Illinois (hereinafter collectively referred to as "SELLER" unless the terms of this Agreement dictate the individual reference of the parties).

## RECITALS

WHEREAS, SELLER, effective as of the Agreement Effective Date or such other date as defined herein, has decided to sell and transfer to BUYER and BUYER has decided to purchase from SELLER, various blocks of insurance business, annuities, and life insurance policies (herein defined and collectively referred to as the "Insurance Business"). The Insurance Business is identified by product identification in Exhibit "A" attached hereto and made a part hereof; and

WHEREAS, the parties agree that the transfer contemplated herein will occur through the form of assumption reinsurance. The parties further agree that certain filing and regulatory requirements must be met before the assumption arrangement can be placed in effect and, as such, the parties agree that the sale and transfer of the Insurance Business will be placed, as of the Agreement Effective Date, under 100% quota share reinsurance as set forth in the Reinsurance Agreement, a copy of which is attached hereto as Exhibit "B" and made a part hereof until such time as the assumption arrangement can occur under the Agreement of Assumption, a copy of which is attached hereto as Exhibit "C" and made a part hereof; and

WHEREAS, under the respective Articles of Incorporation, By-Laws and under applicable laws, SELLER is authorized and empowered to cede through assumption reinsurance, and BUYER is authorized and empowered to accept for its own part said assumption reinsurance of the insurance contracts and all liabilities, obligations, and rights arising out of or relating to such insurance contracts; and

WHEREAS, it is the desire of the parties that the terms and conditions pertaining to the assumption reinsurance of the Insurance Business be set forth in writing.

## WITNESSETH

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements hereinafter set forth, the parties agree as follows:



EXHIBIT
2

## ARTICLE I
## REINSURANCE

The Insurance Business shall be initially transferred to and reinsured by the BUYER by separate transfers as further defined below:

a.    BUYER shall provide SELLER with written notification of BUYER's readiness to administer certain portions of the Insurance Business which administration shall occur no later than December 31, 1998. Upon such notification, SELLER shall transfer and BUYER shall accept as reinsurance that certain Insurance Business effective as of the first day of the month immediately following the month in which BUYER notified SELLER that BUYER's system was ready to administer that portion of the Insurance Business (hereinafter referred to as "Transfer Effective Date"). The Insurance Business transferred shall be fully reinsured by the BUYER from the SELLER, as the ceding Reinsurer, under a 100% quota share Reinsurance Agreement. The terms and conditions governing the reinsurance arrangement are set forth in the Reinsurance Agreement, a copy of which is attached hereto as Exhibit B and made part hereof.

b.    Upon transfer of certain portions of Insurance Business, the parties agree that Exhibit A shall be amended within ten (10) calendar days to reflect the Transfer Effective Date applicable to such transferred business.

c.    BUYER shall continue to provide SELLER with written notification of BUYER's readiness to administer the remaining portions of Insurance Business, which portions shall be transferred to BUYER and reinsured by BUYER pursuant to paragraph a. above. Each new date of transfer shall become the Transfer Effective Date for that certain portion of Insurance Business that was just transferred.

d.    Except for statutory limitations or other reporting required by law or regulation, SELLER shall not, directly or indirectly, at any time, sell, transfer, convey, or make available to any third party, including but not limited to, another insurance carrier, in any form or manner any of the Insurance Business and any of the records or information, computer data, or support systems related thereto.

e.    BUYER agrees to reinsure, under the applicable circumstances recognized herein, all forms of group and individual insurance contracts relating to the Insurance Business underwritten by SELLER, subject to the terms and conditions of the Reinsurance Agreement.

f.    In those states where BUYER is not licensed as a reinsurer, BUYER agrees to obtain, in favor of SELLER, a letter of credit in an amount determined by the SELLER from its statutory interpretation of the required provisions governing said reinsurance arrangement for the purpose of SELLER receiving statutory reserve

credit on SELLER's business. Should a state not permit the BUYER to assume the Insurance Business because BUYER is not licensed, then the Insurance Business shall be placed under reinsurance.

## ARTICLE II
## ASSUMPTION

a.  BUYER agrees to assume and SELLER agrees to transfer by way of assumption, all forms of group and individual insurance contracts relating to the Insurance Business (hereinafter referred to as the "Assumed Policies"), subject to the terms and conditions of this Master Agreement and the Agreement of Assumption. The Assumption Date of all such Insurance Business shall be December 31, 1998 except as to any state where regulatory approval is required, in which case the Assumption Date shall be the first day of the month immediately following the month when such approval is received (hereinafter collectively referred to as the "Assumption Date"). A listing of the Insurance Business to be assumed for which SELLER is currently the insurance carrier is set forth as Exhibit "A" attached hereto. SELLER represents that this is a complete and accurate listing of all the Insurance Business as of the Agreement Effective Date.

b.  SELLER agrees to provide BUYER with representative policy forms and certificates no later than five (5) days prior to the Transfer Effective Date, information or data in its possession sufficient to identify the terms and to administer any such policy forms or certificates no later than the Transfer Effective Date, and any other underlying information or data relating to the Insurance Business, within ten (10) business days after the Transfer Effective Date pursuant to the reinsurance arrangements in Article 1 paragraphs a. and b.

c.  The parties acknowledge that, although it may be possible to transfer some of the Insurance Business from SELLER to BUYER via assumption as of the Assumption Date, certain states have adopted laws and regulations governing assumptions which require prior approval of the transaction and/or assumption certificates or prior consent of the policyholder. Nevertheless, it is agreed that SELLER will transfer the Insurance Business subject to this Master Agreement through assumption as of the Assumption Date, in accordance with the terms and conditions of the Agreement of Assumption attached hereto as Exhibit "C."

d.  Should any insured not consent (some states allow the insured to consent to the transactions or to opt out) to the assumption of any policy or certificate relative to the Insurance Business, or should any state regulatory authority fail to approve the assumption of any of the Insurance Business, BUYER agrees to reinsure one hundred percent (100%) of the risk with respect to that policy or certificate as of the Assumption Date pursuant to the Reinsurance provisions of Article I of this Master Agreement and the terms and conditions of the Reinsurance Agreement, a copy of which is attached hereto as Exhibit "B" and made a part hereof.

3

e.    SELLER represents and warrants that to the best of its knowledge and belief that there are no existing agreements, now known, liens or judgments placed against, nor pending against, nor threatened litigation against, any of the Insurance Business, including any restriction on the right of BUYER to assume the Insurance Business, except for litigation arising in the ordinary course of business. SELLER has title in and to such Insurance Business, and all such title and interest in and to such Insurance Business as hereinbefore described is being transferred to BUYER in accordance with the terms set forth herein. SELLER will not enter into any contract, arrangement, settlement, or negotiation that will encumber such Insurance Business and/or prevent the orderly sale and transfer to BUYER at time of assumption.

f.    BUYER shall be responsible for the continued compliance of the policies and certificates connected with the Insurance Business in effect prior to or after the Assumption Date. Said duties shall include, but not be limited to, policy form and rate filings with appropriate state insurance departments, submission of all required state insurance department forms and surveys, and the remittance of any and all premium refunds properly owed in connection with the Insurance Business for experience years which occur after the Transfer Effective Date.

g.    BUYER shall be responsible for responding to all insurance department complaints associated with the Insurance Business and SELLER shall be responsible for forwarding to BUYER all information in its possession needed to respond to any such complaint, if available. Should BUYER receive any formal inquiry or state insurance department complaint concerning the Insurance Business which arises or arose prior to the Transfer Effective Date, BUYER shall immediately forward such notice or insurance department complaint to SELLER, via fax and overnight express, in order for SELLER to properly respond. Should SELLER receive any formal inquiry or state insurance department complaint concerning the business assumed by BUYER which arises on or after the Transfer Effective Date, SELLER shall immediately forward such notice or insurance department complaint to BUYER, via fax or overnight express for BUYER to properly respond.

h.    SELLER and BUYER will cooperate and take all reasonable action required to obtain all consents, approvals and agreements of, and to give and make all notices and filings with, any governmental authorities and regulatory agencies, necessary to authorize, approve or permit the consummation of the transactions contemplated by this Master Agreement, the Reinsurance Agreement, and the Agreement of Assumption, where required.

i.    SELLER agrees to maintain such qualified staff support and support services, until such time as all the Insurance Business is transferred, in order to facilitate the proper and smooth transition of the Insurance Business to BUYER. All costs of maintaining such support personnel and support services shall be the responsibility of SELLER.

4

j.  BUYER acknowledges that there are certain agency agreements that apply to the Insurance Business under which agents are receiving monthly statements and commissions as set forth on Exhibit D attached hereto and made a part hereof. BUYER acknowledges and agrees that all such agent agreements and accompanying obligations applicable to collected premiums of the Insurance Business shall be assumed by BUYER upon the Transfer Effective Date. BUYER and SELLER shall cooperate and take all reasonable action required to identify and determine the obligations and method of payment for such applicable agent agreements.

## ARTICLE III
## PURCHASE PRICE

In consideration for this assumption reinsurance arrangement and acceptance of the terms and conditions of this Master Agreement, SELLER shall pay to BUYER the following:

a.  within ten (10) business days of the Transfer Effective Date for each transfer of Insurance Business, cash equal to 98.1% of the actual net statutory liabilities in effect as of the last day of the month immediately preceding the transfer of certain Insurance Business.

b.  If the parties learn, subsequent to each Transfer Effective Date, that an insured or annuitant died prior to the applicable date of transfer, BUYER shall refund to SELLER within ten (10) business days cash equal to 98.1% of the net statutory liabilities less any applicable policy loss on the portion of Insurance Business represented by the insured or annuitant with daily interest at a rate of .01643%, and SELLER shall be responsible for disposition of any such claims.

c.  As used within this Article III, "net statutory liabilities" are defined as statutory policy reserves plus advanced premium less net due and deferred premium less policy loans.

## ARTICLE IV
## LITIGATION AND INDEMNIFICATION

Except as otherwise provided in this Article IV, SELLER is responsible for all litigation relating to the Insurance Business where the suit either has commenced prior to the Transfer Effective Date or relates to any claim with an incurred date of loss prior to the Transfer Effective Date, and BUYER is responsible for all litigation relating to the Insurance Business where the suit both has commenced on or after the Transfer Effective Date and relates directly to any claim with an incurred date on or after the Transfer Effective Date. Except as otherwise provided in this Article V, each party shall be fully responsible for all costs of litigation that arise from any such respective claim activity for which such party has responsibility, including the costs of defense of such litigation and attorneys' fees and any and all resulting settlement(s) of award(s).

5

For the purposes of this Article IV as relating to litigation and all other purposes of this Master Agreement, each of the parties hereto agrees to indemnify and hold harmless each of the other parties hereto from and against any and all losses, claims, demands, liabilities, costs, damages (including extra-contractual or punitive damages) (hereinafter collectively referred to as "Losses"), and expenses (including reasonable attorneys' fees) that the other party may incur by reason of any demand or action by any person or entity arising out of the wrongful acts or omissions (whether negligent, grossly negligent, intentional or otherwise wrongful) of the indemnifying party in the performance of its duties hereunder or otherwise relating to the Insurance Business. Nothing within the terms of this arrangement extends any liability to the parties beyond what has been agreed upon within the terms of this Master Agreement.

Should BUYER be in receipt of any suit papers relative to any claim for which it is determined that SELLER is a party or may be liable, BUYER will direct the suit papers to SELLER, initially via facsimile, and then, as soon as immediately possible, by overnight express. BUYER will keep SELLER informed of the status of the lawsuit, will report on a regular basis the expenses (including attorneys' fees) that have been incurred, and will provide SELLER copies of the applicable pleadings, if requested by SELLER. Should SELLER be in receipt of any suit papers relative to any claim for which it is determined that BUYER is a party or may be liable, SELLER will direct the suit papers to BUYER, initially via facsimile and then, as soon as possible by overnight express. SELLER will keep BUYER informed of the status of the lawsuit, will report on a regular basis the expenses (including attorneys' fees) that have been incurred, and will provide BUYER copies of the applicable pleadings, if requested by BUYER.

With respect to any Loss to which the indemnification and hold harmless provision of this Article IV may apply, the indemnitor is entitled to participate at its own expense in all proceedings and activities relating to the resolution of the claim, including participation in any associated litigation, as it may deem necessary to protect its interest in the Loss. To the extent the indemnitor's participation relieves the indemnitee of the need to participate in the proceedings or other activities, the indemnitor shall not be required to reimburse the indemnitee for expenses, including attorneys' fees. Where the indemnitor has acknowledged liability for any and all Loss associated with a matter in litigation, or in other circumstances as the parties may agree, the responsibility for the litigation assigned pursuant to the first paragraph of this Article IV may be transferred from the indemnitee(s) to the indemnitor.

## ARTICLE V
## ARBITRATION

The parties acknowledge and agree that the transactions contemplated herein, as well as the issuance of and payment of claims relating to the insurance policies that are the subject of this Master Agreement, substantially affect and impact interstate commerce. Therefore, all disputes or differences between SELLER and BUYER arising under or related to this Master Agreement upon which an amicable understanding cannot be reached within thirty (30) days shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, except as hereinafter provided, and judgment upon the award entered by the arbitrators may be entered in any court having jurisdiction thereof. The Court of Arbitrators

provided for herein shall construe this Master Agreement in light of the prevailing custom and practices in the insurance industry. The Court of Arbitrators shall consist of three neutral arbitrators who must be active or retired officers of insurance companies other than SELLER, BUYER or anyone of their affiliates, familiar with the insurance business. The parties agree that this Court of Arbitrators, if implemented under this Master Agreement, shall be held in Frazer, Pennsylvania or at another site mutually selected by the Arbitrators. The parties agree to arbitrate within thirty (30) days following the transmittal of written demand of either party to arbitrate any dispute arbitrable under this Master Agreement. Each of the parties shall appoint an arbitrator within thirty (30) days following notice of written demand to arbitrate, notifying the other party of the name and address of such arbitrator. If either party shall fail to appoint an arbitrator as herein provided, or should the two arbitrators so named fail to select the third arbitrator within thirty (30) days of their appointment, then, in either event, the President of the American Arbitration Association or its successor shall appoint such second and/or third arbitrator. The three arbitrators so selected shall constitute the Court of Arbitrators. A decision of a majority of the Court of Arbitrators shall be final and binding and there shall be no appeal therefrom. The Court of Arbitrators shall not be bound by legal rules of procedure and may receive evidence in such a way as to do justice between the parties. The Court of Arbitrators shall promptly enter an award that shall do justice between the parties and the award shall be supported by a written opinion. Except to the extent that the Court of Arbitrators decides otherwise, based on the equities of the situation, the fees of the third arbitrator and the direct costs of the arbitration shall be shared equally by the parties; all other costs of the respective parties, including without limitation the fees of the party's selected arbitrator and fees and expenses of the respective party's attorneys, shall be paid by the respective party, except to the extent that the Court of Arbitrators otherwise directs based on the equities of the situation.

## ARTICLE VI
## MISCELLANEOUS

a.    In the event BUYER executes a consent order with a given state insurance department or receives a final court or administrative order from a forum with the appropriate jurisdiction which states that this Master Agreement, as well as the Reinsurance Agreement, and Agreement of Assumption are in violation of said state's laws or regulations and which expressly prohibit BUYER from reinsuring or assuming the Insurance Business under the terms and conditions herein set forth, then the reinsurance and/or assumption of the Insurance Business with respect to the applicable state only if the Insurance Business shall cease as mutually agreed to by the parties. It is understood and agreed that the terms and conditions of this Master Agreement as well as the attached Reinsurance Agreement, and Agreement of Assumption shall remain in full force and effect with respect to all other states. It is further understood and agreed that each party will use its best efforts to consummate and make effective an alternative arrangement regarding the Insurance Business in force in the applicable state as to carry out the intent of this Master Agreement to transfer that such business from SELLER to BUYER.

7

b.  Subject to the terms and conditions herein provided, each party to this Master Agreement will use its best efforts to take, or cause to be taken, all action, to do, or cause to be done, all things, and to execute any documents necessary, proper or advisable to consummate and make effective the transactions contemplated by this Master Agreement and the other agreements contemplated hereby.

c.  Except as otherwise specifically provided herein, each party to this Master Agreement shall bear its respective expenses incurred in connection with the preparation, execution and performance of this Master Agreement and the transactions contemplated hereby, including, without limitation, all fees and expenses of agents, representatives, counsel, actuaries and accountants.

d.  Whenever this Master Agreement calls for the written notice on the part of any of the parties hereto, said notice requirements will be satisfied by mailing the same, by first class mail, postage prepaid, addressed to the concerned party as follows; unless this Master Agreement sets forth otherwise:

If to SELLER:       Peoples Benefit Life Insurance Company
                    (formerly known as Providian Life and Health Insurance
                    Company)
                    20 Moores Road
                    Frazer, Pennsylvania 19355

      Attention:    Gilbert Fein, Assistant Vice President

With a copy to:     Stephanie A. Fox, Counsel

Note:  Lawsuits and Insurance Department Complaints:

      and           Veterans Life Insurance Company
                    20 Moores Road
                    Frazer, Pennsylvania 19355

      Attention:    Gilbert Fein, Assistant Vice President

With a copy to:     Stephanie A. Fox, Counsel

Note:  Lawsuits and Insurance Department Complaints:

If to BUYER:        First National Life Insurance Company of America
                    377 Riverside Drive
                    Suite 400
                    Franklin, Tennessee 37064

      Attention:    Wade Willis, Assistant Secretary

8

Note:  Lawsuits and Insurance Department Complaints:

e.  Except as may otherwise be required by law, no publicity release or announcement concerning this Master Agreement or the transactions contemplated hereby shall be made without advance approval thereof by both SELLER and BUYER.

f.  Should either party to this Master Agreement fail to comply with any of the terms of this Master Agreement, and if this is shown to be unintentional and the result of a misunderstanding, clerical error, oversight, or miscoding of data on the part of either SELLER or BUYER, then both parties shall be restored to the position they would have occupied had no such error, oversight, misunderstanding or miscoding occurred; provided, further, that such adjustments (financial or otherwise) as are necessary to remedy the situation shall be effected.

g.  This Master Agreement shall be binding upon and inure to the benefit of the parties and their respective successors, assigns and legal representatives.  Neither this Master Agreement nor any right hereunder, may  be assigned by any party without the consent of all other parties.

h.  If this Master Agreement terminates, the parties hereto shall keep confidential and shall not use in any manner any information or documents obtained from the other, unless ordered to do so by a court, governmental or regulatory body having jurisdiction in the premises, or readily ascertainable from public or published information, or trade sources, or already known by the party obtaining such information hereunder independently of any investigation of the other party, or received from a third party not under an obligation to such other party or any of its affiliates to keep such information confidential.   If this Master Agreement terminates, any documents obtained by either party from the other or any of such other party's affiliates shall be either returned or destroyed at the discretion of the party that originally supplied the document.

i.  In the event that any one or more of the provisions contained in this Master Agreement, or in any other document, agreement or instrument referred to herein, shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Master Agreement or any other such document, agreement or instrument.

j.  Nothing in this Master Agreement is intended or shall be construed to give any person, other than the parties hereto and the other persons referred to in the recitals to this Agreement, any legal or equitable right, remedy or claim under or in respect of this Master Agreement or any provision contained herein.

9

k.  This Master Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument. Each counterpart may consist of a number of copies hereof each signed by less than all, but together signed by all of the parties hereto.

l.  The headings in this Master Agreement are for reference only, and shall not affect the interpretation of this Master Agreement.

m.  No amendment or modification of, or supplement to, this Master Agreement or any exhibit hereto shall be binding unless in writing and duly executed by all parties with executed copies being delivered to each of the parties.

n.  This Master Agreement shall be construed in accordance with and governed by the laws of the Commonwealth of Pennsylvania.

o.  This Master Agreement and the other agreements contemplated by this Master Agreement and attached hereto as exhibits and all other understandings between the parties are set forth herein and the document and the exhibits thereto shall constitute the entire agreement of the parties.

p.  Should it be determined that there is a conflict in language or the interpretation thereof between the Reinsurance Agreement, Agreement of Assumption and the provisions of this Master Agreement as to liability of the parties hereto, the provisions of this Master Agreement shall be controlling in the settlement of any issue or dispute.

    **IN WITNESS WHEREOF,** the parties hereto have caused this Master Agreement to be executed as of the day and year first written above.

WITNESS:                                    PEOPLES BENEFIT LIFE INSURANCE
                                            COMPANY
                                            (formerly known as Providian Life and Health
                                            Insurance Company)



                                            By: Brian A. Suill, Vice President

10

WITNESS:

VETERANS LIFE INSURANCE COMPANY

By: Brian A. Smith, Vice President

WITNESS:

Dennis L. Roos

FIRST NATIONAL LIFE INSURANCE
COMPANY OF AMERICA

By: John A. Hackney , President

h:\legal\saf.FNLIC.DOC

11

## EXHIBIT A

## <u>INSURANCE BUSINESS</u>

This page represents the list of insurance business, attached hereto, to be transferred by Peoples Benefit Life Insurance Company (formerly Providian Life and Health Insurance Company) and Veterans Life Insurance Company to First National Life Insurance Company of America and the applicable date of transfer.

## EXHIBIT A

| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) | (14) | (15) | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Deferred Annuity Policies | Deferred Policies with Annuity Riders | Immediate Annuities (SPIA) | 8CNLC? Annuity | MBA Annuity | Paying Policies | With PDF Rider Policies | UL (Co's 601 & 602) | Other UL PLH (Co. 605) | Other UL VAIC (Co. 604) | Kroger Life (Co. 605) | VAIC IRA | Kroger IRA | VAIC SPDA | Agency Life Policies Issued < 1950 | |
| Administrative System | CHV | CHV | "Sheeter" | "Sheeter" | Database | CHV Shelter | CHV | LifeCom | LifeCom | LifeCom | LifeCom | Life70 | Vantage 1 | "Sheeter" | CHV | |
| **Studies** | Agency Life | Agency | Agency | Agency | Agency | Agency | Agency | Agency | | | | | | | Agency | |
| life Base Prem. Paying Policy Reserves | | | | | | | | | | | | | | | | |
| Annuos Premium Paying Policy Reserves | | | | | | | | | | | | | | | | |
| life Paid Up Policy Reserves | | | | | | | | | | | | | | | | |
| Annuity Base Policy Reserves | 5,549,019 | | 300,000 | 500,000 | 522,210 | | | | | | | | | | | 7,237,418 |
| Annuity Rider Policy Reserves | | 2,034,957 | | | | | | | | | | | | | | 2,034,957 |
| PDF Base Policy Reserve | | | | | | 78,910 | | | | | | | | | | 76,910 |
| PDF Rider Policy Reserve | | 435,062 | | | | 409,628 | 1,350,000 | 1,947,517 | 353,628 | 60,885 | 120,935 | 30,603 | 319,614 | 17,089 | 214,255 | 4,871,985 |
| Accumulated Dividends | | | | | | 109,864 | 1,171,348 | | | | | | | | | 1,171,348 |
| Supplemental Benefits Policy Reserve | | 4,039 | | | | 103 | 3,706 | | | | | | | | | 7,936 |
| Supplemental Policy Reserves | | 1,843 | | | | 104 | 690 | | | | | | | | | 2,537 |
| Net Deferred Premium | | 16,965 | | | | 2,142 | 29,928 | | | | | | | | | 51,107 |
| Net Deferred Premium | | 1,154 | | | | 418 | 4,175 | | | | | | | | | 6,784 |
| Net Due Premium | | 103 | | | | 193 | 2,576 | | | | | | | | | 2,839 |
| Advance Premium | | | | | | | | | | | | | | | | |
| WoP Reserve - Disabled Lives | 242 | 22,766 | | | | | | | | | | | | | | 23,006 |
| per/Claim Deduction | | | | | | | | | | | | | | | | |
| Policy Loans | | | | | | | | 275,183 | 315,599 | 14,328 | | | | | | 472,473 |
| **Total** | 5,548,261 | 2,468,860 | 300,000 | 500,000 | 522,210 | 487,089 | 2,455,382 | 1,872,334 | 315,599 | 36,937 | 120,935 | 30,603 | 319,614 | 17,089 | 214,181 | 16,009,135 |
| APF (000's) | 200,000 | 142,311 | 300,000 | 500,000 | 522,210 | 15,228 | 222,985 | 367,614 | 60,012 | 7,908 | 120,935 | 30,603 | 319,614 | 17,089 | 214,255 | 1,015,556 |
| # Policies | 2,033 | 376 | | | 54 | 167 | | 615 | 98 | 14 | 124 | 6 | 45 | 1 | 318 | 3,863 |
| # Riders | | 819 | | | | | | | | | | | | | | 819 |
| as of date: | 7/21/98 | 6/20/98 | | | 6/20/98 | 6/20/98 | 6/20/98 | 7/31/98 | 7/31/98 | 7/31/98 | 6/30/98 | 6/30/98 | 6/30/98 | 6/30/98 | 6/20/98 | 6/20/98 |
| | | estimated | estimated | estimated | | | | | | | | | | | | |

Note: Some of the above amounts are estimates. The exact amounts will be determined for each block as of the effective date of the transfer.