Settlers. Settlers was still liable to the **policyholders** on the subject book of business, even though FNL had stolen the Settlers Reserve Fund. As a result, on May 14, 1999 by order of the Circuit Court of Richmond, Virginia, Settlers was forced into liquidation proceedings in Virginia only two months later, and its individual owners (who had built up Settlers over the course of nearly half a century) lost a company that had **had** an estimated $20 million in equity prior to the fraud perpetrated by FNL. (Petition, R. 60, ¶ 3.)

    <u>D. FNLDefrauds Peoples and Veterans.</u>  In June 1998, a broker put Peoples and Veterans in touch with Franklin American Life Insurance Company ("FAL"), another company owned and controlled by Frankel through the Thunor Trust, to explore the possibility of FAL reinsuring certain blocks of insurance business originally underwritten by Peoples and Veterans. However, Peoples and Veterans objected to such a transaction with FAL because FAL's financial rating was not high enough to assure regulatory approval of the proposed transaction. As an alternative, FAL offered a substitute deal with FNL – FAL's highest-rated affiliate. (Petition, R. 72, ¶ 47.)

    On or about October 30, 1998, Peoples and Veterans entered into a Master Agreement, Reinsurance Agreement, and Assumption Agreement with FNL (collectively, the "P&V Agreements") to transfer certain blocks of insurance business from Peoples and Veterans to FNL, as well as the corresponding $14,689,593 Reserve Fund ("P&V Reserve Fund") (collectively the P&V Reserve Fund and Settlers Reserve Fund are referred to as the "Reserve Funds") that accompanied those blocks of insurance business. (Petition, R. 72, ¶ 48.) Pursuant to the P&V Agreements, Peoples and Veterans transferred the P&V Reserve Fund to FNL's account at First Tennessee Bank in November 1998 and early 1999. (Petition, R. 72, ¶ 49.)

    To induce Peoples and Veterans to enter into the P&V Agreements, FNL provided them

information regarding FNL's financial condition and its investment strategy that was false and misleading. FNL misrepresented that it was a solvent and **prosperous** company. (Petition, R. 72, 79,11148, 81.) FNL failed to inform Peoples and Veterans of FNL's true financial condition, failed to disclose that FNL had sent its own funds to an investment company secretly controlled by Frankel whose broker-dealer license had been permanently revoked in 1992, failed to disclose that Frankel controlled FNL and failed to disclose that Frankel and FNL planned to use the P&V Reserve Funds for the personal benefit of Frankel and others, rather than administering and paying claims under the insurance policies.

FNL intended from the first to defraud Peoples and Veterans and to immediately misappropriate the P&V Reserve Fund for the benefit of certain of FNL's insiders, e.g., Frankel, Hackney and Atnip. FNL acted quickly to consummate the fraud and transferred the P&V Reserve Fund from First Tennessee Bank to Frankel's Banque SCS Alliance Account. (Petition, R. 73, 50.)

**E. Petitioners' Reserve Funds Can Be Traced to the Forfeiture Proceedings.** The Petition lays out detailed allegations tracing the Reserve Funds obtained from Petitioners by fraud from the Petitioners' **bank** accounts to Frankel's account in Switzerland and on to the Forfeiture Proceedings. (Petition, R. 67-71, 75-77,11 31-46, 64-69.)

For example, the Settlers Reserve Fund was deposited in the Banque SCS Alliance account on April 12, 1999. (Petition, R. 67, ¶ 32.) Before the Settlers Reserve Fund was wired to the Banque SCS Alliance account, the balance of that account had dwindled to $931,946.62. (Petition, R. 66, ¶ 28.) On May 7, 1999, Frankel caused $28,000,000 to be transferred from the Banque SCS Alliance account to Bank Monte dei Paschi di Siena in Florence, Italy. (Petition, R. 67,133.) On May 14, 1999, the Banque SCS Alliance account had a balance of $30,384.30.

**(Petition, R. 67,134.)**

On June 27, 1999, the Banque SCS Alliance account was frozen pursuant to a request of the United States Government in accordance with a Mutual Legal Assistance Treaty between Switzerland and the United States. (Petition, R 67, ¶ 35.) On July 7, 1999, $26,499,980 was returned to the **Banque** SCS **Alliance account by** wire **transfer** from Bank Monte dei Paschi di Siena. (Petition, R. 68,136.)

In 1999, all funds in the Banque SCS Alliance account were frozen by the Swiss government pursuant to an order entered by Magistrate Barbey in Geneva, Switzerland. After months of negotiations with the United States Department of Justice, on or about June 28, 2000, the funds contained in the Banque SCS Alliance account, $29,035,500, were wire transferred to Account 20X6875(06), held in the name of U.S. Customs Suspense Account, at the Federal Reserve Bank of New York. (Petition, R. 68,1 37.)

On July 6, 2001, the Internal Revenue Service Criminal Investigation seized the $29,035,500 pursuant to a seizure warrant issued by the Honorable Joan G. Margolis, United States Magistrate Judge of the United States District Court for the District of Connecticut. (Petition, it 68,138.) These assets are currently the subject of a civil forfeiture action pending before Judge Burns in the United States District Court for the District of Connecticut in a case entitled United States v. $29,035,500.00, Civil No. 3:01CV1515(EBB). (Petition, R. 68,140.)

The Settlers Reserve Fund is the only source of the vast majority of the funds seized in the Banque SCS Alliance account. Prior to the transfer of the Settlers Reserve Fund on April 9, 1999, the Banque SCS Alliance account balance had shrunk to $931,946.62. (Petition, R. 66, ¶ 28.)  No other significant funds were transferred into the account before it was seized.

## SUMMARY OF THE ARGUMENT

This case is a straightforward property dispute between two parties. Both the Receiver and the Petitioners have asserted constructive trust claims to funds held in the Forfeiture Proceedings. The Petitioners are not trying to leapfrog **ahead** of **other creditors** of FNL. **The Petitioners are not asking this Court to create rights for the Petitioners that the Petitioners do not already possess.** Rather, the Petitioners are simply asking this Court for the chance to have Mississippi property law applied to determine who owns the funds in the Forfeiture Proceedings.

In its Summary Judgment Order, the Chancery Court failed to address the dispositive question: who is the rightful owner of the property subject to the Forfeiture Proceedings in Connecticut? The Chancellor skipped over this **dispositive** question and assumed that any property claimed by the Receiver must be an asset of the FNL estate! After assuming the conclusion, the court held that the Petitioners could not assert a constructive trust claim to the funds. (Summary Judgment Order, R. 609-610.) However, until the threshold question of ownership is decided, the FNL estate, and therefore, the creditors of FNL, have no right to the property held in the Forfeiture Proceedings.

It is black-letter law that property obtained by fraud or through a breach of duty is subject to a constructive trust and remains the property of the victim of the fraud. <u>Saulsberry Saulsberry,</u> 223 Miss. 684, 690, 78 So. 2d 758, 760 (1955); <u>Sgyth Mississippi Finance Co. v. Mississippi State Tax Coln.,</u> 605 So. 2d 736, 739 (Miss. 1992). The Petitioners' complaint alleges facts which, when proven at trial, will demonstrate that the reinsurance agreements were

---

[4] The Chancellor mischaracterized the Petitioners claims when it stated that the Petitioners "assert that certain property included in the insurance **liquidation** estate can be traced directly to their investments." (Summary Judgment Order, R 609.) The Petitioners have never asserted that the funds in the Forfeiture Proceedings are part of the FNL **liquidation** estate. The FNL estate has neither legal nor equitable title to the funds. The funds are under the control of the Federal Court, and the issue to be decided here is whether the Petitioners or the Receiver are the rightful owner.

11

fraudulently induced and thus are void *ab initio* and were obtained through FNL's breach of the **duty** of utmost good faith owed to the Petitioners. Nothing in the Mississippi Insurers Rehabilitation and Liquidation Act (§ 83-24-1 et seq.) ("Liquidation Act") strips the Petitioners of their property rights under Mississippi law in the funds held in the Forfeiture Proceedings. The funds held in the Forfeiture Proceedings were never FNL's property and are not now part of the FNL estate. The Petitioners have therefore stated a valid claim to a constructive trust over their assets held in Connecticut.

To take one example from their Petition, the Petitioners allege that approximately $26.5 million held in one of the Forfeiture Proceedings is the residue of approximately $44.8 million that Settlers was fraudulently induced to send to FNL, a fraud FNL perpetuated under the control and direction of Martin Frankel ("Frankel") and other corrupt corporate officers. As set forth above at pages 9-10, the $26.5 million in the Swiss account are traceable to Settlers and there is no other possible source for those funds.

It is well-settled that the Receiver's right to property is no greater than the rights that FNL itself possessed prior to the commencement of insolvency proceedings. Under the Liquidation Act, the Receiver is "bested by operation of law with the title to all of the property, contracts and rights of action, and all of the books and records of the insurer ordered liquidated, wherever located, as of the entry of the final order of liquidation." § 83-24-35(1) (emphasis added). "The general rule is that a Receiver of an insurance company `stands in the shoes' of the insolvent, gaining no greater rights than the insolvent had." Stephens v. American Home Ins. Co., 811 F. Supp. 937, 947, (S.D.N.Y. 1993), rev'd on other grounds, 70 F.3d 10, 12 (2d Cir. 1995) (emphasis added). See also, Rawlings v. American Oil Co., 161 So. 851, 854 (Miss. 1935) ("The Mississippi receiver [], of course, had no greater right in these funds than the company

itself."). Accordingly, because **property** which FNL and **Frankel fraudulently** obtained from the Petitioners never properly belonged to FNL, it cannot now belong to the Receiver. The Liquidation Act "simply does not authorize a trustee to distribute other people's property among [] creditors." Pearlman v. Reliance Ins. Co., 371 U.S. 132, 135-36 (1962) (interpreting bankruptcy code.) "No creditor could justly demand that the estate be augmented by a wrongful conversion of the **property** of another . . ., or the **application** to the **general** estate **of property which never rightfully belonged** to the bankrupt." Gorman v. Littlefield, 229 U.S. 19, 25 (1913).

Allowing the Chancery Court's decision to stand would essentially ratify the fraud FNL, Frankel and others perpetrated on the Petitioners. The Petitioners' funds, even though they can be traced to the Forfeiture Proceedings, will be distributed by the Receiver to pay other creditors of FNL. This Court should reverse the decision of the Chancery Court and remand this case for a determination on the merits of the Petitioners' constructive trust claims.

## ARGUMENT

The Petitioners are three of the most significant victims of the massive financial fraud masterminded by Frankel through various corporate vehicles, including FNL. Through a series of misrepresentations and omissions, FNL breached its duty of utmost good faith and fraudulently induced the Petitioners into transferring approximately $60 million to FNL as part of reinsurance agreements. The Chancery Court committed clear error when it converted the Rule 12(c) motion for judgment on the pleadings to a Rule 56 motion for summary judgment without giving the Petitioners the requisite notice and opportunity to present evidence outside of the pleadings in support of their claims. Furthermore, the Chancery Court erred as a matter of law when it entered summary judgment against the Petitioners on the ground that a constructive trust cannot as a matter of law be asserted in Mississippi insurance receivership cases. Finally, the Chancery Court erred as a matter of law by not even addressing the Petitioners' claims in the alternative that they are secured creditors based on constructive trusts.

Even the Receiver does not seriously believe that constructive trust claims are not recognized in insurance insolvency proceedings. The Receiver himself has asserted constructive trust claims on three occasions: (1) in his own attempts to obtain funds for the estate of FNL in this proceeding; (2) as a claimant in the liquidation of another insurance company against the Tennessee Commission of Commerce and Insurance in her capacity as liquidator; and (3) in the Forfeiture Proceedings holding the subject funds. [5]

---

[5] **On July 22, 1999, the Receiver filed with the Chancery Court his Petition for Order Approving Compromise and Settlement of Potential Interstate Claims.  (See Response to 12(c) Motion, Exhibit B, R. 536-543.) That Petition sought approval of a pending compromise between the Receiver for FNL and the receivers for other Frankel-controlled companies in proceedings in Oklahoma, Arkansas, Missouri and Tennessee. These parties were compromising their competing claims to approximately $57 million that Frankel had sent back from the Swiss account and other sources to the Tennessee Department of Commerce and Insurance, early in April of 1999. The Receiver (and receivers for other Frankel controlled insurance companies in Oklahoma, Arkansas and Missouri) reached this settlement with the Tennessee Department in part on the basis of the contention that "the $57 million was removed from funds that were owned by [Franklin American Life Insurance Company] and the other**

14

I.  **STANDARD OF REVIEW**

The matter was initially presented to the Chancery Court on a motion for judgment on the pleadings under Rule 12(c). (Receiver's 12(c) Motion R. 365-496.) A motion for judgment on the pleadings is decided on the face of the pleadings alone. The facts must be viewed in the light most favorable to the Petitioners. Daniels v. GNB, Inc., 629 So. 2d 595, 599 (Miss. 1993). The **truthfulness** of the allegations is assumed and all reasonable inferences from the facts alleged are drawn in favor of the nonmoving party. Kountouris v. Varvaris, 476 So. 2d 599, 603 n. 3 (Miss. 1985). The "motion is not granted unless the movant is entitled to judgment as a matter of law." 5A WRIGHT & MILLER, FEDERAL PRAC. & PROC. § 1369 at 535. The Receiver agrees with this standard. (Receiver's 12(c) Motion R. 374-375.) A motion for judgment on the pleadings raises a question of law for the trial court which this Court reviews *de novo.* City of Tupelo v. Martin, Nos. 97-IA-01542-SCT (¶ 26), 747 So. 2d 822, 829 (1999).

At his own initiative, the Chancellor mistakenly converted the motion for judgment on the pleadings to a Rule 56 motion for summary judgment. (Summary Judgment Order, R. 608.)[6]

---

aforementioned insurance companies [including FNL] in an account commingled by LNS [Liberty National Securities, the Frankel-controlled investment entity] and subject to a constructive trust and equitable distribution... ." (Id., R. 538, ¶ 5 (emphasis added)) Thus, the Receiver obtained this settlement, and the Chancery Court's approval thereof, based upon his argument that the Tennessee receiver held funds that were subject to a constructive trust in favor of the Receiver.

Similarly, in asserting his right to funds held in the Forfeiture Proceedings in Connecticut, the Receiver has argued that he is entitled to those funds under a theory of constructive trust. For example, in the Forfeiture Proceeding pertaining to the residue of the funds Frankel and FNL fraudulently induced Settlers to wire to FNL, the Receiver has asserted that he should receive these funds on behalf of the FNL estate pursuant to a constructive trust claim: "The Defendant Properties [i.e., the $26.5 million that remained in the Geneva account and has been sent to the forfeiture proceedings in Connecticut] were acquired under circumstances such that it would be inequitable and against good conscience not to transfer the titles to the Defendant Properties to the Insurance Companies [FNL and its affiliates, all represented by the Receiver]." (Response to 21(c) Motion, Exhibit A, R. 532, ¶ E.)

[6] In its Summary Judgment Order, the Chancery Court made reference to the need for the Petitioners to provide affidavits and other evidence "which set forth specific facts showing a genuine issue remains for trial." (Summary Judgment Order, R. 609.) To the extent the court's decision may have been based on a lack of summary ju'gment evidentiary materials, the Petitioners are certainly able to provide affidavits, bank records and other evidence supporting their constructive trust claims upon remand. Rule 12(c) provides, in relevant part: "If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given

15

Summary judgment should be granted cautiously. Brown v. Credit Center, Inc., 44 So. 2d 358, 362 (Miss. 1987). The evidence must be viewed in the light most favorable to the party against whom the motion has been made. Id. Moreover, a motion for summary judgment should be denied unless the trial court **finds beyond any reasonable doubt** that the **plaintiff would be unable** to **prove any** facts to **support his/her** claim. Franklin v. Thompson, No. 97-CA-00897-SCT (79), 722 So. 2d 688, 691 (Miss. 1998). The trial court cannot try issues of fact on a Rule 56 motion; it may only determine whether there are issues to be tried. Id.

On its face, the Summary Judgment Order was not based on any lack of factual support for the constructive trust claims, but on the purely legal question of whether, as a matter of law, a party can recover property through a constructive trust that is also claimed by the receiver of an insurance company in liquidation. Accordingly, the Chancellor's order is subject to *de novo* review by this Court. Id. (¶8), 722 So. 2d at 691. The facts should be viewed in the light most favorable to the Petitioners. Id. This Court's standard of review for questions of law cannot be altered by the lower court's mislabeling of its decision.

H.  **PETITIONERS ARE ENTITLED TO CONSTRUCTIVE TRUSTS TO RECOVER THEIR STOLEN PROPERTY**

Whether the issue is addressed under Rule 12(c) or Rule 56, the Chancery Court's Summary Judgment Order should be reversed. As a matter of law, the Petitioners have stated a

---

reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Miss.R.Civ.P. 12(c). The Chancery Court did not give the parties prior notice of its intention to convert the Rule 12(c) motion to a Rule 56 motion. Nor did the court provide the Petitioners the opportunity to present summary judgment evidentiary materials. In fact, on July 15, 2003, the Chancery Court stayed deposition discovery prior to the Receiver filing his motion preventing the Petitioners from obtaining evidence supporting their claims. To the extent the Summary Judgment Order might be based on a failure of the Petitioners to present summary judgment evidence, the Chancellor committed clear error in converting the Receiver's motion for judgment on the pleadings to one for summary judgment under Rule 56. The motion was presented to the Chancellor as a motion for judgment on the pleadings. Such motions are to be decided on the pleadings alone without reference to evidence outside of the pleadings.  Although the Chancellor stayed deposition discovery two months before the Receiver's motion was filed, the Petitioners have been able to obtain documentary evidence through this and other related cases and had the court provided them with an opportunity would have produced abundant evidence supporting their constructive trust claims.

16

claim entitling them to a **constructive** trust in **certain** of the **funds held** in the Forfeiture **Proceedings.** When **viewed in** the **light** most **favorable** to the Petitioners, the facts **alleged in** the Petition **clearly establish** that the **funds in** the **Forfeiture Proceedings** are **property of** the **Petitioners** and are **subject** to a **constructive trust based upon** FNL's fraudulent inducement and breach of the duty of utmost good faith. The Receiver did not argue below, and cannot argue now, that the Petitioners failed to state claims for constructive trusts. Nor did the Chancery Court address the issue of whether the Petitioners had stated claims for constructive trusts. Instead, the court simply asserted, incorrectly, that "the theory of constructive trust does not apply in this case." (Summary Judgment Order R. 610.)

### A. Mississippi Has Long Recognized Constructive Trusts to Remedy Fraud and Breaches of Confidence

Mississippi courts have consistently imposed constructive trusts as a remedy for unjust enrichment, fraud and breach of confidence. As this Court has explained:

> A constructive trust is one that arises by operation of law against one who, l y <u>fraud,</u> actual or constructive, by duress or <u>abuse of confidence,</u> by commission of wrong, or by any form of unconscionable conduct, artifice concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy.

<u>Saulsberry,</u> 223 Miss. at 690, 78 So. 2d at 760 (emphasis added); <u>see also</u> <u>Planters Bank & Trust Co. v. Sklar,</u> 555 So. 2d 1024, 1034 (Miss. 1990) (citing 76 Am Jur 2d, Trusts, § 21 at 446 (1975)) (constructive trusts is "raised by equity to satisfy the demands of justice."); <u>Sojourner v. Sojourner,</u> 153 So. 2d 803, 807 (1963) (citing 54 Am. Jur., Trusts, § 218); <u>Russell v. Douglas,</u> -- 243 Miss. 497 (Miss. 1962) ("[W]hen property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts

him into a trustee.').[7] As this Court explained in Planters Bank, the grounds for imposing a constructive trust are broad - "any transaction may provide an **appropriate** setting for creating a constructive trust where, for any reason, one party holds funds `which in equity and good conscience should be possessed by' another parry. Their forms and varieties `are practically without limit."' Id. (quoting **89** C.J.S. Trusts, § 142 at 1027 (1955)).

The legal principle underpinning constructive trusts is that a thief cannot pass title to stolen property. As this Court has previously noted, this rule is "as old as the hills and often enforced without regard to context, viz., no thief, forger or other felonious fraud has power to pass title to his ill-gotten goods." South Mississippi Finance Co., 605 So. 2d at 739 (emphasis added). See also Eisenberg v. Grand Bank for Savings, FSB, No. 02-60695, 2003 WL 21683600, *5 (5th Cir. Jul. 18, 2003) ("Mississippi case law is clear that a thief does not obtain title to stolen property," including stolen funds that are traceable). So strong is an owner's right to reclaim property stolen from him that even his own negligent treatment of the property does not forfeit his ability to reclaim it from one who purchased it from a thief. Simmons v. Atkinson & Lampton Co., 69 Miss. 862, 867 (Miss. 1896). In Simmons, the court permitted a property owner to reclaim money paid out under the fraudulently altered terms of a promissory note even though the owner could have taken measures to prevent the alterations from occurring. Id.[g]

---

See also, Lackey v. **Lackey,** 691 So. 2d 990, **995** (Miss. 1997) (imposing constructive trust **upon** the **proceeds of** a life **insurance** policy to the extent **that the policy** was **purchased** with stolen funds, **thereby preventing the** thief from **profiting** from his **wrongdoing);** Allstate Ins. Co. v. Estes 345 So. 2d 265, 266 (Miss., 1977) **(imposing constructive** trust **in** case **of bona** fide **purchaser, even though** the **purchaser of a** car was **unaware** that the **automobile he** was **buying had been** stolen from a **dealership).**

[8] In a number of pleadings filed below, the Receiver has implied that the Petitioners are not entitled to relief because the Petitioners could or **should** have written the contracts in a way that would **have** better protected their funds. (Receiver's 12(c) Motion, R. 368, 370, 382-383.) It is a well-settled principle of law that **contributory** or **comparative** negligence is **not a** defense to an **intentional** tort such as fraud. See Gardner v. Jones, **464** So. 2d 1144, 1150 n.3 (Miss. 1985); Reed v. **Charping,** 41 So. 2d 11, 12 (Miss. 1949) *(en banc).* Therefore, the Receiver's attempt at 20/20 hindsight is not a defense to FNL's fraud and its breach of the duty of utmost good faith.

Thus, a constructive trust should be imposed where (1) a party has obtained funds through fraud or (2) a party has obtained funds through a breach of a confidential relationship. In the case where a party abuses a confidential relationship for the benefit of the party whose confidence has been abused, fraud need not be shown. McNeil v. Hester, No. 97-CA-00048-SCT (125), 753 So. 2d 1057, 1064 (2000). That facts alleged in the Petition state a claim for constructive trusts under each of these theories.

### B. Constructive Trusts Are Routinely Applied By Courts in Insolvency Proceedings

Constructive trusts have long been recognized and applied by courts in insolvency proceedings, receiverships and in bankruptcy. In insolvency, as in other contexts, a constructive trust gives the beneficiaries the right to recover the beneficiaries' property over creditors and policyholders. In the Matter of Kennedy & Cohen, Inc., 612 F.2d 963, 965 (5th Cir. 1980). See also In the Matter of Quality Holstein Leasing, 752 F.2d 1009, 1012 (5th Cir. 1985). This black-letter rule is universally acknowledged:

- "Effect of insolvency. A person having an equitable lien upon the property of another has an equitable interest in the property which will be protected .... The equitable claimant is entitled to priority over the creditors of the owner of the property . . . ." Rest. (1st) Restitution § 161 comment c

- "Effect of insolvency of the wrongdoer. The claimant can reach the product of his property even though the wrongdoer is insolvent. This is true whether the claimant seeks to enforce a constructive trust upon the product or to impose an equitable lien upon it. The claimant has an equitable interest in the product, and his equitable interest is not cut off by the insolvency of the wrongdoer, since the creditors of the wrongdoer are not in the position of bona fide purchasers []. The creditors whose rights are no better than those of their debtor are not entitled to profit because of the wrongful acquisition of property by their debtor through the use of the claimant's property." Rest. (1st) Restitution § 202 comment e

- "Where property subject to a trust is taken by a receiver, rights under the trust are enforceable against it. Thus, where collections by a receiver of an agent constitute a trust fund for the use and benefit of beneficiaries, they are entitled thereto, as against general creditors ...." 65 Am. Jur. 2d, Receivers § 199

- "Property in which the debtor holds ... only legal title and not an equitable interest, . .. becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the **debtor's** legal title to **such property, but** not to the **extent of** any **equitable** interest in **such property** that the **debtor does** not **hold."** 11 U.S.C. § 541 (d).

- It is a fundamental rule that the estate succeeds only to the title and rights in the property that the debtor possessed ... Therefore, when the debtor is in possession of property impressed with a[] constructive [] trust ..., the estate will generally hold such property subject to the **outstanding** interest of the beneficiaries. The assets held in trust will thus normally not be available to the debtor or the debtor's creditors. 5 Collier on **Bankruptcy** (15th rev. ed. 2001)1j541[11][5].

Nothing in the Mississippi Liquidation Act precludes the Petitioners from asserting their constructive trust claims in this case.

In reaching its erroneous holding, the Chancery Court ignored analogous bankruptcy cases cited by the Petitioners. (Summary Judgment Order, R. 610.) The Receiver has already admitted that bankruptcy cases are instructive in the context of insurance insolvency proceedings. In his brief to the Second Circuit Court of Appeals in <u>United States v. Peoples Benefit Life Insurance Company,</u> 271 F.3d 411 (2d Cir. 2001), addressing the Petitioners' same claims for constructive trusts at issue in this case, the Receiver argued that bankruptcy law was analogous to the case at hand: "Under **bankruptcy** law, specifically as it relates to constructive trust claims, a creditor is not entitled to an express or constructive trust unless he can trace the actual funds he claims." (Quoted in Petitioners' Surreply to Receiver's Motion for Judgment on the Pleadings, R.555.). The Receiver went on to elaborate:

> Principles of **bankruptcy** law are often considered instructive in the context of insurance insolvency where analogous procedures and issues are concerned. <u>Commercial National Bank of Shreveport v. Superior Court, et al.,</u> 14 Cal. App. 4th 393, 17 Cal.Rptr.2d 884, 900 (1993); see also <u>In re Advanced Cellular Systems,</u> 235 B.R. 713, 717-18 (Bankr. D. Puerto Rico 1999) (bankruptcy proceedings and insurance company insolvency proceedings are considered fundamentally similar in that object of bankruptcy proceeding is to marshall debtor's assets into estate for distribution to creditors pursuant to prescribed priority scheme).

(Id.) Furthermore, the Chancery Court's refusal to look to **bankruptcy** cases is contrary to long-standing case law ruling that cases interpreting the **Bankruptcy** Code are especially helpful in interpreting state insurance **liquidation** acts. See e.g., In the Matter of First Columbia Life Ins. Co., 724 So. 2d 790, 795 (La. Ct. App. 1998) (looking to **bankruptcy** law to interpret state priority scheme similar to § 83-24-83); Pine Top Ins. Co. v. Republic Western Ins. Co., 123 B.R. 2'77, 281(N.D. Ill. 1990); **Covington** v. University Hospitals of Cleveland, 778 N.E.2d 54, 57 (Ohio Ct. App. 2002). State insurance liquidation statutes are based on Federal bankruptcy law. In the Matter of First **Columbia** Life Ins. Co., 724 So. 2d at 795. Principles of **bankruptcy** law are considered instructive in the context of insurance insolvency where analogous procedures and issues are concerned. Commercial Nat'l Bank v. Superior Court, 14 Cal. App. 4th 393, 17 (1993). This Court should look to **bankruptcy** law for guidance in interpreting the Liquidation Act.

  **C.**  **Because of FNL's Fraud, Petitioners Have Stated Claims for Constructive Trusts and to Establish Title in Petitioners' Property**

The Petitioners have alleged facts entitling them to a constructive trust. The elements of a constructive trust under Mississippi law are:

(1) a benefit conferred upon the defendant by the plaintiff,
(2) appreciation by the defendant of the fact of such benefit
(3) acceptance **and** retention by the defendant of that benefit, under circumstances such that it would be inequitable to retain the benefit without payment of its value.

Milliken & Michaels, Inc. v. Fred Netterville Lumber Co., 676 So. 2d 266, 271 (Miss. 1996) (Sullivan J. concurring) (citing cases). A constructive trust can arise from a fraud or from the breach of a confidential relationship. McNeil, No. 97-CA-00048-SCT (¶ 25), 753 So. 2d at 1064. The facts alleged in the Petition state a claim under each of these theories.

The Receiver's attempts below to cast this case as one of simple breach of contract

mischaracterizes the allegations in the Petition. (Receiver's 12(c) Motion, R. 381; Receiver's 12(c) Reply at 4.) This Court has long noted that "[a] distinction exists between the breach of a promise not fraudulently made **and** a breach of a promise made with no intention of performing it." Saulsberry, 223 Miss. at 690, 78 So. 2d at 760. Here, the Petition expressly alleges that FNL **fraudulently induced** the Petitioners into entering into the reinsurance agreements **and** that FNL never had any intention of performing under those agreements. (Petition, R. 65, ¶ 23 (FNL **"had** intended from the first to defraud Settlers and to immediately misappropriate the Settlers Reserve Fund for the benefit of certain of First National Life's insiders, e.g., Frankel, Hackney and Atnip."), R. 73, ¶ 50 (FNL "never had any intention of honoring the P&V Agreements and intended from the first to defraud Peoples and Veterans out of the P&V Fund.").)

      1.     **The Petitioners Have Adequately Alleged Facts Supporting Their Claim that FNL Fraudulently Induced Them to Enter into the Reinsurance Agreements**

As detailed above, the Petitioners allege that FNL and its insiders defrauded them, that FNL and its insiders stole Petitioners' property through false pretenses, that Petitioners' contracts with FNL were void *ab initio,* and that, as a result, the Reserve Funds in the Forfeiture Proceedings were not then and are not now FNL's assets. (Petition, R. 77-85, ¶¶ 70-100.) For these reasons, it would be inequitable for FNL to retain the assets it stole from the Petitioners.

Furthermore, the fraudulent conduct of FNL's owner, officers and director can be and should be imputed to FNL. Nicklaus v. Bank of Russellville, 336 F.2d 144, 145 (8th Cir. 1964); Anderson v. Yates, 99 So. 499, 501 (Miss. 1924). See also FDIC v. Ernst & Young, 967 F.2d 166, 171 (5th Cir. 1992); J.R. Haralson v. E.F. Hutton Group, Inc., 919 F.2d 1014, 1026 (5th Cir. 1991).

In Nicklaus, an insider used his corporation to commit fraud against third parties. The court denied the bankruptcy trustee's petition to enjoin a bank from prosecuting a civil action to

22