

**SETTLERS LIFE INSURANCE COMPANY**
*A Member of the NGL Insurance Group*

1969 Lee Highway • P.O. Box 8600 • Bristol, Virginia 24203-8600
Ph: (540) 645-4300 • Fax: (540) 645-4399 • www.settlerslife.com

Michael W. Lowe
Executive Vice President
540-645-4303

June 28, 2000

Liquidator, First National Life Insurance Company of America
328 West Valley Avenue
Birmingham, Alabama 35202

Enclosed herewith is the Proof of Claim, Statement of Claim, and attached documents on behalf of The Settlers Companies, Incorporated and Settlers Life Insurance Company.

A duplicate copy of this filing is being sent to you at Post Office Box 11316, Birmingham, Alabama 35202..

Michael W. Lowe
Executive Vice President

First National Life Insurance Company of America,
*in liquidation*
Post Office Box 11316
Birmingham, Alabama 35202-1316
205-942-2112

POC No._____
Mailing Date 02-25-2000

## PROOF OF CLAIM

NOTE: Final date for filing this Proof of Claim is JUNE 29, 2000

This Proof of claim must be completed, signed, and returned to the above address, postmarked by JUNE 29, 2000. READ ALL OF THE INSTRUCTIONS ON THE FRONT AND BACK OF THIS FORM BEFORE COMPLETING
PLEASE TYPE OR PRINT

Enter Amount of Claim, if any:

| Amount | Claim Type |
|---|---|
| $_____ | Claim is for agent commission |
| $_____ | Claim is for deficiency of secured claim |
| $_____ | Claim is for trade or general creditor debts due from FNL |
| $_____ | Claim is for employee compensation or benefits due |
| $44,795,476, plus interest and costs | Claim of a ceding or assuming insurance company |
| $_____ | Claim of Federal, State or Local government |
| $_____ | Claim of a Guaranty Association |
| $44,795,476, plus interest and costs | Other: (provide explanation on separate sheet) |

Attach a written statement explaining your claim and include all supporting documentation for your claim, including:

- The particulars of the claim, including the consideration given for it.
- The identity and amount of the security on the claim.
- The payments made on the debt, if any.
- That the amount claimed is justly owing and that there is not a setoff, counterclaim or defense to the claim.
- If you claim a right of priority of payment or other specific right, provide explanation.
- Attach a copy of the written documentation or instrument, which is the foundation of your claim.

If the amount of your claim is unknown, the amount may be omitted and insert the words "Contingent" or "Undetermined".

Include the name and address of the claimant and the attorney who represents the claimant, if any.

The undersigned subscribes and affirms as true under the penalties of perjury as follows: that he/she has read the foregoing Proof of Claim and attachments thereto and knows the contents thereof; that the said claim against the above named company is true of his/her own knowledge except as to the matters therein stated to be alleged upon information and belief and as to those matters therein stated to be alleged upon information and belief and as to those matters he/she believes to be true; that no payment of or an account of the aforesaid claim has been made except as stated herein, that there are no setoffs, counterclaims or defense thereto; that the claimant is not a secured creditor or claimant and has no security except as state herein.

_Karen E. Livingston-Wilson_
Karen E. Livingston-Wilson
Butler, Snow, O'Mara, Stevens, Cannada, PLLC
17th Floor, Deposit Guaranty Plaza
210 East Capitol Street
Jackson, MS 39225
Attorneys for Claimants

_V. Lane Wharton_
V. Lane Wharton, Jr.
Bode, Call & Stroupe, L.L.P.
3101 Glenwood Avenue, Suite 200
Raleigh, NC 27612
Attorneys for Claimants

THE SETTLERS COMPANIES, INCORPORATED
By: _Jack F. Harmon_
Jack F. Harmon, President
1969 Lee Highway
Bristol, VA 24201

SETTLERS LIFE INSURANCE COMPANY
By: _Michael Lowe_
Michael Lowe, Executive Vice President
1969 Lee Highway
Bristol, VA 24201

RECEIVED
JUL 0 5 2000

Mailing List Number 2191
Reference Info. EFF 4-1-99 1006

## STATEMENT OF CLAIM

The Settlers Life Insurance Company ("Settlers") is a corporation organized and existing as an insurance company under the laws of the Commonwealth of Virginia. The home office of Settlers is located in Bristol, Virginia, a small town in the southwestern corner of Virginia.

Settlers was organized in 1984 as the outgrowth of the Huff Cook Mutual Burial Association, which was formed in the 1930's. Until December, 1999, all of the stock of Settlers was owned by The Settlers Companies, Incorporated (the "Settlers Companies"), the principal beneficial owners of which were the Huff Cook Mutual Burial Association, the founders of Huff Cook, Jack and Edith Harmon, and Jess Walker (collectively, the "Founders"). As will be detailed later, the Settlers Companies and the Founders lost their ownership in Settlers due to the transactions which are described below.

Settlers' primary business is to write life insurance which will pay for the costs of the funeral of the insured. This type of insurance, or variations of this type, are called "burial insurance", "preneed insurance", "care plan insurance", or "final expense" insurance in the United States. Settlers also wrote some regular life insurance policies and some health and disability insurance designed to provide a benefit if an insured is treated for cancer.

Because Settlers was organized under Virginia law, it is considered to be "domiciled" in Virginia and subject to primary regulation by the Bureau of Insurance, a part of the State Corporation Commission ("SCC") an agency of the Commonwealth of Virginia.

Settlers had licenses from the Virginia Bureau of Insurance and from the Insurance Departments of seventeen other states. Settlers has issued over 400,000 policies, and the largest numbers of its policyholders are located in Virginia, North Carolina and Tennessee, in that order.

By the end of 1998, Settlers had approximately US $200,000,000 invested in cash and securities as reserves to pay the present and future claims of its policyholders. Settlers also had "capital and surplus", which is an insurance accounting term for "net worth", of approximately US $22,000,000.

## THE THEFT OF SETTLERS' MONEY

As of the beginning of 1998, Settlers had a group of existing policies (called a "book of business" in insurance circles) of burial insurance called the "Care Plan" book. Settlers had discontinued selling this type of policy and was holding approximately US $ 46,000,000 as reserves for the payment of claims associated with this "book" of business. Because Settlers no longer sold this type of policy, it was interested in "selling" this book to another insurance company. Under American law and insurance practice, one insurance company can transfer liabilities to another insurance company, subject to compliance with the governing state laws. This process is generically called "reinsurance", and takes many forms.

Normally, when one insurance company enters into a reinsurance transaction, it transfers all, or a portion of, a risk, of book or risks, to the reinsurer, for an agreed premium. Normally, the original insurer continues to pay claims, but is reimbursed by the reinsurer for the agreed portion of the claims. The original insurer remains liable to the insured, but for financial statement purposes the original insurer may show a reduced liability because of the reinsurance if the reinsurance transaction qualifies under the applicable state laws and regulations. Sometimes, however, the original insurance company can completely transfer the policy liabilities to the reinsurer. This is called "assumption" reinsurance. This process normally requires regulatory approval, and the policyholder generally receives a certificate, or new policy, from the reinsurer, which replaces and supercedes the original policy.

By early 1999, consideration of an assumption reinsurance deal for the $46 million Settlers Care Plan book of business appeared attractive to Settlers. Through a business broker, Settlers was approached by representatives of First National Life Insurance Company of America ("FNL"), an insurer domiciled in the State of Mississippi, which proposed an agreement with Settlers under which it would acquire the Care Plan book of business in an assumption reinsurance transaction. FNL agreed to pay US $1.75 million for the book. This payment was to take the form of a "ceding commission" from the reserves for the book which Settlers would transfer to FNL. In other words, Settlers would transfer approximately $46 million in liabilities, but only $44.75 million in cash.

FNL, although a Mississippi company, was one of nine insurance companies controlled by the Thunor Trust ("Thunor"), which operated out of the small town of Franklin, Tennessee, which is near the capital of Nashville, Tennessee. The Thunor Trust was established in 1991, under Tennessee law. The three original grantors of Thunor were, we believe, nominees for a Martin Frankel, a former securities investment advisor who had run afoul of the United States Securities and Exchange Commission in the late 1980's, which had banned Frankel from investing other people's money.

The Thunor Trust had set up two holding companies, International Financial Corporation ("IFC"), and Franklin American Corporation ("FAC"). IFC was wholly owned by Thunor. FAC had a public offering of stock in 1991, and 15.5% of FAC stock was owned by the public, with Thunor owning the rest. By 1998, FAC owned six active insurance companies, chartered in Tennessee and Mississippi. IFC owned three companies, chartered in Mississippi, Missouri and Oklahoma. One of the companies IFC owned was First National Life Insurance Company of America.

The Trustee of Thunor Trust was John A. Hackney. Hackney was also the president and chief executive officer of each insurance company. All of the companies were administratively headquartered in Franklin, Tennessee. The companies' assets were ostensibly managed by a committee comprised of Hackney, Gary L. Atnip (who was the chief financial officer of the holding companies), and, at least in the beginning, by John Jordan, a Nashville lawyer. The custodian for the companies' investments was an entity named Liberty National Securities, Inc. ("LNS"), which was the *alter ego* of Martin Frankel. LNS was supposed to merely be a custodian; and the

investment committee was supposed to direct the investment policy of the companies. In reality, the investment committee did not control investments, and instead acted as a conduit to Frankel. It was the scheme of Frankel to use the Thunor insurance companies to obtain money from policyholders, which would be transferred to LNS, where Frankel could convert it to his own purposes. As a result of Frankel's activities, the financial statements filed by the Thunor companies with state insurance regulatory agencies were materially false at all relevant times.

By early 1999, the Thunor insurance companies were coming under regulatory scrutiny, and Frankel's schemes were beginning to unravel. Insurance Department examiners from Mississippi were investigating FNL, and Tennessee Insurance Department examiners were examining other Thunor companies. These examiners were unable to confirm that the assets the Thunor companies carried on their financial statements actually existed. At the same time that FNL was being examined by Mississippi regulatory officials, the Mississippi Insurance Department had notified FNL that any assumption reinsurance transaction needed to be approved by the Department. Notwithstanding the examination and this notification, FNL made in early 1999 a written reinsurance proposal to Settlers. The proposal contemplated that Settlers would transfer the $ 46 million Care Plan book of business to FNL, along with $44.75 million in cash. FNL represented that it would take the necessary steps to obtain the regulatory approvals required to assume the Settlers' policies, thereby extinguishing Settlers' liabilities for these policies. The laws of both Virginia and Mississippi imposed requirements on the proposed transaction. Both states required that the reinsurance agreement contain certain features (most important of which was a provision called an "insolvency clause", which allows for the receiver of an insolvent party to a reinsurance agreement to collect reinsurance in the event of insolvency). Mississippi also required that the proposed agreement be filed with that state, and approved, before it became effective. Additionally, other states where Settlers had policyholders, such as North Carolina, Tennessee, as well as Virginia, required regulatory filings before an assumption by FNL of Settlers' policies would be allowed.

FNL and Settlers entered into a Reinsurance Agreement around April 1, 1999 (the Agreement is undated, but has an effective date of April 1, 1999) (the "Reinsurance Agreement"). The Reinsurance Agreement provided that it would not be effective until certain conditions were met, one of which was that Settlers and FNL had to agree as to the amount of cash which would be transferred. The agreement as to the cash was reached only after Settlers asked for, and FNL produced, a verified financial statement for the year ended December 31, 1998. This statement showed hundreds of millions of dollars of assets which did not exist, and was materially false. It was furnished by FNL to Settlers with the intent that Settlers would rely upon it, and in fact Settlers did rely upon the financial statement as an inducement to cause Settlers to enter into the reinsurance contract and transfer money to FNL. The transaction was thus fraudulent from its inception.

The Reinsurance Agreement prepared by FNL for the transaction did not meet regulatory requirements (it did not, for example, contain an "insolvency clause"). The Reinsurance Agreement, when signed around April 1, 1999, also provided that it was "subject to and contingent upon receipt by Ceder [Settlers] and Reinsurer [FNL] of any required regulatory approvals of the transaction". No regulatory approvals of the Reinsurance Agreement were received by FNL.

Because of deficiencies in the Reinsurance Agreement, and because of the lack of regulatory approval, it violated the law for FNL to enter into this Reinsurance Agreement and demand the transfer of funds from Settlers. Therefore, any transfer to FNL may be void as a matter of law.

Notwithstanding the illegality of the transaction, FNL requested, and received on April 9, 1999, a transfer of the $44.8 million from Settlers. The money was obtained on the pretense that FNL was a bona fide reinsurer. The money was transferred from two of Settlers' accounts at First Union Bank in Charlotte, North Carolina, nos. 5056681511 and 5056492342. The total amount transferred was US $44,795,476.00, and the transfer occurred at 11:32 a.m., eastern time. The money was transferred to FNL's account no. 100057727 at First Tennessee Bank in Memphis, Tennessee. The persons in control of FNL knew that FNL and the other Thunor companies were insolvent, and those persons had no intention of letting the Settlers' money remain where it could be reached by regulatory authorities. Accordingly, the Settlers' money remained in FNL's bank account for less than two hours. At 13:11 p.m., central time, on April 9, 1999, FNL transferred U.S. $44,795,000 from the First Tennessee account to an account in the Bank of New York, in New York City, New York, for the benefit of Dreyfus Cash Management Plus ("Dreyfus Account"), with a notation "Attention: Lion System DDA #8900052252/AC-719-079-1438435 OBI=Reference FNL Co. Of America Receiving Dealer #2552".

The Dreyfus Account was in the name of "FNL CO OF AMERICA REC ACCT". The Dealer was identified as #002552, and the "REP" was identified as "LNS, Inc., 405 Tarrytown Road, Suite 212, White Plains, NY 10807 1326". This account was controlled by Martin Frankel.

The Dreyfus Account was a sham. Frankel had given standing instructions to Dreyfus that any securities received in the account were to be redeemed, and together with cash in the account were to be transferred by wire to a bank in New York City, UBS, for further credit to Banque Alliance SA, in Geneva, Switzerland, sub account no. 70026, for further credit to "BENEFICIARY BLOOMFIELD INV LTD FC TO FNL CO OF AMERICA". In accordance with these standing instructions, after Settlers' money was wired into the Dreyfus account on April 9, 1999 (a Friday), the following Monday, April 12, 1999, Dreyfus wired the exact amount, U.S. $ 44,795,000.00, together with $17,640.49 in accrued interest, to Banque Alliance SA, Genève, via UBS as correspondent bank. As intended, Martin Frankel was the beneficial owner of the Banque Alliance SA account, and the Settlers' money was to have become available for his personal use.

In early May, 1999, Frankel's scheme was discovered. All nine of the Thunor insurance companies were placed in receivership by the Insurance Commissioners of each company's state of domicile. At the same time, Settlers was notified that its $44.8 million had been stolen, making the company insolvent. Accordingly, on May 14, 1999, Settlers was placed in receivership in Virginia, the SCC was appointed Receiver, and Virginia Insurance Commissioner Alfred Gross was appointed as Deputy Receiver to act for the SCC.

The Thunor insurance companies, the vehicles for Frankel's schemes, are for the most part, hopelessly insolvent. FNL has been placed in liquidation.

In July, 1999, Commissioner Gross instituted an action in the U. S. District Court for the Western Division of Virginia, Abingdon Division, against Commissioner Dale, as Liquidator of FNL, seeking a declaration that Settlers was entitled to receive back from FNL any portion of the $44 million which might ultimately be recovered by FNL.

Commissioner Dale responded to the complaint by a motion to dismiss or stay the action, based upon the receivership proceedings for FNL pending in the Chancery Court of Hinds County, Mississippi.

In the meantime, Commissioner Gross and his Special Deputy arranged for a Wisconsin insurer, National Guardian Life Insurance Company ("NGL") to re-capitalize Settlers. Pursuant to a Purchase Agreement entered into as of December 15, 1999, The Settlers Companies interest in Settlers was redeemed for $1.00, and new shares issued to NGL, which replaced the money stolen by FNL and Frankel as consideration for the new shares. The Settlers Companies were assigned the major portion of any recovery on Settlers' claims against Frankel and FNL as additional consideration for the transfer of control.

The transactions were approved by the State Corporation Commission of the Commonwealth of Virginia, the receivership was terminated, and Settlers resumed operations.

Following the change of control, the complaint in the federal court in Abingdon was amended to make The Settlers Companies, Incorporated the substitute plaintiff, and to additional claims and parties (including Frankel). A copy of the amended complaint is attached.

Settlers Life Insurance Company, and The Settlers Companies, Incorporated (collectively "Claimants"), based upon the transactions set out above, make the following claims, which are expressly made contingent upon and subject to the present action pending in the U.S. District Court in Abingdon, Virginia, between FNL and The Settlers Companies, Incorporated.

1.    Claimants seek a ruling by the Chancellor that these Claimants were defrauded by FNL and that Claimants are entitled to the imposition of a constructive or resulting trust in any funds coming into the possession of the estate of FNL which are traceable to the $44.795 million transferred from Settlers to FNL;

2.    In the alternative, to a ruling by the Chancellor that Settlers is entitled to specific performance of the agreement between FNL and Settlers for an assumption and novation of the Settlers' policies which are subject to the April 1, 1999 Reinsurance Agreement, such that FNL becomes liable on these policies;

3.    A ruling from the Chancellor that the current Mississippi priority of claims statute applicable to insurance company insolvencies is unconstitutional because it attempts to alter the vested rights of Claimants, and that it, and its predecessor statutes are unconstitutional because they violate federal law and deprive the Claimants of property without due process of law;

4. In the alternative, a ruling from the Chancellor that the claims of the policyholders of Settlers, whose policies FNL promised to assume, are entitled to payment as a Class 2 priority claim in the liquidation proceedings of FNL, with the same priority as all other policyholder claims; and

5. For such other and further claims for relief as arise from the facts set out in this statement.

Copies of documents which Claimants presently have, which they believe are relevant to their claims, are attached hereto.