# EXHIBIT 1

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

COPY

- - - - - - - - - - - - - x
UNITED STATES OF AMERICA,  )    CRIMINAL NO.:
          Plaintiff,  )    3:99CR235 (EBB)
                )
        vs.         )
                )
MONA KIM,            )
         Defendant.  )    JANUARY 17, 2003
- - - - - - - - - - - - - x

Federal Building
141 Church Street
New Haven, Connecticut

JURY TRIAL

Volume 5

Held Before:

THE HONORABLE ELLEN BREE BURNS
    *Senior U.S. District Court Judge*

FALZARANO COURT REPORTERS
117 North Saddle Ridge
West Simsbury, CT 06092
860.651.0258

1    <u>APPEARANCES</u>:

2

     <u>For the Government</u>:

3

4            OFFICE OF THE U.S. ATTORNEY
             157 Church Street
             23rd Floor
5            New Haven, Connecticut 06508
             203.821.3700
6                 By:  JEFFREY A. MEYER, ESQ.
                        *Assistant U.S. Attorney*

7

8            OFFICE OF THE U.S. ATTORNEY
             915 Lafayette Boulevard
9            Bridgeport, Connecticut 06604
             203.696.3000
10                By:  MARK G. CALIFANO, ESQ.
                        *Assistant U.S. Attorney*

11

12

     <u>For the Defendant</u>:

13

             LAW OFFICES OF PETER A. KELLY
14           385 Orange Street
             New Haven, Connecticut 06511
15           203.781.0888
             203.781.0861/Fax
16                By:  PETER A. KELLY, ESQ.

17

18   <u>Also Present</u>:

19           Leanne Charette
             Erin McNamara
20

21

22

23

24

25

Falzarano Court Reporters

1

2

3           . . . The following transcript is the

4    Trial Proceedings, Volume 5, held In the Matter of

5    United States of America v. Mona Kim, held before

6    The Honorable Ellen Bree Burns, Senior U.S. District

7    Court Judge, at the Federal Building, 141 Church Street,

8    New Haven, Connecticut, on Friday, January 17, 2003,

9    commencing at 9:17 a.m. . . .

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Falzarano Court Reporters

1          "I have examined the attached records,

2     including records" labeled -- "Bates-labeled

3     Settlers 1 to Settlers 14 (reinsurance agreement,

4     board of director minutes, and wire authorization

5     request), which were produced in response to

6     a government subpoena, and I certify that they

7     are standard business records of Settlers Life

8     Insurance Company; and:

9          "These records were made at or near the time

10    of the occurrences of the matters set forth by,

11    or from information transmitted by, a person with

12    knowledge of those matters; that these records

13    were kept in the course of the company's regularly

14    conducted activity; that it was the regular

15    practice of the company to make and maintain these

16    records as part of its regularly conducted business

17    (sic) activities.  Signed, Melvin Dillon."

18

19                    DIRECT EXAMINATION

20

21    BY MR. CALIFANO:

22         Q    Mr. Harmon, I'd like to ask you some preliminary

23    questions, sir.  How old are you?

24         A    I will be 80 years old in April.

25         Q    Now, sir, do you have a hearing problem?

1    A    Yes.

2    Q    If I should say anything that you don't hear or

3  don't understand, would you please tell me so and I will make

4  sure I repeat the question?

5    A    Yes.

6    Q    Where do you live, Mr. Harmon?

7    A    I live in Bristol, Virginia.

8    Q    Where is Bristol, Virginia?

9    A    Bristol, Virginia, is in the southwest part of

10  Virginia.  It's on the state line with Tennessee; half of

11  it's in Tennessee, and half is in Virginia.

12    Q    Sir, did you used to work at Settlers Life

13  Insurance Company?

14    A    Yes, sir.

15    Q    Could you tell us how you came to get a job at

16  Settlers Life Insurance Company?

17    A    Well, Settlers Life insurance started out -- well,

18  the huff cook mutual burial association --

19              THE COURT REPORTER:  Excuse me?  I'm sorry?

20              THE WITNESS:  -- operating in --

21              MR. CALIFANO:  I'm sorry, Mr. Harmon.

22         Sometimes the Court Reporter may ask you to

23         repeat a few names.

24

25

Falzarano Court Reporters

BY MR. CALIFANO:

1    Q    You said the Huff-Cook Mutual Burial Association?

2    A    The Huff-Cook Mutual Burial Association.

3    Q    Could you spell that for the record, sir.  Could

4    you spell out Huff-Cook for the record.

5    A    H-u-f-f, hyphen, C-o-o-k, mutual.

6              THE COURT REPORTER:  Thank you.

7    BY MR. CALIFANO:

8    Q    Is that who you started work for, the Huff-Cook

9    Mutual Burial Association?

10   A    Yes, sir.

11   Q    All right.  Could you tell us how you started to

12   work at the Huff-Cook Mutual Burial Association?

13   A    Well, I started out there in 19 and 48.  I started

14   with the Huff-Cook Mutual Burial Association in 1948, which

15   was a very -- it was two girls in the office and the

16   president of the company and my wife; then they took me in.

17   Q    Were you married to your wife at the time?

18   A    I was married to my wife.

19   Q    How long had she worked at the Huff-Cook Mutual

20   Burial Association?

21   A    Well, she started working at the Huff-Cook Mutual

22   Burial Association in 19 and 38.

23   Q    When you started at the Huff-Cook Mutual Burial

24   Association, what was your job?

Falzarano Court Reporters

1    A    Well, when I started there at the burial

2  association, I started out more or less just a gopher, and

3  then they took me in; and I was promoted within the

4  organization.

5    Q    Sir, could you explain how the Huff-Cook

6  association worked?

7    A    Oh, the Huff-Cook Mutual Burial Association is

8  a mutual association comprised of the members.  They are

9  an assessment association where they -- when they bought

10  a certain amount of money, like, for the beginning it was

11  25 cents a month for $200 burial benefit, and it worked as

12  an assessment burial association.

13    Q    So the members would pay an assessment, and if they

14  should -- have agreed to join.  If they needed to have a

15  funeral, the association would pay for the funeral?

16    A    Cash.  Yes.

17    Q    Did you continue to work for the company through

18  the 1950's and '60's?

19    A    Oh, yes.  Yes, sir.

20    Q    And were you promoted in the company?

21    A    Well, at the time of the president's death, which

22  was in 19 and 76, I was promoted to president and chairman of

23  the board.

24    Q    Did the burial association do well over those

25  years?  How did it do?  Did it grow?

1    A    Well, we had a television program, which I was the

2 master of ceremonies promoting the burial association, and we

3 had rapid -- we had rapid growth.

4    Q    Did there come a time when the Huff-Cook Burial

5 Association became Settlers Life Insurance Company?

6    A    The Settlers Life Insurance Company grew out of the

7 Huff-Cook Mutual Burial Association with the blessings of the

8 Bureau of Insurance in the State of Virginia.

9    Q    When did that happen?  When did that happen?

10    A    That happened in 19 -- October 19 and 84.

11    Q    And what was Settlers?  What type of an entity was

12 Settlers Life Insurance Company?

13    A    Settlers Life Insurance Company was a legal reserve

14 life insurance company, which we were able to write life

15 insurance, regular life insurance, and health insurance, but,

16 in other words, we were admitted as a regular legal reserve

17 life insurance company.

18    Q    When the company -- when Huff-Cook Mutual Burial

19 Association grew into Settlers, the reserve life insurance

20 company, did Settlers issue stock?

21    A    Yes, sir.

22    Q    And who were the major stockholders of Settlers

23 Life Insurance Company?

24    A    The major stockholders of Settlers Life Insurance

25 Company was Jess Walker, myself, and my wife, and the

Falzarano Court Reporters

1    Huff-Cook Mutual Burial Association.

2         Q     By 1999, sir, how much was the stock of Settlers

3    Life Insurance Company worth?

4         A     The stock would have a book value of between --

5    around $22 million.  Now, that is the book value of it.

6    Now, what it's worth, it would be worth much more than that.

7         Q     As to book value, sir -- well, how much of that

8    stock did you and your wife own?

9         A     We owned 51 percent of it.

10        Q     Now, in 1999, sir, what was your position at the

11   company?

12        A     In 19 and 99, I was president and chairman of the

13   board.

14        Q     Were you drawing a salary from the company?

15        A     I was drawing a salary from the Settlers Life

16   Insurance Company.

17        Q     How much of a salary were you drawing?

18        A     To tell you the truth, I don't know the exact

19   amount, but it was a little -- slightly over $100,000 a year.

20        Q     And did you and your wife -- sir, what were you

21   going do with all that stock?

22        A     We have no children, and I have no people.  And

23   I ha d-- what I -- my part of the stock was to go back into

24   the company to enhance or build the value of the company.

25        Q     And what were you doing with your salary at that

Falzarano Court Reporters

1    time with respect to the company and the employees?

2         A    Well, we were very gracious to help the ladies

3    employed in there with education for their children, but

4    as far as my salary there, we were living off of it.

5         Q    How were you helping the employees and their

6    children?

7         A    Well, we've put -- we've put several of -- helped

8    several of them with paying the college tuition.

9         Q    Did there come a time, sir, in 1999, when you sold

10   a block of insurance to First National Life Insurance

11   Company?

12        A    That's true.

13        Q    Could you tell the jury and the Court a little bit

14   about what type of insurance was in that block of insurance?

15        A    All right.  We were a mutual burial association,

16   and the funeral regulators thought quite well of us because

17   when they buried a member of ours, they'd get their money.

18   And they -- they thought quite well of that.

19             But, in other words, the block of business that

20   we're speaking of is a block of business that was designed

21   and was to pay for the burials of the policyholders of

22   Settlers.  Up until the Settlers, which is a legal reserve

23   life insurance, was formed, we were not allowed to take an

24   assignment from a funeral home, but as a legal reserve

25   company, we were; and that brought the business -- was the

1    block of business which funded prearranged funerals.

2        Q    I want to bring up to you some documents,

3    Mr. Harmon.  If you could just take a look at that.  They're

4    marked Government's Exhibit B-5.  Could you take a look at

5    the first page.  I'm going to put that up on the screen.

6    Sir, is that the reinsurance agreement between Settlers Life

7    Insurance Company and the First National Life Insurance

8    Company of America?

9        A    Yes, sir.

10        Q    Do you remember approximately when this reinsurance

11    agreement was executed?

12        A    It was executed the first part of April of 19

13    the 99.

14        Q    Okay.  If you could, if you could go down to the

15    signature page, which would be, I believe, the tenth page.

16    Have you got the signature page?

17        A    Yes.

18        Q    Is that the same page I've got up on the screen?

19        A    Yes.

20        Q    Now, sir, if you could turn to the next page after

21    the signature page -- by the way, on the signature page, do

22    you recognize the signature of the officer who represents

23    Settlers Life Insurance Company?

24        A    Yes.

25        Q    Who is that?

1     A     Well, the first one is myself.  The second one is

2  my wife --

3     Q     Excuse me, Mr. Harmon.  Are you on page Settlers

4  10 in the lower righthand corner?  There's the page.  Is that

5  the page that's up on the screen, Mr. Harmon?

6     A     Yes.

7     Q     I'm going to magnify the signature.  The first

8  signature -- Charles P. Olinger?

9     A     Yes, sir.

10     Q     Who is Mr. Olinger?

11     A     At this particular hour, Mr. Olinger was the

12  CEO/chief operating officer.  He is a CPA, and he -- that

13  was his signature.

14     Q     How long had he been working for the company?

15     A     Well, he had done -- he come from an accounting

16  firm, Fleener, Meadows & Olinger, and he had been working for

17  the company a number of years as an independent accountant,

18  and then he come to the company full-time.

19     Q     Sir, can you repeat the name of the accounting

20  firm that Mr. Olinger came from?

21     A     F-l, double e, N-e-r, Meadows, M-e-a-d-o-w-s, and

22  Olinger.

23     Q     Mr. Harmon, could you turn to the next page of

24  that document, and do I have that page up on the screen?

25  It's got four signatures, and it looks like an amount of

1    money.  Do you see the page I'm referring to?

2        A    Yes.

3        Q    Sir according to this -- I'm going to -- if you

4    look up at the screen, I'm circling an amount at the bottom

5    of the schedule of funds.  Do you see the chart I'm pointing

6    to on that piece of paper?  Is there a schedule of funds?

7        A    Yes, yes.

8        Q    And according to this agreement, how much money was

9    going to be turned over to First National Life Insurance

10   Company upon the execution of the agreement?

11       A    $44,795,476.

12       Q    Now, Mr. Harmon, in the course of this, did the

13   board have to approve this particular reinsurance agreement?

14       A    That's true.

15       Q    I want you to turn to the next page, sir.  Would

16   you like some water, sir?  Is this the Minutes of the Special

17   Called Meeting of the Board of Directors on April 7th?

18       A    Yes.

19       Q    Is that your signature at the bottom, along with

20   your wife's?

21       A    Yes.

22       Q    Now, does this -- is this the first -- excuse me,

23   Your Honor.  Is this the first action of the board of

24   directors to approve the reinsurance agreement with First

25   National Life Insurance Company?  Did this document help

1    approve First National Life Insurance Company's reinsurance

2    agreement?

3         A     It had been discussed before.  This is the

4    first . . . (trailing).

5         Q     -- resolution?  Could you turn to the next

6    document, Mr. Harmon, Action of the Board of Directors.

7    Do you have that document in front of you?

8         A     Yes.

9         Q     Does that also contain your signature?

10        A     Yes.

11        Q     Your wife's signature?

12        A     Yes, sir.

13        Q     Mr. Walker's signature?

14        A     Yes, sir.

15        Q     And Mr. Olinger's signature?

16        A     Yes.

17        Q     The second to the last paragraph, could you read

18   that?  It's up on the screen.  I'll point it out to you.

19   Could you read that second-to-last paragraph aloud, please.

20        A     "Further resolved that the First Union custodial

21   department is hereby authorized to transfer $44,795,476 to

22   First National on April the 9th from funds being held in

23   trust accounts numbered 50564492342 and 50505681311.

24        Q     Now, Mr. Harmon, did there come a time shortly

25   after that that you learned that something had happened to

1    those funds?

2        A    Yes, sir.

3        Q    Could you describe what you remember.

4        A    It's very painful, but Charles Olinger come into

5    our office and got Jess Walker and myself and my wife

6    together and said the money that had -- the money that had

7    been transferred is gone.

8        Q    What did you do when you learned that?

9        A    Cried a little bit, but we wanted to get to the

10   bottom of it.

11       Q    Did you call the Department of Insurance in

12   Virginia?

13       A    They called us.

14       Q    And do you remember what happened the next day?

15       A    Yes.

16       Q    Could you please tell the jury.

17       A    The commissioner of insurance come into our office,

18   and called us all into the office.  As a matter of fact,

19   I was not able to be there.  I was -- I was back home.

20       Q    Well, do you recall what happened with the company?

21       A    Oh, well, we were all asked to turn in our keys,

22   and then we all was to leave.  And he had brought -- the

23   commissioner of insurance had brought in their complete

24   examining staff into our company, and they took charge right

25   then.

Falzarano Court Reporters

1      Q     Did there come a time when a receiver was appointed

2   for Settlers Life Insurance Company by the commissioner?

3      A     I didn't get that.

4      Q     I'm sorry.  Did the commissioner appoint a receiver

5   for Settlers Life Insurance Company?

6      A     The commissioner brought in a Melvin Dillon from

7   over north Atlanta to run the company as -- as a receiver.

8      Q     And what did Mr. Dillon do?

9      A     Well, the first thing he done, he dismissed a few

10  of the people that we had there, and Mr. Dillon said that he

11  would -- that he would like for myself, my wife, and Jess

12  Walker, at no pay, to stay on in the company.

13     Q     Sir, when the money, the 44 million, disappeared,

14  what was your stock worth after the money disappeared?

15     A     Before?

16     Q     After.

17     A     After?

18     Q     What was it worth?

19     A     Nothing.

20     Q     Have you ever gotten any money back for your stock,

21  sir?

22     A     No, sir.

23     Q     Have you ever gotten a salary since May of 1999?

24     A     No, sir.  Not one penny.

25

Falzarano Court Reporters

1          MR. CALIFANO:  No further questions,

2      Your Honor.

3          THE COURT:  Shall we take the break at this

4      time?

5          MR. KELLY:  Thank you, Your Honor, sure.

6

7          (Recess:  10:45 to 11:00.)

8

9                    CROSS-EXAMINATION

10

11  BY MR. KELLY:

12      Q    How do you do, Mr. Harmon.  My name is Peter Kelly,

13  and I represent a lady named Mona Kim; and Mona Kim is seated

14  over here.  Would you stand up, Ms. Kim?

15

16          (Defendant rises at counsel table.)

17

18  BY MR. KELLY:

19      Q    Do you recognize this person?

20      A    No, sir.

21      Q    To your knowledge, have you ever had any dealings

22  with Mona Kim?

23      A    Not to my knowledge.

24      Q    I'm just going to ask you a couple of questions

25  about this agreement -- and we all know the terrible thing

1    that happened -- but on this reinsurance agreement, now, as

2    I understand it, you transferred some money to -- which

3    company was it?  First National?

4          A    First National, right.

5          Q    And what was the business purpose for you?  Why did

6    you think this was a good arrangement?  What was the benefit

7    going to be to Settlers Insurance?

8          A    Well, they accepted the 44 million, but we had

9    approximately a million-eight more.  The advantage to us was

10   enhancing our value by the difference between the reserve

11   that we had on the business and the reserve that they were

12   willing to take for the business.

13         Q    I'm not an insurance lawyer, but if I understand

14   the agreement and your testimony correctly, they were going

15   to take over responsibility for these claims?

16         A    Yes.

17         Q    Now, before you entered into this agreement, I'm

18   assuming there was a period of some negotiation and checking

19   out different things?

20         A    Sure.

21         Q    Do you know who -- who was your company dealing

22   with at First National?

23         A    My company dealt with a fellow named Wayne Willis,

24   but John Hackney -- John Hackney -- and Wayne Willis was the

25   actuary who come to our office and looked over the block of

1    business.

2        Q    Now, have you met Mr. Hackney before?

3        A    I met Mr. Hackney years ago when he first started

4    with the Franklin American in Tennessee, but it's been years

5    since I have.  I have met him, yes, sir.

6        Q    Okay.  Now, again, my questions now have to do

7    with this reinsurance agreement you testified about, and my

8    question is:  In putting this agreement together, do you

9    remember if Mr. Hackney approached you first or if you

10   approached him?

11       A    I can't answer that question.

12       Q    Okay.  Is it because you're not sure how it got

13   started?

14       A    To be exact, no.

15       Q    I understand you had other people working for you

16   doing other things; correct?

17       A    Charles Olinger was the fellow who made the

18   negotiations.

19       Q    Okay.  But I assume that there was -- are you

20   familiar with the term "due diligence" in business matters?

21       A    Sure.

22       Q    And why don't you tell the jurors what your

23   understanding of due diligence is?

24       A    Well, due diligence is making sure you have all the

25   facts before you go into a transaction, and we depended on

Falzarano Court Reporters

1  the bureau of insurance, the best rating, plus the

2  investigation that they done.  And I was convinced that

3  Charlie Olinger, who is a CPA, and our attorney, Terry Frye,

4  in-house, had done the due diligence.

5        Q    So, as far as you were concerned, you had properly

6  checked out Mr. Hackney and his companies; correct?

7        A    Me personally?

8        Q    No, no.  I mean your company had done its work?

9        A    So far as I know.  So far as I know.

10       Q    And what you learned later on was that there was a

11 fraudulent scheme and you were really bamboozled out of that

12 money; correct?

13       A    An understatement.

14       Q    Right.  So I guess that in order to have tricked

15 accountants and actuaries, this had to be a pretty clever

16 scheme; would you agree?

17       A    Unbelievable.

18            MR. KELLY:  Thank you.  I don't have any

19       further questions, Mr. Harmon.

20            MR. CALIFANO:  No further questions,

21       Your Honor.  Thank you, Mr. Harmon.

22            THE COURT:  Thank you, Mr. Harmon.

23            THE WITNESS:  Thank you.

24

25            (Witness excused:  11:07 a.m.)


Falzarano Court Reporters