# EXHIBIT 3

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

FILED

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| 277 DIAMONDS VALUED AT APPROXIMATELY $2,461,093.00 | : |
| | : |
| ONE (1) PAIR OF DIAMOND EARRINGS, VALUED AT APPROXIMATELY $40,120.00, | : |
| | : |
| AND | : |
| | : |
| ONE (1) PLATINUM AND DIAMOND RING VALUED AT APPROXIMATELY $25,935.00 | : |
| | : |
| Defendants. | : |

Civil No. 3:02 CV 889 (EBB)

**VERIFIED STATEMENT OF INTEREST OR RIGHT OF
HUFF COOK, INC. OR, IN THE ALTERNATIVE,
SETTLERS LIFE INSURANCE COMPANY AND JURY DEMAND**

Huff Cook, Inc., in the right of and on behalf of Settlers Life Insurance Company ("Huff

Cook") or, in the alternative, Settlers Life Insurance Company on its own behalf ("Settlers")

(collectively, the "Claimants"), by and through their attorneys, Rosen & Dolan, Lord, Bissell &

Brook, and Bode, Call & Stroupe, L.L.P., pursuant to 18 U.S.C. § 983(a)(4)(A) and Rule C(6) of

the Supplemental Rules for Certain Admiralty and Maritime Claims, for their statement of

interest or right in certain of the 277 Diamonds, the pair of diamond earrings and the platinum

1.    Peoples Benefit Life Insurance Company is a corporation organized and existing under the laws of the State of Missouri with its principal place of business at 20 Moores Road, Frazer, Pennsylvania.

2.    Veterans Life Insurance Company is a corporation organized and existing under the laws of the State of Illinois with its principal place of business at 20 Moores Road, Frazer, Pennsylvania.

3.    The Defendant Properties are the proceeds of the fraud perpetrated by Frankel, First National Life Insurance Company of American ("FNLIC") and others wherein Frankel and his henchmen used FNLIC as a vehicle to defraud Claimants out of nearly $15 million. As a result of the theft of Claimants' funds, as well as other misconduct by Frankel, FNLIC and others, FNLIC was placed in rehabilitation by the Mississippi Commissioner of Insurance on or about May 10, 1999. The rehabilitation order was later converted into an order of liquidation.

4.    In *United States v. $11,014,165.20 in U.S. Currency*, Civ. No. 3:99CV2589, this Court denied Claimants' motion to intervene noting that Claimants had filed proofs of claim in the liquidation proceedings. (*See* Ruling on Motions to Intervene, p.5, dated Oct. 31, 2000, a copy of which is attached hereto as Exhibit 1.) The Claimants have filed a Petition in the FNLIC liquidation proceedings currently pending in the Chancery Court of Hinds County, Mississippi, seeking declaratory and other relief establishing a constructive trust over some of the Defendant Properties. (A copy of the Petition is attached hereto as Exhibit 2, and is incorporated herein by reference as if fully set forth.) The monies stolen from Claimants by

---

908S2, Chancery Court of Hinds County, Mississippi. These additional properties are currently before this Court in *United States v. $29,035,500.00*, Civil No. 3:01CV1515(EBB) and *United States v. $11,014,165.20*, Civil No. 3:99CV02589(EBB). The proof establishing Claimants' right to the Defendant Properties in the present case are equally applicable to proving Claimants' right to these other properties.

Frankel, FNLIC and others are not now, nor were they ever part of the FNLIC estate but at all times remained the property of the Claimants and must be returned to Claimants.[2]  Discovery is proceeding in the Chancery Court and the case will most likely be set for trial at the end of this year or early next year.

5.    Some, if not all, of the Defendant Properties are the proceeds of funds stolen from the Claimants by Martin Frankel, FNLIC, and others.  The stolen monies can be traced to some, if not all, of the Defendant Properties.

6.    In June 1998, a broker put the Claimants in touch with Franklin American Life Insurance Company ("FALIC") to explore the possibility of FALIC's reinsuring certain blocks of insurance business originally underwritten by the Claimants.  When the Claimants objected to such a transaction with FALIC because that company's financial rating was not high enough to assure regulatory approval of the proposed transaction, FALIC officials offered as an alternative a deal with FNLIC – FALIC's highest-rated affiliate and another company ultimately controlled by Frankel.

7.    Relying on the false representations regarding the financial condition of FNLIC as a solvent company and also relying on the crucial representation that FNLIC would continue to use the reserve fund associated with the book of business for its intended purpose, namely the administration of the book of business and the payment of policyholder claims, Claimants entered into a set of agreements with FNLIC.  On or about October 30, 1998, the Claimants entered into a Master Agreement, Reinsurance Agreement, and Assumption Agreement with

---

[2] Claimants intend to file an Amended Petition in the Mississippi liquidation proceedings to include claims seeking the recovery of the property at issue in this case.  Claimants became aware of the present proceedings when they received notice from the U.S. Attorneys' office via letter dated March 21, 2003.  (A copy of the letter is attached hereto as Exhibit 3.)  The U.S. Attorneys' office inadvertently forgot to send notice of the forfeiture complaint.  Several state insurance departments filed statements of interest beginning on March 14, 2003.

FNLIC (collectively, the "Agreements") to transfer certain blocks of insurance business from the Claimants to FNLIC, as well as $14,689,593.00 held by Claimants in reserve (the "Reserve Fund") to pay claims of the policyholders for those blocks of insurance business.

8.    Pursuant to their terms, the Agreements would not and could not become effective until the Mississippi Commissioner of Insurance approved the Assumption Agreement. The Agreements also provided that FNLIC would return immediately any portion of the insurance business – and therefore the corresponding portion of the Reserve Fund – that the appropriate regulatory authorities did not approve for transfer to FNLIC.

9.    Pursuant to the Agreements, the Claimants transferred the Reserve Fund to FNLIC's bank account at First Tennessee Bank in three separate installments in November 1998 and early 1999.

10.    Between the time the Reserve Fund was transferred to FNLIC and the time the Agreements failed, Frankel, through his control of FNLIC, FALIC and affiliated companies, caused the Claimants' Reserve Fund to be transferred out of the First Tennessee Bank account and ultimately to Account Number 70026 at Banque SCS Alliance SA in Geneva, Switzerland in the name of Devonshire Technologies, Ltd.

11.    The Reserve Fund was transferred to Banque SCS Alliance prior to March 12, 1999. According to the allegations in the United States' Verified Complaint in this action, on March 31, 1999 Frankel caused approximately $2 million of cash assets held in Account Number 70026 at Banque SCS Alliance to be transferred to Account Number 012931920, held in the name of Worldwide Diamond at Bank Leumi, Beverly Hills, California for the purchase of diamonds. (Verified Compl. ¶ 43.)

12.    According to the allegations in the United States' Verified Complaint, on or about

April 2, 1999, Martin Frankel received approximately $1.1 million worth of diamonds through Worldwide Diamond Company of Los Angeles, California. The remaining approximate $900,000 worth of diamonds were to be delivered to Martin Frankel at a later date. (Verified Compl. ¶ 44.)

13.    According to the allegations in the United States' Verified Complaint, on May 3, 1999, Frankel wire transferred $10,000,000 from Account Number 70026 at Banque SCS Alliance to Account Number 0102931920, held in the name of Worldwide Diamond, at Bank Leumi, Beverly Hills, California for the purchase of diamonds. (Verified Compl. ¶ 46.)

14.    According to the allegations in the United States' Verified Complaint, on or about May 4, 2002, a representative of Worldwide Diamond Company and another individual assisting in the transaction, flew to Teterboro Airport in New Jersey with approximately $6 million worth of diamonds. Additional diamonds valued at $3 million were to be picked up in New York City as part of the $10 million transaction with Martin Frankel. Included in that sale was the outstanding $900,000 worth of diamonds that Martin Frankel was owed as a result of his $2 million purchase on or about March 31, 1999. (Verified Compl. ¶ 47.)

15.    As alleged by the United States, the Defendant Properties were purchased by Frankel in the $2 million and $10 million transactions with Worldwide Diamond Company, and/or that these diamonds were purchased with the proceeds of Frankel's fraudulent scheme. (Verified Compl. ¶ 52.)

16.    On information and belief, all or part of the Defendant Properties is the proceeds of, or traceable to the proceeds of, the Reserve Fund.

17.    The Reserve Fund, held by FNLIC in constructive trust for the benefit of the Claimants, was the Claimants' property when stolen. Claimants therefore assert an interest

and/or right in the Defendant Properties.

18.    In the alternative, when the regulators failed to approve the Assumption Agreement, FNLIC should have repaid the Claimants the Reserve Fund, which in equity and good conscience belonged to the Claimants and which FNLIC had no right to retain.  Under a money had and received theory, Claimants were and are entitled to a return of their Reserve Fund.  Claimants therefore assert an interest and/or right in the Defendant Properties.

19.    Peoples Benefit Life Insurance Company and Veterans Life Insurance Company, pursuant to Federal Rule of Civil Procedure 38, hereby demand a trial by jury for all issues so triable.

Dated: April 1C, 2003

PEOPLES BENEFIT LIFE INSURANCE
COMPANY AND VETERANS LIFE
INSURANCE COMPANY

By:_____
     David N. Rosen
     Rosen & Dolan
     400 Orange Street
     New Haven, CT 06511
     Federal Bar No. 000196
     Telephone:  (203) 787-3513
     Telecopy:  (203) 789-1605

Of counsel:

Forrest B. Lammiman
Timothy M. Maggio
A. Kelly Turner
Brian I. Hays
Lord, Bissell & Brook
115 South LaSalle Street
Chicago, IL  60603
Telephone:  (312 ) 443-0700
Telecopy:  (312) 443-0336

## VERIFICATION

I, Michael Eubanks, declare that I am Senior Vice President and General Counsel of

AEGON Special Markets Group and am authorized to make this verification on behalf of

Peoples Benefit Life Insurance Company and Veterans Life Insurance Company.  I declare under

penalty of perjury as provided by 28 U.S.C. § 1746 that the foregoing VERIFIED STATEMENT

OF INTEREST OR RIGHT OF PEOPLES BENEFIT LIFE INSURANCE COMPANY AND

VETERANS LIFE INSURANCE COMPANY AND JURY DEMAND is true and correct.

Executed on: ____4 - 8____, 2003        _Michael A. Eubanks_____
                                                                    Michael Eubanks

711271_1

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that true and correct copies of the foregoing VERIFIED STATEMENT OF INTEREST OR RIGHT OF PEOPLES BENEFIT LIFE INSURANCE COMPANY AND VETERANS LIFE INSURANCE COMPANY AND JURY DEMAND were served via U.S. mail, First Class, postage prepaid on April 10, 2003 on:

David X. Sullivan
Assistant United States Attorney
P.O. Box 1824
New Haven, Connecticut 06508

Douglas S. Skalka
Neubert, Pepe & Monteith
195 Church St.
13th Floor
New Haven, CT 06510-2026

_____
David N. Rosen

8

**EXHIBIT 1**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

Oct 31   2 48 PM '00

U.S DISTRICT COURT
NEW HAVEN, CONN.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| Plaintiff | : | |
| | : | |
| v. | : | 3:99-CV-2590 (EBB) |
| | : | |
| | : | |
| ONE 1995 TURBO COMMANDER AIRCRAFT | : | |
| MODEL 114TC, SERIAL NO. 20002, | : | |
| ETC, ET AL., | : | |
| Defendants | : | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff | : | |
| | : | |
| v. | : | 3:99-CV-2589 (EBB) |
| | : | |
| | : | |
| $11,014,165.20 IN U.S. CURRENCY | : | |
| CONVERTED FROM GOLD COINS, ETC., | : | |
| ET AL., | : | |
| Defendants | : | |

<u>RULING ON MOTIONS TO INTERVENE</u>

<u>INTRODUCTION</u>

Peoples Benefit Life Insurance Company ("Peoples") and

Veterans Life Insurance Company ("Veterans") have moved this

Court to grant them the right to intervene, pursuant to Rule 24

of the Federal Rules of Civil Procedure, as parties with a direct

interest in the outcome of the above-referenced litigations,

which arise out of the looting of insurance companies by Martin

Frankel. The Receivers of the estates have filed timely

objection thereto.

RECEIVED

NOV - 6 2000

## STATEMENT OF FACTS

The Court sets forth only those facts deemed necessary to an understanding of the issues raised in, and decision rendered on, these Motions.

In approximately 1993, Martin Frankel established one Thunor Trust in Franklin, Tennessee.  The Thunor Trust was established to acquire ownership of insurance companies, including First National Life Insurance Company ("FNLIC") and Franklin American Life Insurance Company ("FALIC").

In June, 1998, a broker of blocks of insurance business put Peoples and Veterans in touch with FALIC to explore the possibility of FALIC reinsuring certain blocks of insurance business that were originally underwritten by Peoples and Veterans.

Peoples and Veterans rejected the proposal due to the fact that FALIC's financial rating was not high enough to assure regulatory approval of the proposed transaction.  As an alternative, FALIC officials offered a substitute deal with FNLIC, FALIC's highest rated affiliate under the folds of the Thunor Trust.  Based on a series of representations regarding the financial condition of FNLIC and its statutory financial statements, Peoples and Veterans entered into a set of agreements with FNLIC.

The Agreements entered into included a Master Agreement, a Reinsurance Agreement and an Assumption Agreement.  The Agreements were to transfer the initial blocks of insurance

2

business from Peoples and Veterans to FNLIC, as well as the corresponding $14,689,593.00 Reserve Fund which accompanied those blocks of insurance business.

The Agreements provided that they would not and could not become effective until the Mississippi Commissioner of Insurance approved the Assumption Agreement. The documents also provided that FNLIC would immediately return any portion of the insurance business -- and the concomitant portion of the Reserve Fund -- that was not approved for transfer by the appropriate regulatory authorities.

The Agreements failed because certain conditions set forth in the Agreements did not occur. However, rather than returning the business and the Reserve Fund, Peoples and Veterans assert that Frankel absconded with the Reserve Fund. As a consequence, Peoples and Veterans lost the Reserve Fund but remained liable for all claims and expenses for the corresponding insurance business.

## LEGAL ANALYSIS

Intervention as a matter of right under Federal Rule of Civil Procedure 24(a)(2) is permitted when the party proposing to intervene meets the following requirements: (1) the motion to intervene must be timely filed; (2) the party must demonstrate an interest in the property or transaction which is the subject of the underlying action; (3) the party must show that a prejudice to that interest will result if intervention is not permitted; and (4) the applicant's interest must not be adequately protected

3

by any of the existing parties.  Security Pacific Mortg v. Republic of the Philippines, 962 F.2d 204, 208 (2d Cir. 1992). "Failure to satisfy *any* of these requirements is a sufficient ground to deny the application."  Farmland Dairies v. Comm'r of N.Y. Dep't of Agriculture, 847 F.2d 1038, 1043-44 (2d Cir. 1988)(emphasis in original).

The Supreme Court has held that the "interest" referred to in factor two is required to be a "significantly protectible interest."  Donaldson v. United States, 400 U.S. 517, 531 (1970)(denying intervention for lack thereof).  Here, although the interest of Peoples and Veterans is of significant interest to them, it is not within the meaning the Donaldson and its progeny.  *See, e.g.* Mountain Top Condominium Ass'n v. Dave Staubbert Master Builder, 72 F.2d 361 (3d Cir. 1995); Conservation Law Foundation of New England, Inc. v. Mosbacher, 966 F.2d 39 (1st Cir. 1992).  This can be recognized by the acknowledgment, oft repeated in their moving papers, that they "may" have an interest in the seized assets.

In fact, the monies in the Reserve Funds which were stolen were stolen from the insurance companies, and not from Peoples or Veterans themselves.  In a parallel vein:

> [T]he injury . . . is primarily to the corporation. . . and is an injury to the creditor . . . only insofar as it decreases the assets of the corporation to which he must look for satisfaction of his debt. . . the suit is for a tort suffered by the corporation, and properly brought by the trustee.

University of Maryland at Baltimore v. Peat Marwick Main & Co..

4

923 F.2d 265, 273 (3d Ci. 1991).

In a sense, Peoples and Veterans realize this flaw in their reasoning, as they have filed appropriate proofs of claim with the Mississippi and Tennessee receivership actions.  With this motion, they intend to "leapfrog" over every other worthy (and sometimes worthier) claimant to an as yet limited amount of funds.  This the Court cannot allow.

## CONCLUSION

The Receivers in these actions are the appropriate parties to be pursuing these actions against the monies liquidated out of the seizures to date of the Frankel assets.  Hence, the Court will not grant permissive intervention.  Too, inasmuch as they do not meet the standards for intervention as of right, the Motions to Intervene [Doc. No. 36, 3:99-CV-2589 and 32, 3:99-CV-2590) are hereby DENIED.

SO ORDERED

ELLEN BREE BURNS

SENIOR UNITED STATES DISTRICT JUDGE

Dated at New Haven, Connecticut this 31 day of October, 2000.

5

**EXHIBIT 2**

## IN THE CHANCERY COURT OF THE FIRST JUDICIAL DISTRICT
## OF HINDS COUNTY, MISSISSIPPI

GEORGE DALE, COMMISSIONER OF
INSURANCE OF THE STATE OF MISSISSIPPI                    PLAINTIFF

V.                                          CIVIL ACTION NO. G99-908S2

FIRST NATIONAL LIFE INSURANCE COMPANY
OF AMERICA, A MISSISSIPPI DOMICILED
INSURANCE COMPANY                                         DEFENDANT

### PETITION FOR DECLARATORY RELIEF OF
### HUFF-COOK, INC., PEOPLES BENEFIT LIFE INSURANCE COMPANY
### AND VETERANS LIFE INSURANCE COMPANY

Huff-Cook, Inc. ("Settlers"), Peoples Benefit Life Insurance Company ("Peoples"), and

Veterans Life Insurance Company ("Veterans") (collectively, the "Petitioners") submit this Petition

seeking a declaration by this Court that certain property owned by the Petitioners in which the

Honorable George Dale, Commissioner of Insurance for the State of Mississippi (the "Liquidator"),

in his capacity as Liquidator of First National Life Insurance Company ("First National Life"), asserts

an interest is not part of the estate of First National Life. Instead, that property is impressed with a

constructive or other equitable trust in favor of the Petitioners. In the alternative, Petitioners seek

a declaration by this Court that Petitioners are secured creditors of First National Life. In further

support, Petitioners allege as follows:

### JURISDICTION

1.    This Court has jurisdiction over this matter pursuant to Mississippi Insurers

Rehabilitation and Liquidation Act. Miss. Code Ann.

2.    This Court also has jurisdiction over this matter pursuant to Mississippi Rule of Civil

Procedure 57.

## THE PARTIES

3.     Huff-Cook, Inc. is a corporation organized and existing under the laws of the Commonwealth of Virginia.  At all relevant times, Huff-Cook, Inc. (then known as the Settlers Companies, Inc.) was the sole shareholder of the Settlers Life Insurance Company, a corporation organized as a life insurance company under Virginia law.  On April 9, 1999, First National Life defrauded Settlers Life Insurance Company of $44.8 million pursuant to a scheme described below. As a direct result of First National Life's fraud, Settlers Life Insurance Company was placed in receivership on May 14, 1999 by order of the Circuit Court of Richmond, Virginia, with the State Corporation Commission of Virginia as Receiver, and the Insurance Commissioner, the Honorable Alfred W. Gross, as deputy Receiver.  On December 1, 1999, the State Corporation Commission, as Receiver of Settlers Life Insurance Company, assigned to Huff-Cook, Inc. (then known as the Settlers Companies, Inc.) the right to prosecute the claims of Settlers Life Insurance Company arising out of the activities of Martin Frankel ("Frankel"), Frankel's associates and associated entities (including First National Life).

4.     Peoples Benefit Life Insurance Company is a corporation organized and existing under the laws of the State of Iowa with its principal place of business at 20 Moores Road, Frazer, Pennsylvania.

5.     Veterans Life Insurance Company is a corporation organized and existing under the laws of the State of Illinois with its principal place of business at 20 Moores Road, Frazer, Pennsylvania.

-2-

6.    Plaintiff George Dale is the duly-appointed Liquidator of the Mississippi domiciled First National Life Insurance Company of America, pursuant to an Order of Liquidation entered on June 29, 1999, by this Court. Prior to being placed into liquidation, First National Life had been subject to an Order of Rehabilitation entered on May 10, 1999.

7.    Defendant First National Life Insurance Company is a Mississippi domiciled insurance company. First National Life Insurance Company of America is subject to an Order of Liquidation entered on June 29, 1999, by this Court.

## STATEMENT OF FACTS

### A.    Background Information

8.    From at least 1991 until 1999, Frankel, John Hackney ("Hackney"), Gary Atnip ("Atnip") and others executed a scheme to defraud companies out of hundreds of millions of dollars. The fraudulent scheme included the use of various corporations and corporate entities including Liberty National Securities, Inc. ("LNS"), Bloomfield Investments, Ltd., and Devonshire Technologies Ltd. The fraudulent operations focused primarily on ostensibly investing, through LNS, the assets of certain insurance companies. In truth, Frankel, Hackney, Atnip, through First National Life and other companies, systematically drained the assets of the insurance companies through various transfers into and out of numerous domestic and international accounts.

9.    In approximately 1993, Frankel established the Thunor Trust in Tennessee. Hackney was the sole trustee of the Thunor Trust. The Thunor Trust was established to acquire ownership of insurance companies, including Franklin American Life Insurance Company ("Franklin American Life") in 1993 and First National Life in 1997 Hackney was a trustee of the Thunor Trust from the

-3-

first. The purpose in acquiring these companies, and others, was to loot the assets of these and other companies, including the Petitioners.

10.     Hackney also was the president and chairman of the board of directors of First National Life.

11.     Atnip was the chief financial officer of Franklin American Corporation who, together with Hackney, served as the investment committee for First National Life.

12.     The fraudulent operations began to unravel after the Greenwich (Connecticut) Police Department searched a residence of Frankel that had been the scene of a fire on May 5, 1999. The search revealed that the house in Greenwich had apparently been used as brokerage office with an active trading floor and 80-plus computers and various telecommunications equipment providing a continual flow of financial and trading market information. Records obtained during the search identified various business entities that had been operated by Frankel from the house. Also recovered from the residence were astrological charts created to answer questions such as "Will I go to prison?" and "Should I wire money back from overseas?" Included among documents recovered from the fire at the house was a "to do" list, with the first item listed as "Launder money."

13.     On September 22, 2000, Hackney pled guilty to multiple counts of wire fraud and money laundering based, in part, on his role in First National Life's theft of approximately $60 million from Settlers, Peoples and Veterans, some of which was a significant component of the approximately $200 million stolen from these and other entities. Hackney has confessed that he personally received almost $8 million over the years from the fraudulently obtained funds.

-4-

14.     Frankel and Atnip have been indicted by a federal grand jury and charged with numerous counts of wire fraud and money laundering, as well as participating in a Racketeer Influenced and Corrupt Organization, conspiracy to participate in a Racketeer Influenced and Corrupt Organization, and securities fraud based, in part, on their role in First National Life's theft of approximately $60 million from Settlers, Peoples and Veterans.   Atnip improperly received approximately $700,000 directly from Account 70026 at Banque SCS Alliance in Geneva, Switzerland.

15.     Pursuant to a number of warrants, the United States has seized a number of assets that are proceeds of the fraudulent scheme.   These assets are the subjects of a number of forfeiture proceedings currently pending before Judge Burns in the United States District Court for the District of Connecticut including United States v. $29,035,500.00, Civil No. 3:01CV1515(EBB) and United States v. $11,014,165.20, Civil No. 3:99CV02589(EBB).

16.     The Petitioners have filed Verified Statements of Interest or Right and sought to intervene in a number of these forfeiture proceedings.

17.     The forfeiture proceedings have been consolidated before Judge Burns in the United States District Court for the District of Connecticut.   By order dated October 31, 2000, Judge Burns denied Peoples and Veterans motion to intervene in the forfeiture proceedings.  United States v. One 1995 Turbo Commander, No. 3:99-CV-2590, No. 3:99-CV-2589, 2000 WL 18388334, *2.   The United States Court of Appeals for the Second Circuit affirmed the denial of Peoples and Veterans' motion to intervene and directed Peoples and Veterans to pursue their constructive trust claims in the

present First National Life receivership proceeding. <u>United States v. Peoples Benefit Life Ins. Co.</u>, 271 F.3d 411, 416-17 (2d Cir. 2001).

18.    Through bank records, the Petitioners can trace substantial portions of the funds stolen from them by First National Life to assets in these forfeiture proceedings initiated by the United States government in federal court in Connecticut.

**B.    <u>First National Life Defrauded Settlers Out of Nearly $44.8 Million</u>**

19.    As of the beginning of 1998, Settlers had a group of existing policies (a "book of business") of burial insurance called the "Care Plan" book. Settlers had discontinued selling this type of policy and was holding approximately $46 million as reserves for the payment of claims of the policyholders for this "book of business." As Settlers no longer sold this type of policy, it was interested in selling this book to another insurance company.

20.    In early 1999, representatives of First National Life approached Settlers regarding entering into an agreement with Settlers to acquire the Care Plan book of business by an assumption reinsurance transaction. First National Life agreed to pay $1.75 million for the Care Plan book of business. This payment was to take the form of a "ceding commission" which would be deducted from the reserves for the book, which Settlers would transfer to First National Life. In other words, Settlers would transfer to First National Life approximately $46 million in liabilities associated with the Care Plan business and $44,795,000 in cash reserves (the "Settlers Reserve Fund").

21.    Settlers was fraudulently induced to enter into the assumption reinsurance agreement ("Settlers Agreement," a copy of which is attached hereto as Exhibit A), in part by First National Life's misrepresentations that it was a solvent and prosperous company. More important, First

National Life also fraudulently represented that any funds transferred to First National Life under the Settlers Agreement would be used to administer the book of business and pay policyholder claims, when in fact, First National Life intended that the Reserve Funds would be misappropriated immediately for the personal use of Frankel, Hackney, Atnip and their accomplices and associates. Settlers entered into the Settlers Agreement in reliance on these representations.

22.    The Settlers Agreement required approval from regulators, including the Mississippi Department of Insurance, before assumption of the book of business could become effective. The Settlers Agreement specifically provided that it was "subject to and contingent upon receipt by Ceder [Settlers] and Reinsurer [First National Life] of any required regulatory approvals of the transaction."

23.    Before seeking the required regulatory approvals, First National Life requested that Settlers transfer the Settlers Reserve Fund. On Friday, April 9, 1999, Settlers complied and transferred a total of $44,795,476.00 to First National Life's account no. 100057727 at First Tennessee Bank in Memphis, Tennessee. First National Life never obtained the approval of regulators for the Settlers Agreement, and could never have properly obtained that approval. More significant, First National Life had intended from the first to defraud Settlers and to immediately misappropriate the Settlers Reserve Fund for the benefit of certain of First National Life's insiders, e.g., Frankel, Hackney and Atnip. First National Life acted quickly to consummate the fraud.

24.    The Settlers Reserve Fund remained in First National Life's bank account for less than three hours. At 13:11 central daylight time on April 9, 1999, First National Life caused the $44,795,000 Settlers Reserve Fund to be transferred from First National Life's First Tennessee account to an account at the Bank of New York, in New York, New York, for the benefit of Dreyfus

Cash Management Plus ("Dreyfus Account"), with a notation "Attention: Lion System DDA #8900052252/AC-719-079-1438435 OBI=Reference FNL Co. of America Receiving Dealer #2552."

25.    The Dreyfus Account was in the name of "FNL CO OF AMERICA REC ACCT." The Dealer was identified as #002552, and the "REP" was identified as "LNS, Inc.; 405 Tarrytown Road, Suite 212, White Plains, NY 10807 1326." This account was controlled by Frankel.

26.    The Dreyfus Account was a sham. Any securities transferred to the account were to be redeemed, and, together with any cash in the account, were to be wire transferred to UBS Bank in New York, for further credit to Banque SCS Alliance SA, in Geneva, Switzerland, sub account no. 70026, for further credit to "BENEFICIARY BLOOMFIELD INV LTD FC TO FNL CO OF AMERICA."

27.    On April 12, 1999, the Monday after the Settlers Reserve Fund was wired to the Dreyfus account, Dreyfus wired the Reserve Fund of $44,795,000.00, together with $17,640.49 in accrued interest, to Banque SCS Alliance SA, Geneva, via UBS as primary bank.

28.    Before the Settlers Reserve Fund was wired to the Bloomfield Investments, Ltd. account at Banque SCS Alliance SA in Geneva, the balance of that account had dwindled to $931,946.62.

29.    After the April 12, 1999 wire transfer of the Settlers Reserve Fund, plus interest, to the Bloomfield Investments, Ltd.'s account at Banque SCS Alliance SA, and continuing until the date this account was frozen, the $44,795,000 of proceeds of the Settlers Reserve Fund constitutes the overwhelming bulk of new funds deposited in the account.

30.     First National Life's immediate misappropriation of that Fund for the use of First National Life's insiders, rather than as a reserve to pay claims and administer the book of business, was disastrous for Settlers.  Settlers was still liable to the policyholders on the subject book of business, even though First National Life had stolen the Reserve Fund.  As a result, Settlers was forced into liquidation proceedings in Virginia only two months later, and its individual owners (who had built up Settlers over the course of nearly half a century) lost a company that had had an estimated $20 million in equity prior to the fraud perpetrated by First National Life.

**C.**     **Tracing the Settlers Reserve Fund**

31.     Much of the Settlers Reserve Fund can be traced directly to assets currently subject to civil forfeiture proceedings in Connecticut.

> **(a)     $29 Million of the Settlers Reserve Fund are Directly Traceable to Banque SCS Alliance Account 70026**

32.     As set forth above, the Settlers Reserve Fund was deposited in Account 70026 on April 12, 1999.

33.     On May 7, 1999, Frankel caused $28,000,000 to be transferred from Account 70026 to Bank Monte dei Paschi di Siena in Florence, Italy, to the order of Sanita PIU, S.P.A., for an alleged investment in a corporation.

34.     On May 14, 1999, Account 70026 had a balance of $30,384.30.

35.     On June 27, 1999, Account 70026 was frozen pursuant to a request of the United States Government in accordance with a Mutual Legal Assistance Treaty between Switzerland and the United States.