36.    On July 7, 1999, the amount of $26,499,980 was returned to Account 70026 by wire transfer from Bank Monte dei Paschi di Siena, order of Sanity PIU, S.P.A., as repayment of an investment in a corporation resulting from the execution of a cancellation agreement.

37.    In 1999, all funds in Account 70026 were frozen by the Swiss government pursuant to an order entered by Magistrate Barbey in Geneva, Switzerland. After months of negotiations with the United States Department of Justice, on or about June 28, 2000, the funds contained in Account 70026, $29,035,500, finally were wire transferred to Account 20X6875(06), held in the name of U.S. Customs Suspense Account, at the Federal Reserve Bank of New York.

38.    On July 6, 2001, the Internal Revenue Service Criminal Investigation seized the $29,035,500 pursuant to a seizure warrant issued by the Honorable Joan G. Margolis, United States Magistrate Judge of the United States District Court for the District of Connecticut.

39.    Most of the funds seized from Account 70026 are clearly traceable to the Settlers Reserve Fund. On April 11, 1999, Account 70026 had $931,946.62. Immediately prior to the deposit of the Settlers' Reserve Fund, Account 70026 had been virtually emptied. From April 12, 1999 through the date Account 70026 was frozen, few other amounts were credited to the account. The majority of the funds in the account at the time it was seized could only have come from the Settlers Reserve Fund.

40.    These assets are currently the subject of a civil forfeiture action pending before Judge Burns in the United States District Court for the District of Connecticut in a case entitled United States v. $29,035,500.00, Civil No. 3:01CV1515(EBB).

-10-

**(b)    Other Transfers from Account 70026 are Traceable to the Settlers Reserve Fund.**

41.    Martin Frankel made the following additional wire transfers from his Bloomfield Investments, Ltd. account number 70026 at Banque SCS Alliance:

(1)    On May 14, 1999, Frankel wire transferred $160,000.00 into Account Number 026-015-0998, held in the name of Jacqueline A. Ju, at People's Bank, Bridgeport, Connecticut.

(2)    Frankel made the following wire transfers into Account Number 641-7028470, held in the name of Beng Tan, at Putnam Trust Company, Greenwich, Connecticut:
(a)    the amount of $88,000.00 on May 3, 1999;
(b)    the amount of $20,000.00 on May 6, 1999; and
(c)    the amount of $4,500.00 on May 17, 1999.

(3)    Frankel made the following wire transfers into Account Number 4461533, held in the name of Gomberg, Kane & Fisher, Ltd., Client Fund Account, at Northern Trust, Chicago, Illinois:
(a)    the amount of $100,000.00 on May 6, 1999, for the benefit of Karen Timmins;
(b)    the amount of $400,000.00 on May 6, 1999, for the benefit of Martin Frankel; and
(c)    the amount of $100,000.00 on May 6, 1999, for the benefit of Sonia Howe.

(4)    On May 5, 1999, Frankel wire transferred $75,000.00 into Account Number 0000267694, held in the name of Thomas A. Bolan, at Bank of New York, New York, New York.

(5)    On May 5, 1999, Frankel wire transferred $50,000.00 into Account Number 4705/6255, held in the name of Jiro and Yasuko Nakamura, at Citibank, New York, New York.

(6)    On May 3, 1999, Frankel wire transferred $50,000.00 into Account Number 29692637, held in the name of Beng Tan, at Citibank, White Plains, New York.

(7)     On April 23, 1999, Frankel wire transferred $750,000.00 into Account Number 96968953, held in the name of Victor C. Moses, at Seafirst Bank, Seattle, Washington.

(8)     On May 7, 1999, Frankel wire transferred $10,000.00 into Account Number 110114, held in the name of Highland Industrial Park, at Hudson Valley Bank, Pickle, New York.

(9)     On April 21, 1999, Frankel wire transferred $542,850.00 into Account Number 0111146957, held in the name of Fausto Fausti, at Chase Manhattan Bank, New York, New York.

(10)    On April 14, 1999, Frankel wire transferred $650,000.00 into Account Number 42535468, held in the name of Bruce I. Weiser, at Citibank, Stamford, Connecticut.

(11)    On April 16, 1999, Frankel wire transferred $1,395,000.00 into Account Number 70134101, held in the name of North Mississippi Aviation, Inc., at Falkner Bank, Falkner, Mississippi.

(12)    Frankel made the following wire transfers into American Express Credit Card Number 37383880008008, in the name of K. Schuchter, at American Express, New York, New York:
(a)     the amount of $100,000.00 on May 5, 1999; and
(b)     the amount of $200,000.00 on May 6, 1999.

(13)    Frankel made the following wire transfers into Account Number 1080305385, held in the name of Park Avenue Travel Services, at Bank of New York, New York, New York:
(a)     the amount of $50,000.00 on May 5, 1999;
(b)     the amount of $400,000.00 on May 6, 1999; and
(c)     the amount of $500,000.00 on May 7, 1999.

42.     These monies are directly traceable to the Settlers Reserve Fund. The transfers listed above totaled $5,645,350.00. As set forth above, as of April 11, 1999, Account 70026 only had $931,946.62, and each of the transfers enumerated in paragraph 41 above was made after that date. Accordingly, the additional amounts in Account 70026 were largely made from the Settlers Reserve Fund deposited in the account on April 12, 1999. The proceeds of the transfers set forth in paragraph

-12-

41 are currently the subject of a civil forfeiture pending before Judge Burns in the United States District Court for the District of Connecticut in an action entitled <u>United States v. $11,014,165.20</u>, Civil No. 3:99CV02589(EBB).

(c)    **$10 Million in Diamonds are Traceable to the Settlers Reserve Fund**

43.    On or about May 3, 1999, Frankel bought $10 million worth of diamonds from World Wide Diamonds in Los Angeles via a wire transfer of $9,999,985 from the account at Banque SCS Alliance.

44.    On information and belief, Frankel had approximately $8 million in diamonds in his possession when he was apprehended by the German authorities on September 4, 1999.   On information and belief, these diamonds are currently being held by the German authorities awaiting return to the United States.

45.    On information and belief, on or about May 4, 1999, one of Frankel's accomplices, David Rosse, stole an unknown number of diamonds purchased by Frankel with a portion of the Settlers Reserve Fund that were en route to Frankel.  As part of a guilty plea, Rosse turned over some but not all of these diamonds to the United States government.

46.    As set forth above, the Settlers Reserve Fund constituted the overwhelming majority of the funds in Account 70026 on May 3, 1999.  The funds used to purchase the $10 million in diamonds could only have come from the Settlers Reserve Fund.

### D.    First National Life Defrauded Peoples and Veterans Out of $14.7 Million

47.    In June 1998, a broker put Peoples and Veterans in touch with Franklin American Life to explore the possibility of Franklin American Life's reinsuring certain blocks of insurance business originally underwritten by Peoples and Veterans.  However, Peoples and Veterans objected to such a transaction with Franklin American Life because Franklin American Life's financial rating was not high enough to assure regulatory approval of the proposed transaction.  As an alternative, Franklin American Life officials offered a substitute deal with First National Life ☐ Franklin American Life's highest-rated affiliate and another company within the fold of the Thunor Trust.

48.    Relying on the false representations regarding the financial condition of First National Life and also relying on the crucial representation that First National Life would continue to use the Reserve Fund for its intended purpose, namely the administration of the book of business and the payment of policyholder claims, Peoples and Veterans entered into a set of agreements with First National Life.  On or about October 30, 1998, Peoples and Veterans entered into a Master Agreement, Reinsurance Agreement, and Assumption Agreement with First National Life (collectively, the "Peoples and Veterans Agreements" copies of which are attached hereto as Exhibit B) to transfer certain blocks of insurance business from Peoples and Veterans to First National Life, as well as the corresponding $14,689,593 Reserve Fund ("Peoples and Veterans Reserve Fund") that accompanied those blocks of insurance business.

49.    Pursuant to the Peoples and Veterans Agreements, Peoples and Veterans transferred the Peoples and Veterans Reserve Fund to First National Life's bank account at First Tennessee Bank in three separate installments in November 1998 and early 1999.

-14-

50. First National Life never had any intention of honoring the Peoples and Veterans Agreements and intended from the first to defraud Peoples and Veterans out of the Peoples and Veterans Reserve Fund. First National Life did just that.

51. On November 6, 1998, Peoples and Veterans wired the first installment of the Peoples and Veterans Reserve Fund in the amount of $7,287,504.00 from their affiliate s account at First National Bank of Maryland to First National Life's account at First Tennessee Bank, account no. 100057727.

52. On November 10, 1998, First National Life wired $5,000,000.00 of the Peoples and Veterans Reserve Fund from First National Life's account at First Tennessee Bank to the Dreyfus Cash Management Plus account at The Bank of New York, account no. 719-079-1438435.

53. The Dreyfus Account was a sham. Any securities transferred to the account were to be redeemed, and, together with any cash in the account, were to be wire transferred to UBS Bank in New York, for further credit to Banque SCS Alliance SA, in Geneva, Switzerland, sub account no. 70026, for further credit to "BENEFICIARY BLOOMFIELD INV LTD FC TO FNL CO OF AMERICA."

54. On November 17, 1998, $5,004,936.51 (the $5 million wired on November 10, 1998, plus accrued interest) was transferred from the Dreyfus Cash Management Plus account at The Bank of New York to Banque SCS Alliance s U.S. Dollar account at Swiss Bank Corporation (now, UBS AG), account no. 101-WA-206626-000.

55.    On November 18, 1998, $5,004,936.51 was credited to the Bloomfield Investments, Ltd. account at Banque SCS Alliance, Account No. 70026. Prior to this transfer, Account 70026 had a balance of $149,667.13.

56.    On January 19, 1999, Peoples and Veterans wired the second installment of the Peoples and Veterans Reserve Fund in the amount of $2,134,101.00 from their affiliates account at First National Bank of Maryland to First National Life's account at First Tennessee Bank, account no. 100057727.

57.    On January 20, 1999, First National Life wired $2,134,000.00 of the Peoples and Veterans Reserve Fund from First National Life's account at First Tennessee Bank to the Dreyfus Cash Management Plus account at The Bank of New York, account no. 719-079-1438435.

58.    the Peoples and Veterans Reserve Fund in the amount of $5,267,988 from their affiliates account at First National Bank of Maryland to First National Life s account at First Tennessee Bank, account no. 100057727.

59.    On March 2, 1999, First National Life wired $5,400,000, which included $5,267,988 of the Peoples and Veterans Reserve Fund, from First National Life's account at First Tennessee Bank to the Dreyfus Cash Management Plus account at The Bank of New York, account no. 719-079-1438435.

60.    On March 10, 1999, $7,553,786.84 (the $2,134,000.00 wired on January 20, 1999, plus the $5,400,000.00 wired on March 2, 1999, plus dividend reinvestments and accruals of $3,450.53, $8,032.51 and $8,303.80) was transferred from the Dreyfus Cash Management Plus

-16-

account at The Bank of New York to Bank SCS Alliance s U.S. dollar account at Swiss Bank Corporation (now, UBS AG), account no. 101-WA-206626-000.

61.    On March 11, 1999, $7,553,786.84 was credited to the Bloomfield Investments, Ltd. account at Banque SCS Alliance, account no. 70026. Prior to this transfer, Account 70026 had a balance of $880,340.39.

62.    As of March 11, 1999, the entire Peoples and Veterans Reserve Fund had been deposited by First National Life in an account controlled by Frankel at Banque SCS Alliance.

63.    First National Life's fraud forced Peoples and Veterans to take responsibility for policyholder claims that the Reserve Fund would have paid for if First National Life had used that Reserve Fund for its intended purpose rather than stealing it. First National Life stole the Reserve Fund, but left Peoples and Veterans to the pay policyholders. Peoples and Veterans have resumed that responsibility, and have been administering the book of business and paying policyholder claims since the summer of 1999.

E.    **Part of the Peoples and Veterans Reserve Fund is Directly Traceable to Gold Coins that are the Subject of Forfeiture Proceedings.**

64.    On April 6, 1999, approximately $16 million of cash assets in Account 70026 were transferred to another account held under Frankel's control at Banque SCS Alliance, in the name of Devonshire Technologies, Ltd. (another entity created by Frankel to further his fraudulent schemes). These cash assets were transferred to Monex, a gold commodities brokerage business, to account number 1-2627980-0, in the name of Devonshire Technologies, Inc. and/or Devonshire Technologies, Ltd. Frankel placed orders with Monex for Vienna Philharmonic gold coins, of a total value of $16 million.

-17-

65.    By memorandum dated May 3, 1999, Martin Frankel, as President and Secretary of Devonshire Technologies, Ltd., directed Monex Deposit Company to deliver 12,000 one-ounce Austrian Vienna Philharmonic .9999 fine gold coins purchased by Devonshire from Monex Deposit Company to the custody of Banque SCS Alliance in Geneva, Switzerland.

66.    At Frankel's direction, some of the Vienna Philharmonic gold coins were sent to Banque SCS Alliance. By letter dated May 3, 1999, Monex Deposit Company notified Banque SCS Alliance that 12,000 Vienna Philharmonic gold coins for the account of Devonshire would be shipped directly from the Austrian Mint in Vienna to Banque SCS Alliance s offices on May 5, 1999. On May 5, 1999, 12,000 Vienna Philharmonic Gold Coins were shipped from the Vienna Mint at the instruction of Frankel s broker, Monex, to Banque SCS Alliance s custodian bank for precious metals, Union Bank of Switzerland, Acacias branch, 35, rue des Noirettes, Geneva. These coins represent proceeds of the fraud and were held in the name of Devonshire Technologies, Ltd.

67.    These gold coins were seized by the Swiss authorities. These gold coins were liquidated and converted to currency in the amount of $3,241,500. On or about June 28, 2001, pursuant to negotiations between the Swiss authorities and the United States Department of Justice, Banque SCS Alliance wire transferred the amount of $3,241,500 to Account 00008114, held in the name of the Seized Asset Deposit Fund, at the Federal Reserve Bank.

68.    On July 5, 2001, the Federal Bureau of Investigation seized $3,241,500 pursuant to a seizure warrant issued by the Honorable Joan G. Margolis, United States Magistrate Judge for the District of Connecticut, on July 5, 2001. The converted currency is currently the subject of a civil

-18-

forfeiture action pending before Judge Burns in the United States District Court for the District of Connecticut entitled <u>United States v. $29,035,500.00</u>, Civil No. 3:01CV1515(EBB).

69.    On or about June 1, 1999, special agents of the Federal Bureau of Investigation executed a seizure warrant issued by the Honorable Stephen J. Hillman, United States Magistrate Judge for the Central District of California, for the remaining Vienna Philharmonic gold coins contained in account number 1-2627980-0, held in the name of Devonshire Technologies, at Monex, Newport Beach, California.  On June 1, 1999, the gold coins constituting the remainder of the $16 million dollars in gold coins were converted into $11,014,165.20 in United States currency and later deposited with the United States Marshall's Service for the District of Connecticut.  The converted currency is currently the subject of a civil forfeiture action pending before Judge Burns in the United States District Court for the District of Connecticut entitled, <u>United States v. $11,014,165.20</u>, Civil No. 3:99CV2589 (EBB).

## COUNT I

## <u>DECLARATORY JUDGMENT OF CONSTRUCTIVE TRUST FOR SETTLERS</u>

70.    Settlers incorporates each of the preceding paragraphs of this Petition as if fully set forth herein.

71.    Settlers is entitled to the return of its Reserve Fund.

72.    Settlers entered into the Settlers Agreement and transferred the Settlers Reserve Fund to First National Life in reliance on First National Life's misrepresentations that it was a solvent and prosperous company and that any funds transferred to First National Life under the Settlers Agreement would be used to administer the book of business and pay policyholder claims.

-19-

73.    Property that is obtained by fraud is subject to a constructive trust and remains the property of the original owner.  The Settlers Reserve Fund was taken from Settlers through the fraudulent scheme of First National Life.  These assets belong to Settlers and are not part of the First National Life estate.

74.    Furthermore, the Liquidator is seeking through the various forfeiture proceedings in other courts to bring property that rightfully belongs to Settlers into the First National Life estate.

75.    The Settlers Reserve Fund was obtained by First National Life by fraud and First National Life should not, in good conscience, hold the Reserve Fund.

76.    A constructive trust confers on the true owners, Settlers, an interest in the property that is superior to the Liquidator, who stands in the shoes of First National Life who obtained the Reserve Funds by fraud.  Settlers is entitled to reclaim the Reserve Fund.

77.    Furthermore, the Settlers Agreement should be rescinded *ab initio* because Settlers was fraudulently induced into entering the Agreement.  First National Life intentionally defrauded Settlers of the Reserve Fund.  First National Life never had any intention of complying with the terms of the Settlers Agreement.  The Agreement was never fully executed.  Moreover, the Liquidator has effectively rescinded the Settlers Agreement by not accepting and paying policyholder claims under the ceded insurance policies.  Rescission is an appropriate remedy for fraud.

78.    As set forth above, Settlers can trace substantial portions of the Reserve Fund to the assets currently subject to forfeiture proceedings in Connecticut.

WHEREFORE, Petitioner, Settlers respectfully asks this Court to grant Settlers declaratory relief by declaring, *inter ali*a, that the following assets are not property of the First National Life estate, but, instead, are subject to constructive trusts and shall be turned over to Settlers:

(1)    The $29,035,500.00 that is the subject of <u>United States v. $29,035,500.00</u>, Civil No. 3:01CV1515(EBB).

(2)    The $11,014,165.20 that is the subject of <u>United States v. $11,014,165.20</u>, Civil No. 3:99CV02589(EBB).

## COUNT II

## DECLARATORY JUDGMENT OF<br>CONSTRUCTIVE TRUST FOR PEOPLES AND VETERANS

79.    Peoples and Veterans incorporate each of the preceding paragraphs of this Petition as if fully set forth herein.

80.    Peoples and Veterans are entitled to the return of their Reserve Fund.

81.    Peoples and Veterans entered into the Peoples and Veterans Agreement and transferred the Peoples and Veterans Reserve Fund to First National Life in reliance on First National Life's misrepresentations that it was a solvent and prosperous company and that any funds transferred to First National Life under the Peoples and Veterans Agreement would be used to administer the book of business and pay policyholder claims.

82.    First National Life has received money through its fraudulent conduct that in good conscience should be returned to Peoples and Veterans. First National Life should not be allowed to enrich itself at the expense of Peoples and Veterans.

83.    Property that is obtained by fraud is subject to a constructive trust and remains the property of the original owner.  Both the Peoples and Veterans Reserve Fund were taken from Peoples and Veterans through the fraudulent scheme of First National Life.  These assets belong to Peoples and Veterans and are not part of the First National Life estate.

84.    Furthermore, the Liquidator is seeking through the various forfeiture proceedings in other courts to bring property that rightfully belongs to Peoples and Veterans into the First National Life estate.

85.    The Peoples and Veterans Reserve Fund was obtained by First National Life by fraud and First National Life should not, in good conscience, hold the Reserve Fund.

86.    A constructive trust confers on the true owners, Peoples and Veterans, an interest in the property that is superior to the Liquidator, who stands in the shoes of First National Life who obtained the Reserve Fund by fraud.  Peoples and Veterans are entitled to reclaim the Reserve Fund.

87.    Furthermore, the Peoples and Veterans Agreements should be rescinded *ab initio* because Peoples and Veterans were fraudulently induced into entering the Agreements. First National Life intentionally defrauded Peoples and Veterans out of the Reserve Fund.  First National Life never had any intention of complying with the terms of the Agreements.  The Agreements were never fully executed.  Moreover, the Liquidator has effectively rescinded the Agreements by not accepting and paying policyholder claims under the ceded insurance policies.  Rescission is an appropriate remedy for fraud.

88.    As set forth above, Peoples and Veterans can trace substantial portions of the Reserve Fund to the assets currently subject to forfeiture proceedings in Connecticut.

-22-

WHEREFORE, Petitioners, Peoples Benefit Life Insurance Company and Veterans Life Insurance Company, respectfully asks this Court to grant Peoples and Veterans declaratory relief by declaring, *inter alia*, that the following assets are not property of the First National Life estate, but, instead, are subject to constructive trusts and shall be turned over to Peoples and Veterans:

(1)     $3,241,500.00 of the assets that are the subject of <u>United States v. $29,035,500.00</u>, Civil No. 3:01CV1515(EBB).

(2)     The $11,014,165.20 that is the subject of <u>United States v. $11,014,165.20</u>, Civil No. 3:99CV02589(EBB).

## COUNT III

### RECISSION OF THE SETTLERS AGREEMENT

89.     Settlers incorporates each of the preceding paragraphs of this Petition as if fully set forth herein.

90.     The Settlers Agreement was obtained by fraud and can be rescinded by Settlers. A constructive trust should be imposed against First National Life who received the Settlers Reserve Fund as a result of the fraud. Title to the Settlers Reserve Fund did not pass to First National Life. Accordingly, any portions or proceeds of the Settlers Reserve Fund held or acquired by the Liquidator are held for the benefit of Settlers and are not property of the First National Life estate.

91.     A party that is induced into entering a contract through a fraudulent or material misrepresentation by another party is entitled to void the contract. Here, there is no dispute that Settlers was induced to enter into the Agreement based on the fraudulent misrepresentations of some of First National Life's officers. Therefore, Settlers is entitled to void the Agreement. Furthermore, the Liquidator has not made any attempt to perform under the terms of the Settlers Agreement, has

not given value in exchange for the Agreement, and has not relied on any aspect of the Agreement to its detriment. Accordingly, the Agreement between Settlers and First National Life is a nullity. No accounting is due from Settlers to First National Life. The ownership of the Reserve Fund was never transferred from Settlers to First National Life, and First National Life has never had the slightest intent, nor made the slightest effort, to treat the Agreement as real or in effect. The Settlers Agreement should therefore be declared void *ab initio* and rescinded, and the Reserve Fund should be returned in its entirety to Settlers.

92.     As set forth above, Settlers can trace the Reserve Fund to the assets currently subject to forfeiture proceedings in Connecticut.

WHEREFORE, Petitioner, Settlers respectfully asks this Court to grant Settlers declaratory relief by rescinding the Settlers Agreement and declaring, *inter ali*a, that the following assets are not property of the First National Life estate, but, instead, are subject to constructive trusts and shall be turned over to Settlers:

(1)  The $29,035,500.00 that is the subject of <u>United States v. $29,035,500.00</u>, Civil No. 3:01CV1515(EBB).

(2)  The $11,014,165.20 that is the subject of <u>United States v. $11,014,165.20</u>, Civil No. 3:99CV02589(EBB).

## COUNT IV

## <u>RESCISSION OF THE PEOPLES AND VETERANS AGREEMENT</u>

93.  Peoples and Veterans incorporate each of the preceding paragraphs of this Petition as if fully set forth herein.

94. The Peoples and Veterans Agreements were obtained by fraud and can be rescinded by Peoples and Veterans. A constructive trust should be imposed against First National Life who received the Peoples and Veterans Reserve Fund as a result of the fraud. Title to the Peoples and Veterans Reserve Fund did not pass to First National Life. Accordingly, any portions or proceeds of the Peoples and Veterans Reserve Fund held or acquired by the Liquidator are held for the benefit of Peoples and Veterans and are not property of the First National Life estate.

95. A party that is induced into entering a contract through a fraudulent or material misrepresentation by another party is entitled to void the contract. Here, there is no dispute that Peoples and Veterans were induced to enter into the Agreements based on the fraudulent misrepresentations of some of First National Life's officers. Therefore, Peoples and Veterans are entitled to void the Agreements. Furthermore, the Liquidator has not made any attempt to perform under the terms of the Agreements, has not given value in exchange for the Agreements, and has not relied on any aspect of the Agreements to its detriment. Accordingly, the Agreements between Peoples and Veterans and First National Life are a nullity. No accounting is due from Peoples and Veterans to First National Life. The ownership of the Reserve Fund was never transferred from Peoples and Veterans to First National Life, and First National Life has never had the slightest intent, nor made the slightest effort, to treat the Agreements as real or in effect. The Agreements should therefore be declared void *ab initio* and rescinded, and the Reserve Fund should be returned in their entirety to Peoples and Veterans.

96. As set forth above, Peoples and Veterans can trace the Reserve Fund to the assets currently subject to forfeiture proceedings in Connecticut.

-25-

WHEREFORE, Petitioners, Peoples Benefit Life Insurance Company and Veterans Life Insurance Company, respectfully asks this Court to grant Peoples and Veterans declaratory relief by rescinding the Peoples and Veterans Agreements and declaring, *inter ali*a, that the following assets are not property of the First National Life estate, but, instead, are subject to constructive trusts and shall be turned over to Peoples and Veterans:

(1) $3,241,500.00 of the assets that are the subject of <u>United States v. $29,035,500.00</u>, Civil No. 3:01CV1515(EBB).

(2) The $11,014,165.20 that is the subject of <u>United States v. $11,014,165.20</u>, Civil No. 3:99CV02589(EBB).

## COUNT V

### DECLARATORY JUDGMENT THAT
### SETTLERS IS A SECURED CREDITOR

97. Settlers incorporates each of the preceding paragraphs of this Petition as if fully set forth herein.

98. In the alternative, Settlers has a secured claim to the Reserve Fund. The Mississippi Liquidation and Rehabilitation Act defines a "secured claim" as "any claim secured by mortgage, trust deed, pledge, deposit as security, escrow, or otherwise." Miss. Code Ann. § 83-24-7(p). The "or otherwise" language encompasses the common law and equitable concept of constructive trusts. Money taken by fraud therefore gives rise to a secured claim to the funds. Therefore, Settlers has a secured claim to the Reserve Fund.

WHEREFORE, Petitioner, Settlers, respectfully asks this Court to grant Settlers declaratory relief by declaring that Settlers is a secured creditor in the amount of the Reserve Fund, that its claims

-26-

should be re-classified accordingly and that, *inter ali*a, the following assets are not property of the First National Life estate, but, instead, are subject to constructive trusts and shall be turned over to Settlers:

    (1)   The $29,035,500.00 that is the subject of <u>United States v. $29,035,500.00</u>, Civil No. 3:01CV1515(EBB).

    (2)   The $11,014,165.20 that is the subject of <u>United States v. $11,014,165.20</u>, Civil No. 3:99CV02589(EBB).

**COUNT VI**

**DECLARATORY JUDGMENT THAT<br>PEOPLES AND VETERANS ARE SECURED CREDITORS**

    99.   Peoples and Veterans incorporate each of the preceding paragraphs of this Petition as if fully set forth herein.

    100.   In the alternative, Peoples and Veterans have a secured claim to the Reserve Fund. The Mississippi Liquidation and Rehabilitation Act defines a "secured claim" as "any claim secured by mortgage, trust deed, pledge, deposit as security, escrow, or otherwise." Miss. Code Ann. § 83-24-7(p). The "or otherwise" language encompasses the common law and equitable concept of constructive trusts. Money taken by fraud therefore gives rise to a secured claim to the funds. Therefore, Peoples and Veterans have secured claims to the Reserve Fund.

    WHEREFORE, Petitioners, Peoples Benefit Life Insurance Company and Veterans Life Insurance Company, respectfully asks this Court to grant Peoples and Veterans are secured creditors in the amount of the Reserve Fund, that their claims should be re-classified accordingly and that, *inter ali*a, the following assets are not property of the First National Life estate, but, instead, are subject to constructive trusts and shall be turned over to Peoples and Veterans:

-27-

(1) $3,241,500.00 of the assets that are the subject of <u>United States v. $29,035,500.00</u>, Civil No. 3:01CV1515(EBB).

(2) The $11,014,165.20 that is the subject of <u>United States v. $11,014,165.20</u>, Civil No. 3:99CV02589(EBB).

**DATED** this the 11th day of March, 2002.

Respectfully submitted,

PEOPLES BENEFIT LIFE INSURANCE COMPANY, VETERANS LIFE INSURANCE COMPANY, and HUFF-COOK, INC., IN THE RIGHT OF AND ON BEHALF OF SETTLERS LIFE INSURANCE COMPANY, the Petitioners

By: *Michael VJ*

One of their Attorneys

OF COUNSEL:

Alex A. Alston, Jr., MSB #1543
Richard L. Jones, MSB #3229
BRUNINI, GRANTHAM, GROWER & HEWES, PLLC
248 East Capitol Street, 1400 Trustmark Bank Bldg.
P. O. Drawer 119
Jackson, Mississippi 39205
Telephone:  (601) 948-3101
Facsimile:  (601) 960-6902

Forrest B. Lammiman
Timothy M. Maggio
Brian I. Hays
LORD, BISSELL & BROOK
Chicago, Illinois 60603
Telephone:  (312) 443-0700
Facsimile:  (312) 443-0336

-28-

## CERTIFICATE OF SERVICE

I, Richard L. Jones, do hereby certify that on this the 11th day of March, 2002, I caused a true

and correct copy of the foregoing document to be forwarded via United States mail, postage prepaid,

to the following:

       Charles G. Copeland, Esq.
       COPELAND COOK TAYLOR & BUSH
       P. O. Box 6020
       Ridgeland, MS  39158

Richard L. Jones

-29-

# REINSURANCE AGREEMENT
## BETWEEN
## SETTLERS LIFE INSURANCE COMPANY
### AND
## FIRST NATIONAL LIFE INSURANCE COMPANY OF AMERICA

**SETTLERS LIFE INSURANCE COMPANY,** an Insurer organized and operating under the laws of the state of Virginia (hereinafter referred to as "Ceder"), and **FIRST NATIONAL LIFE INSURANCE COMPANY OF AMERICA,** an Insurer organized and operating under the laws of the state of Mississippi (hereinafter referred to as the "Reinsurer"), enter into this Reinsurance Agreement (hereinafter referred to as the "Agreement") and mutually agree and covenant as follows:

## ARTICLE I
## DEFINITIONS

As used in this Agreement:

A. <u>Assumption date(s)</u> shall mean, with respect to any of the Policies, the date on which a particular policy or contract included in the Reinsured Policies is assumed by Reinsurer.

B. <u>Coinsurance Effective Date</u> shall mean April 1, 1999.

C. <u>Coinsurance claims</u> shall be equal to the Reinsurer's portion of the death claims incurred after the Coinsurance Effective Date on policies coinsured hereunder.

D. <u>Coinsurance Surrender Benefits</u> shall be equal to the Reinsurer's portion of the surrender benefits paid after the Coinsurance Effective Date on policies coinsured hereunder.

E. <u>Monthly Coinsurance Premium</u> shall be equal to the gross premiums collected less premium refunds during the month on the Reinsurer's portion of the policies coinsured hereunder.

F. <u>Net Policy Reserves</u> means reserves established as of the Coinsurance Effective Date for the Reinsured Policies in an amount identified and defined in Exhibit A. Such Net Policy Reserves shall be computed in accordance with commonly accepted actuarial standards consistently applied and fairly stated in accordance with sound actuarial principles and practices and based on the methodology as approved by the Virginia Bureau of Insurance.

G. <u>Net Consideration</u> shall be equal to the Net Policy Reserves less the Initial Ceding Commission as defined and identified in Exhibit A.

H. <u>Reinsured Policies</u> mean only those policies as identified in the attached Exhibit B, including paid up Policies which are in force on the Coinsurance Effective Date. A policy will be deemed to be in force on the Coinsurance Effective Date if the premium thereon has been paid to or beyond the Coinsurance Effective Date or if the premium shall be paid to or beyond the Coinsurance Effective Date within the grace period permitted in the policy and by Ceder's customary practice. If, on the Coinsurance Effective Date, the premium on a policy is unpaid beyond said grace period, it will be deemed not to be in force; except that if the holder of such policy pays the premium and complies with Ceder's usual and customary reinstatement requirements and practices, the policy will be deemed to be in force on the Coinsurance Effective Date. A policy that on the Coinsurance Effective Date is on extended term insurance status or reduced paid up status under a nonforfeiture option shall be deemed to be in force.

1

**EXHIBIT**

1

Administration Effective Date shall mean the date on which the Reinsured Policies are administered at the offices of the Reinsurer.

Case 1:01-cv-01655-DFH Document 57-9 Filed 06/08/2005 Page 22 of 26

J.  Administration Agreement shall mean the agreement entered into between Reinsurer and Ceder which defines the responsibilities of each party for administration of the Reinsured policies during the time period between the Coinsurance Effective Date and the Administration Effective date.

# ARTICLE II
# COINSURANCE OF POLICIES

A.  Generally

Subject to the terms and conditions of this Agreement, Ceder hereby cedes to Reinsurer and Reinsurer hereby accepts reinsurance as of the Coinsurance Effective Date on a coinsurance basis of 100% of Ceder's obligations, rights and liabilities with respect to the Reinsured Policies.

B.  Amount of Coinsurance

With respect to each of the Reinsured Policies, the amount of coinsurance hereunder shall be maintained in force without reduction so long as the policy remains in force without reduction. If there is a reduction with respect to a Reinsured Policy, Reinsurer's liability with respect thereto shall be equally reduced. All coinsurance for which Reinsurer is liable hereunder shall be subject to the same rates, terms, conditions, limitations and restrictions as are contained in each Reinsured Policy.

C.  Termination of Coinsurance

As to any Reinsured Policy which due to objection by the policyholder is not assumed under Article III hereof, the coinsurance under this Article II shall remain in full force and effect until the liabilities under the Reinsured Policies have been discharged in full. On the assumption of a Reinsured Policy previously coinsured, coinsurance of such policy shall automatically terminate.

D.  Settlement

A monthly coinsurance settlement shall be made only as long as policies are coinsured under Article II.  Within 20 days after the end of each month, Ceder will pay Reinsurer the Monthly coinsurance Premium for the month.

Within 20 days after the end of each month, Reinsurer will pay Ceder the sum of:
1.  Coinsurance Claims;
2.  Coinsurance Surrender Benefits; and
3.  Premium Taxes.

Payments, as required by this Article, shall be netted.  An additional settlement shall be made as required and as follows:  For any death claim paid after the Coinsurance Effective Date and incurred prior to the Coinsurance Effective Date, Ceder shall pay such claim and Reinsurer shall reimburse Ceder the Net Policy Reserve on the Policy for which the claim is being paid, calculated as of the Coinsurance Effective Date.

While any policy is in force under coinsurance, the party administering the policy shall provide the other party monthly settlement reports. Quarterly, a report known as the Periodic Coinsurance Report shall be furnished detailing the reserves and such other Items as are required to compute the Reserve Liability and any other amount required for the functioning of this agreement and for statutory financial reporting.

# ARTICLE III
# ASSUMPTION OF POLICIES

### A.  Generally

Subject to the terms and conditions of this Agreement, Ceder hereby agrees to assign, cede, transfer, sell, bargain and convey unto Reinsurer by way of Assumption Reinsurance all of its obligations, rights, privileges and liabilities under the Reinsured Policies, and Reinsurer hereby agrees to assume all of the obligations, rights, privileges and liabilities of Ceder with respect to the Reinsured Policies under the terms of each Reinsured Policy. It is the intent of the parties to accomplish, as of the Assumption Date(s), a full and complete transfer of all rights and liabilities under the Reinsured Policies to the end that Reinsurer, as transferee, in all respects and conditions shall directly assume all of Ceder's risks and liabilities and shall succeed Ceder as the insurer under the terms and provisions of each of the Reinsured Policies as though Reinsurer had originally issued the Reinsured Policies. In connection with such assumption, the Reinsurer shall be entitled to any and all defenses, offsets, counterclaims, and cross actions to which Ceder would otherwise be entitled and other legal actions or remedies, whether the same be known to exist or hereafter discovered. Reinsurer agrees to file the necessary documents to accomplish the assumption of the business reinsured hereunder with the appropriate regulatory agency within ninety (90) days of the Coinsurance Effective Date. Further, Reinsurer and Ceder agree to use their best efforts to obtain regulatory approval.

### B.  Assumption Subject to Regulatory Approval

This Agreement and any assumption of policies pursuant to this Agreement are subject to and contingent upon receipt by Ceder and Reinsurer of any required regulatory approvals of the transaction contemplated by this Agreement. After the Coinsurance Effective Date, Reinsurer, at Reinsurer's sole expense, shall make all regulatory filings which each state's insurance authority requires for the assumption reinsurance of such Reinsured Policies by Reinsurer. Reinsurer shall use its best efforts to obtain such regulatory approvals, consents or waivers of this Agreement or the assumption by Reinsurer of any of the Reinsured Policies. Reinsurer agrees that any guaranty fund assessments that remain with Ceder on the Assumption Date that are associated with Reinsured Policies are to be assumed by Reinsurer. Both Ceder and Reinsurer shall assist each other by providing all necessary information and assistance as shall be reasonably requested by the other party for purposes of satisfying all contractual requirements under this Agreement and for satisfying all regulatory requirements in each state.  Reinsurer shall have the obligation to assume, unless prohibited by regulation, all those Reinsured Policies identified in Exhibits B and C and still in-force on the Reinsurance effective date. Reinsurer agrees to undertake the responsibility to take all action necessary to accomplish the purposes of this Article III (B) and further agrees that Ceder shall be required to take independent corporate action only when such action by Ceder is necessary as a precondition to proceeding on the Assumption Date as to a particular state. Ceder and Reinsurer hereby agree that the terms and conditions of this agreement may be modified by mutual agreement of the parties, if necessary, to obtain regulatory approvals in the various states having jurisdiction over this Agreement. Should the receipt of a regulatory approval, consent or waiver require or be conditioned upon a modification of the terms and conditions of this Agreement, each party hereto agrees that it will consent to

3

such modification unless it determines in good faith that such modification (i) would conflict with any law, regulation or agreement by which it is bound or (ii) would otherwise materially and adversely affect its interests.

C. <u>Assumption Closing(s)</u>

Each assumption by the Reinsurer of the Reinsured Policies shall take place on an Assumption Date after all necessary requirements for such assumption have been met. However, such Assumption Date must be within 90 days from the date that all necessary requirements for such assumption have been met. Exhibit C of this agreement shall list each state in which the Reinsured Policies have been assumed and the Assumption Date with respect to each state. Reinsurer shall update Exhibit C as needed.

D. <u>Proof of Regulatory Approvals Consents or Waiver</u>

Within 30 days of any Assumption Date contemplated by this Agreement, Reinsurer shall provide notification and evidence that all regulatory approvals, consents or waivers required by this Agreement have been obtained.

# ARTICLE IV
# TRANSFER OF ASSETS

A. Generally

The net consideration due Reinsurer pursuant to this Agreement shall be an amount equal to the Net Policy Reserves held by Ceder for the Reinsured Policies less an Initial Ceding Allowance that shall be due to Ceder. The Ceder's independent actuary firm shall calculate the Net Policy Reserves as of March 31, 1999 and provide Reinsurer sufficient detailed information to review and verify such Net Policy Reserve calculations. The agreed upon total amounts of the Net Policy Reserves to be transferred by Ceder and the Initial Ceding Allowance to be paid Ceder will be clearly stated and identified in Exhibit A. Should the parties through their actuaries be unable to reach an agreement as to the methodology of evaluating the Net Policy Reserves, then this Reinsurance Agreement shall become null and void.

B. ASSETS TO BE TRANSFERRED

Upon reaching an agreement for the Net Consideration (the Net Policy Reserves less the Initial Ceding Allowance) as reflected in the signed Exhibit A, Ceder shall transfer cash or other assets acceptable to Reinsurer equal to the agreed upon consideration. In addition to the net consideration, Ceder shall also pay the Reinsurer interest at 5.5% APR from April 1, 1999 to the date the consideration is paid to Reinsurer. Ceder and Reinsurer agree that the Net Consideration is the agreed upon total value of the transaction and the agreed upon value of net assets to be transferred to Reinsurer.

# ARTICLE V
## ASSUMPTION CERTIFICATE

Each policyowner shall be mailed an Assumption Certificate in a form substantially similar to the form attached hereto as Exhibit D or in such other form as may be required by the insurance regulation of the state in which the policyowner resides. If required by the insurance regulatory authority of the state in which the policyowner resides such Assumption Certificate shall contain a 30-day opt out provision allowing any policyowner the right to reject the assumption of such contract as contemplated by this Agreement. The expiration date of the opt out provision shall be thirty-five (35) days from the date of the mailing of the Assumption Certificate. As soon as possible after the Assumption Date(s) and within the time prescribed by applicable Insurance laws, Reinsurer shall mail to the last known address of each policyowner of the Reinsured Policies such Assumption Certificate and Reinsurer shall provide evidence satisfactory to Ceder of proof of such mailing.

# ARTICLE VI
## ADMINISTRATION AGREEMENT

Ceder and Reinsurer shall enter into an Administration Agreement in conjunction with this agreement which defines the responsibilities of each party for administration of the Reinsured policies during the time period between the Coinsurance Effective Date and the Administration Effective date.

# ARTICLE VII
## REPRESENTATIONS AND WARRANTIES OF CEDER

Ceder hereby represents and warrants to the Reinsurer that:

A.   Organization, Standing and Power
Ceder is a corporation duly organized, validly existing, and in good standing under the laws of the state of Virginia and is duly licensed, qualified or admitted to do business and is in good standing in all jurisdictions in which the ownership, use or leasing of its assets or properties or the conduct or nature of its business makes such licensing, qualification or admission necessary. Ceder has full corporate power and authority to enter into this Agreement and perform its obligations hereunder.

B.   Authority
The execution, delivery and compliance with the terms of this Agreement by Ceder and performance by Ceder of its obligations hereunder has been duly and validly authorized by all necessary corporate action on the part of Ceder and this Agreement constitutes a valid and binding obligation of Reinsurer which is enforceable against Reinsurer in accordance with its terms.

C.   Effect of Agreement
The execution and delivery of this Agreement by Ceder does not and the performance by Ceder of its obligations under this Agreement will not:
(1)   violate any existing term or provision of any law or any writ, judgment, decree, injunction or similar order applicable to Ceder;
(2)   conflict with or result in a violation or breach of, or constitute (with or without notice or lapse of time or both) a default under, any of the terms, conditions, or provisions of the articles or certificate of incorporation or bylaws of Ceder;

5

result in the creation or imposition of any lien, charge, or encumbrance upon Ceder or any of its assets or properties that individually or in the aggregate with any other liens, charges, or encumbrances has or may reasonably be expected to have a material adverse effect on the validity or enforceability of this Agreement, or on the ability of Ceder to perform its obligations under this Agreement; or

(4) conflict with or result in a violation or breach of, or constitute (with or without notice or lapse of time or both) a default under, or give to any person or entity any right of termination, cancellation, acceleration, or modification in or with respect to, any contract or agreement to which Ceder is a party or by which its assets or properties may by bound, and as to which any such conflicts, violations, breaches, defaults or rights individually or in the aggregate have or may reasonably be expected to have a material adverse effect on the validity or enforceability of this Agreement, or on the ability of Ceder to perform its obligations under this Agreement, except as to any rights preserved by federal or state laws to the policyowners of the Policies.

# ARTICLE VIII
# REPRESENTATIONS AND WARRANTIES OF REINSURER

Reinsurer hereby represents and warrants to Ceder that:

A. **Organization, Standing and Power**

Reinsurer is a corporation duly organized, validly existing, and in good standing under the laws of the state of Mississippi and is duly licensed, qualified or admitted to do business and is in good standing in all jurisdictions in which the ownership, use or leasing of its assets or properties or the conduct or nature of its business makes such licensing, qualification or admission necessary, except as previously disclosed by Reinsurer to Ceder in writing. Reinsurer has full corporate power and authority to enter into this Agreement and to perform its obligations hereunder, except to the extent exercise of such power and authority requires regulatory approval consent or Waiver as contemplated by Article III(B).

B. **Authority**

The execution, delivery and compliance with the terms of this Agreement by Reinsurer and performance by Reinsurer of its obligations hereunder has been duly and validly authorized by all necessary corporate action on the part of Reinsurer and this Agreement constitutes a valid and binding obligation to Reinsurer which is enforceable against Reinsurer in accordance with its terms.

C. **Effects of Agreement**

The execution and delivery of this Agreement by Reinsurer do not, and the performance by Reinsurer of its obligations under this Agreement will not:

(1) violate any existing terms or provision of any law or any writ, judgment, decree, injunction or similar order applicable to Reinsurer;

(2) conflict with or result in a violation or breach of, or constitute (with or without notice or lapse of time or both) a default under any of the terms, conditions, or provisions of the articles or certificate of incorporation or bylaws of Reinsurer;