# EXHIBIT 4

IN THE CHANCERY COURT OF THE FIRST JUDICIAL DISTRICT
OF HINDS COUNTY, MISSISSIPPI


GEORGE DALE, COMMISSIONER OF          )
INSURANCE OF THE STATE OF             )
MISSISSIPPI,                          )
                                      )
          Plaintiff,                  )
                                      )
v.                                    )  Civil Action
                                      )  No. G99-908 S/2
                                      )
FIRST NATIONAL LIFE INSURANCE         )
COMPANY OF AMERICA, a Mississippi     )
Domiciled Insurance Company,          )
                                      )
          Defendant.                  )

_____

                    Deposition of:

              **MR. JACK F. HARMON**

        As Taken the 21st day of November, 2002

Appearances:

For Settlers Life Insurance
Company and Veterans Life
Insurance Company and
Peoples Benefit Life
Insurance Company            MR. ALEX A. ALSTON, JR.

For Commissioner George
Dale, acting as liquidator
for First National Life
Insurance Company of America  MR. CHARLES G. COPELAND
                              MS. JANET G. ARNOLD

COPY

1          MR. COPELAND:  Okay.

2          Q.   Well, tell -- tell about the trust

3    you set up.

4          A.   Oh, well we had a trust foundation

5    set up which left to the company, Settlers Life

6    Insurance Company, for the education of our employees

7    of the co -- of the company.

8          Q.   Yes, sir.  Now, let me -- let me

9    ask you this; what kind of insurance was Huff-Cook

10   selling?

11         A.   Huff-Cook was a mutual assessment

12   burial association.

13         Q.   Okay.  And did it -- what -- what

14   is that?  What do they sell?

15         A.   Well, actually this is in the old

16   days when we sold -- for thirty-five cents a month we

17   sold a $200.00 benefit and we sold them in whole sale

18   lots.

19         Q.   Okay.

20         A.   But now, that was before the time

21   that I come with the company.  When I came with the

22   company they had raised -- we had -- we raised the

23   benefits up to $500.00 but that was at the beginning.

24   It's an assessment; in other words, when -- if so

25   many died, maybe an assessment but in other words, we

12

1          Q.   Well, let's take one at a time.

2     Let's take -- let's take the company first.

3          A.   Take the company, all right.   It

4     put -- it put the company into insolvency and put the

5     company   into   insolvency   and   it   --   under   the

6     receivership and of the receivers sold, it put the

7     company -- it didn't put the company out of business,

8     but it changed everything within the company.

9          Q.   What about -- what happened when

10    they put it in receivership?

11         A.   All right.   Commissioner Grove

12    came down and whenever he announced the -- what -- and

13    called all the employees into the conference room and

14    they were each asked to turn in all their keys.   And,

15    in other words, they took over right on -- right on

16    the spot.   They had policemen up there to guard the

17    doors and it was such a sad, sad sight; in other

18    words, employees were all upset over it.   Then the

19    next day we were invited back and they oper -- we

20    operated the company just like before.   We were not

21    allowed to sell any new business.   All of our sales

22    force were -- all of our sales force was stopped as of

23    right -- because of -- the company was insolvent.   But

24    we worked -- we worked on until Commissioner Grove

25    brought in a -- a receiver from over in North Carolina

                                                       35

1  and he took charge of the company to sell -- sell the

2  company.

3           Q.    Were you paid any, this period of

4  time?  Were you paid a salary?

5           A.    We -- now, when you say,...

6           Q.    You.  I'm talking about...

7           A.    Me, personally?

8           Q.    Yes.

9           A.    I have not drawn one penny from

10  Settlers Life Insurance Company from April 1999 until

11  today.

12           Q.    Well, let me -- let me ask you

13  this; you talked about when Settlers was formed and

14  how you rolled over Huff-Cook into Settlers and you

15  talked about changing of the company after that.  Have

16  you ever taken anything out of the company as far as

17  stock or money?  Settlers...

18           A.    Are you talking about from the beg

19  -- organization?

20           Q.    Yes, the organization of Settlers.

21           A.    I put money into the company.  I

22  have never taken one dime out of the company, other

23  than my salary, since the very beginning; in other

24  words, the employees, we give them a little bonus, but

25  none of the stock holders have got one dime out of the

36

1  company, other than the salaries that they...

2              Q.    You weren't paid -- you didn't get

3  a little Christmas bonus or anything?

4              A.    No, we have never taken one -- one

5  penny out of the company.

6              Q.    When you say, "we," are you

7  talking about you and your wife?

8              A.    I'm talking about me, my wife and

9  Jesse Walker, or/and Huff-Cook Mutual Burial

10  Association.

11             Q.    Now, what -- what impact, if any,

12  did this have on the stock and interest you had in the

13  company?

14             A.    Well, it wiped it out.    I mean,

15  it's devastated...

16             Q.    Go ahead.

17             A.    It wiped it out.    We lost it all.

18             Q.    Well, what about -- what about--

19  what were your plans?   Did you have a Will or did you

20  have some plans?

21             A.    Yes, I had a Will.

22             Q.    What were you planning to do with

23  the...

24             A.    Well, are you asking me the

25  question, "What was my plans, my plans, for my

                                                            37

1    stock..."

2                   Q.    Yes.

3                   A.    "...with Settlers Life Insurance

4    Company?"

5                   Q.    Yes, sir.

6                   A.    My plans for stock in Settlers

7    Life Insurance Company was going back into the country

8    [sic] -- company for the benefit of the company and

9    actually, to raise the capi -- you know, and the

10   benefit of the employees.  That was my goal.

11                  Q.    Let me -- let me see if I

12   understand this.  After you had transferred all of

13   these reserves to First National Life Insurance

14   Company for this block of business, who -- who has

15   been paying the claims made on this block of business?

16                  A.    Settlers Life Insurance Company

17   continued paying the claims right down the line.

18                  Q.    Well, did you get -- ever get any

19   reserves back to pay for any of those claims?

20                  A.    We never saw any -- in other

21   words, it was all gone.  It had all been stolen.

22                  Q.    So, not only were your reserves

23   stolen, you have to pay -- Settlers had to pay all the

24   claims?

25                  A.    Sure, they had to pay all of them.

                                                      38

1          Q.   And they're still paying?

2          A.   Still -- well, Settlers Life

3 Insurance Company is still paying them, yes.

4          Q.   What happened?  How did the -- how

5 does the comp -- company get out of receivership?

6          A.   All right.

7          Q.   Can you enlighten me a little bit

8 on that?

9          A.   The -- the company was sold to the

10 National Guardian Life Insurance Company.  They were

11 one of the ones who had came -- who came in and

12 they're the ones that did business with the receiver

13 and then they took over Settlers Life Insurance

14 Company.  They added -- they added thirty-eight

15 million dollars; I'm not sure of that amount.  They

16 added that much into the reserve and took over

17 Settlers Life Insurance Company and they have control

18 of that, Settlers, now.

19          Q.   Let's go off the record just one

20 moment.

21

22 (OFF RECORD)

23

24          MR. COPELAND:  Is that all from -- from

25 the Settlers?

39

1  I'll get him anything he wants.

2          Q.   Is his name, is it like -- is his

3  name one of the names in the fund?

4          A.   I can not tell you that.

5          Q.   Can't tell me, okay.  But you do

6  know that he's working around Bristol?

7          A.   I know that he has an accounting

8  firm in Bristol, Virginia -- I mean, I'm sorry,

9  Bristol, Tennessee.

10          Q.   Is Bristol on both sides of the

11  boarder?

12          A.   But his office is on the Tennessee

13  side.

14          Q.   Tennessee side?  I just didn't

15  know it was on both sides, that the town was in both

16  sides.

17          A.   Yeah.

18          Q.   Okay.  Anything else, counselor?

19          MS. JANET ARNOLD:  No.

20          Q.   That's all we have, Mr. Arnold.

21

22          REDIRECT EXAMINATION BY MR. ALEX A.

23  ALSTON, JR.:

24

25          Q.   Mr. Harmon, let me just ask you

73

1    one question or two.   Mr. Copeland was asking you

2    about net worth and you had -- you had testified that

3    you thought approximately the net worth of Settlers at

4    the time we're talking about, the last of 1998, was

5    twenty to twenty-two million dollars, is that correct?

6             A.    That is correct.  But may I...

7             Q.    No, no, no, let me ask the

8    questions.   Now, that's -- that's the net worth,

9    that's the capital in surplus that...

10            A.    That's right.

11            Q.    Right.   And actually, he asked

12   you, and I think you didn't either hear him or

13   something, he said, "Is that the equity -- does that-

14   - does that represent the equity that you have in the

15   company or could you sell it at that."   Would you

16   comment on that?

17            A.    Well, I mean as far as that goes,

18   I understood him at first to say, "of the capital in

19   surplus."

20            Q.    Yes, sir.   That...

21            A.    I mean, that was the figure when I

22   -- when I answered "no," that was my -- I perceived

23   him asking that question.

24            Q.    Okay.

25            A.    And I apologize.   I -- I wasn't

74

1   forth but actually, you realize that a company is

2   worth more than the book value -- yes.

3           Q.   Okay.   And what would that

4   generally be as far as insurance companies are

5   concerned, you know, do you have anything in your mind

6   about what the -- what the value of the company might

7   be over and above the book value?

8           A.   Oh, it -- it was -- before this

9   money was stolen, con -- consid -- I mean, the good

10  name of the company, the reputation of the company,...

11          Q.   All right.   Let me -- let me test

12  you a little bit further.   How much would you estimate

13  it would be worth, over and above the book value?

14          A.   To the stock holders of the

15  company, before this money was stolen, as far as being

16  what it's worth and what they would take, the value to

17  the emp -- well, you would have to consider the value

18  to the employees; in other words, that was their--

19  their life -- in other words, they had put their whole

20  life's work into this company just to have it stolen

21  away.

22          Q.   Well, let me ask you this; is it

23  uncommon to sell an insurance company for twice what

24  its book value is?

25          MR. COPELAND:  Object to the form.

75

1      Q.    Is it -- is it?

2      A.    It would -- no, sir.  Banks are

3  the same way.

4      Q.    All right.  You mentioned, and I

5  do want no confusion about this, but what -- what were

6  the reserves back in the end of 1998 of Settlers?

7      A.    Just the reserve -- well, subtract

8  the twenty-two million from that,...

9      Q.    Right.

10      A.    ...would be approximately two

11  hundred thousand.

12      Q.    I have no further questions.

13      MR.  COPELAND:    I  think  that's

14  incorrect.  You mean, two hundred million?

15      Q.    Million.  Two hundred million,

16  yes.

17      MR.  COPELAND:  Mr. Groves would have

18  been down there to see you if you had only had two

19  hundred thousand.

20      Q.    That's all the questions I have

21  and Jack, thank you very, very much.

22

23  AND FURTHER DEPONENT SAITH NOT.

24

25

76

# EXHIBIT 5

# 00-6360(L), 00-6361 (CON)

## United States Court of Appeals

for the

## Second Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

– and –

PARK AVENUE TRAVEL SVCS.,

*Claimants-Appellees.*

– against –

PEOPLES BENEFIT LIFE INS. CO. and VETERANS
LIFE INSURANCE COMPANY,

*Movants-Appellants.*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

### BRIEF OF CLAIMANTS-APPELLEES

Of Counsel
Douglas Skalka

Neubert Pepe & Monteith P C
195 Church St 13th Floor
New Haven CT 06510-2026
(203) 821-2000

*Attorneys for Claimants-Appellees*

KC:836361-1

- and –

ACE CAPITAL RE OVERSEAS LTD., formerly known as
KRE REINSURANCE LTD.,

*Movant,*

- and –

DEVONSHIRE TECH, JACQUELINE A. JU, BENG TAN, KANE &
FISHER GOMBERG, THOMAS BOLAN, JIRO NAKAMURA,
YASUKO NAKAMURA, VICTOR C. MOSES, FAUSTO FAUSTI,
THURSTON LITTLE, KAETHE SCHUCHTER, GOOD LUCK CORP,
PARK AVENUE TRAVEL SVCS, FRANKLIN AMERICAN LIFE
INSURANCE COMPANY, GEORGE DALE, MISSISSIPPI
COMMISSIONER OF INSURANCE, Insurance Commission,
CARROLL FISHER, INSURANCE COMMISSIONER AND RECEIVER
FARMERS AND RANCHERS LIFE INSURANCE COMPANY, Insurance
Commission, BRUCE I. WEISER, INTERNAITONAL FINANCIAL
SERVICES LIFE INSURANCE COMPANY, MIKE PICKENS,
Receivers of Old Southwest Life Insurance Company,

*Claimants,*

- and –

CURRENCY, US, $11,014,165.20, CURRENCY, US, $160,000.00,
CURRENCY, US, $42,220.91, CURRENCY, US, $600,000.00,
CURRENCY, US, $25,616.49, CURRENCY, US, $44,812.41, CURRENCY,
US $1,089.50, CURRENCY, US, $747,000.00, CURRENCY, US,
$1,817.06, CURRENCY, US $10,223.66, CURRENCY, US, $636,903.39,
CURRENCY, US, $28,284.97, CURRENCY, US, $167,771.30, CURRENCY,
US, $950,000.00, CHECK, CHASE MANHATTAN BANK, $30,398.33,
CHECK, CHASE MANHATTAN BANK, $1,092.22, LUCKY STAR
INVESTMENTS, TURBO COMMANDER AIRCRAFT, Model 114TC,
1995, MERCEDES BENZ, 1995, Vin # WDBEA34ESC225572,
MERCEDES BENZ, E430W, 1998, Vin # WDBJF70F4WA664478,
MERCEDES BENZ, 600 SEL, 1999, Vin # WDBGA57G7XA432096,
MERCEDES BENZ, S500V, 1999, Vin # WDBGA51G9XA430195,
MERCEDES BENZ, E320W, 1999, Vin # WDBJF65H4XA865206,
MERCEDES BENZ, 1999, Vin # WDBGA57G0XA426950, MERCEDES
BENZ, 1999, Vin # WDBGA57G1XA412183, BMW, 5401, 1998, Vin #
WBADE632XWBW62956, BMW, 328, 1999, Vin # WBAAM5337XFR02760,
BMW, 1999, Vin # BAGGS333XDN74476, CHEVROLET, TAHOE, 1995, Vin
# 1GNEK13K5SJ417234, CHEVROLET, TAHOE, LS1500, 1995, Vin #
3GNEK13ROX1446063, CHEVROLET, CAVALIER, 1995 Vin #
1G1JF12D8S7219639, CHEVROLET, Cavalier, 1998, Vin #
1G1JF12T0W7152692, CHEVROLET, Cavalier LS,
1998, Vin # 3GIJF5245WS845159, VOLVO, S70A SR, 1999,
Vin # YV1LS55A0X1599258, INFINITY, QX4, 1998, Vin #
JNRAR05Y7WWO25301, LEXUS, GS400, Vin # JT8BH68X0X0013961,
VOLVO, S70A, 1998, Vin # YV1LS5579W2506279,

*Defendants.*

RECEIVED

APR 2 4 2001

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

STATEMENT OF THE ISSUES.......................................................................... 1

STATEMENT OF THE CASE.............................................................................. 1

STATEMENT OF FACTS .................................................................................... 3

SUMMARY OF ARGUMENT ............................................................................ 6

ARGUMENT ........................................................................................................ 7

    I.    The District Court Properly Exercised its Discretion in Denying
         Peoples' Motion to Intervene as of Right............................................... 7

         A.    People's Failure to File a Verified Claim Defeats its Right
             to Intervene in this Action.......................................................... 8

         B.    Peoples Does Not Have a Significant Interest in the
             Defendant Properties................................................................... 8

             1.    Only the Thunor Insurance Companies have a direct interest
                  in the forfeited properties................................................. 9

             2.    Peoples cannot prove an interest based on a constructive trust ......... 11

             3.    Peoples is similarly situated with every other general creditor
                  of the Insurance Companies .............................................. 16

         C.    The Disposition of this Action Will Not Impair or Impede Peoples'
             Ability to Protect Any Interest it May Have in the Subject Property ......... 19

         D.    Peoples' Interest Is Adequately Represented by the FNLIC and FALIC
             Receivers Whose Duties Are to Recover All Assets Belonging to
             Their Receivership Estates.......................................................... 24

    II.    The District Court Properly Exercised its Discretion to Deny Peoples'
         Motion for Permissive Intervention ...................................................... 26

    III.    Peoples' Intervention in this Case Would Violate the McCarran-
         Ferguson Act............................................................................................ 29

CONCLUSION..................................................................................................... 32

CERTIFICATE OF COMPLIANCE.................................................................... 34

# TABLE OF AUTHORITIES

**Federal Cases**

American Lung Ass'n v. Reilly, 962 F.2d 258 (2d Cir. 1992)....................................... 7

Baltimore v. Peat Marwick Main & Co., 923 F.2d 265 (3d. Cir. 1991) ..................... 10, 18

Catanzano v. Wing, 103 F.3d 223 (2d Cir. 1996)......................................................... 7, 27

Clark v. FitzGibbons, 105 F.3d 1049 (5th Cir. 1997)........................................................ 20

Continental Casualty Co. v. ZHA, Inc., 154 F.R.D. 281, 282 (M.D. Fla. 1994)............. 28

Donaldson v. United States, 400 U.S. 517 (1971)............................................................. 9

Farmland Dairies v. Comm'r of N.Y. State Dept. Agriculture and Markets,
    847 F.2d 1038 (2d Cir. 1988)...................................................................................... 7

H.L. Hayden Co. v. Siemens Medical Systems, Inc., 797 F.2d 85 (2d Cir. 1986)........... 28

Hartford Cas. Ins. Co. v. Borg-Warner Corp., 913 F.2d 419 (7th Cir. 1990)............. 23, 25

Holmes v. Securities Investor Protection Corp., 503 U.S. 258 (1992) ...................... 22, 23

Humana v. Forsyth, 525 U.S. 299 (1999)................................................................... 30, 32

In re Advanced Cellular Systems, 235 B.R. 713 (Bankr. D. Puerto Rico 1999)............. 12

In re Carrozzella & Richardson, 247 B.R. 595 (2d Cir. BAP Conn. 2000)................. 12, 13

In re Holocaust Victim Assets Litigation, 225 F.3d 191 (2d Cir. 2000)................. 7, 27, 28

In re Western World Funding, Inc., 52 B.R. 743 (Bankr. D. Nev. 1985)......................... 10

Lovilia Coal Co. v. Williams, 143 F.3d 317 (7th Cir. 1998)............................................ 33

Manson v. Stacescu, 11 F.3d 1127 (2d Cir. 1993).......................................................... 10

Mrs. W. v. Tirozzi, 124 F.R.D. 42, 44 (D. Conn. 1989)................................................. 27

Munich American Reinsurance Co. v. Crawford, 141 F.3d 585 (5th Cir. 1998) ............. 31

New York News, Inc. v. Khell, 972 F.2d 482 (2d Cir. 1992)........................................ 7, 9

S.E.C. v. Waltzer and Associates, 122 F.3d 1057 (2d Cir. 1997)................................... 30

Stephens v. American Intern. Ins. Co., 66 F.3d 41 (2d Cir. 1995) ............................ 30, 31

Time Warner v. M.D. Electronics, Inc., 101 F.3d 278 (2d Cir. 1996)........................ 13, 14

United States v. 2171-73 Bennett Road, , 1991 WL 236893 *1 (Oct. 21, 1991) ............. 17

United States v. 281 Syosset Woodbury Road, 791 F.Supp. 61 (E.D.N.Y. 1992) ............ 8

United States v. BCCI Holdings, Luxembourg, S.A., 69 F.Supp.2d 36
    (D.D.C. 1999) ...................................................................................................... 14, 26

United States v. Cambio Exacto, S.A., 166 F.3d 522 (2d Cir. 1999) ............................... 8

United States v. City of New York, 198 F.3d 360 (2d Cir. 1999) .................................... 27

United States v. Pitney Bowes, Inc., 25 F.3d 66 (2d Cir. 1994)........................................ 7

United States v. Ribadeneira, 105 F.3d 833 (2d Cir. 1997)............................................ 16

United States v. U.S. Currency, 16 F.3d 344, 346 (9th Cir. 1994).................................. 16

United States v. United States Currency and Coin: $558,110.00, 626 F.Supp.
    517 (S.D. Ohio 1985)............................................................................................. 16, 17

Washington Elec. Co-op., Inc. v. Massachusetts Mun. Wholesale Elec. Co.,
    922 F.2d 92 (2d Cir. 1990)....................................................................................... 9

**State Cases**

Boedeker v. Rogers, No. 74929, 2000 WL 504115 (Ohio Ct. App. Apr. 27, 2000) ........ 10

In re Liquidation of Security Casualty Co., 537 N.E.2d 775, (Ill. App. 1989)................. 22

State of Arizona, ex rel. Low v. Imperial Ins. Co., 682 P.2d 431 (1984)........................ 20

## Federal Statutes

Title 18 USC § 981 ........................................................................................... 1, 10

## State Statutes

Ark. Code Ann. § 23-68-113 ............................................................................ 25, 31
Ark. Code Ann. §§ 23-68-101 ................................................................................ 20
Ark. Code Ann. §§ 23-68-129 ................................................................................ 21
Ark. Code. Ann. § 23-68-102(9) ............................................................................. 11
Miss. Code Ann. § 83-24-35 .................................................................................. 25
Miss. Code Ann. § 83-24-41(1)(o) .................................................................... 25, 31
Miss. Code Ann. §§ 83-24-1 .................................................................................. 20
Miss. Code Ann. §§ 83-24-83, 83-24-47(1) ........................................................... 21
Miss. Code. Ann. § 83-24-7(i) ............................................................................... 11
Mo. Rev. Stat. § 375.1152(11) ............................................................................... 11
Mo. Rev. Stat. § 375.1176 ..................................................................................... 31
Mo. Rev. Stat. § 375.1218 ..................................................................................... 21
Mo. Rev. Stat. §§ 375.1150 ................................................................................... 20
Okla. Stat. tit. 36, § 1901(9) ................................................................................. 11
Okla. Stat. tit. 36, § 1911 ...................................................................................... 25
Okla. Stat. tit. 36, § 1927.1(A) .............................................................................. 21
Okla. Stat. tit. 36, §§ 1901 ..................................................................................... 20
Okla. Stat. tit. 36, §§ 1902, 1911, 1914 ................................................................. 31
Tenn. Code Ann. § 56-9-310(a)(15) ....................................................................... 25
Tenn. Code Ann. §§ 56-9-307(a) ........................................................................... 20
Tenn. Code Ann. §§ 56-9-310(a)(15) ..................................................................... 31
Tenn. Code Ann. §§ 56-9-332, 56-9-330 ............................................................... 21
Tenn. Code. Ann. § 56-9-103(9) ............................................................................ 11

## STATEMENT OF THE ISSUES

1.      Applying the requirements of Federal Rule of Civil Procedure 24(a)(2), whether the district court correctly denied Appellants' motion to intervene because:

   A.      Appellants failed to file a verified claim in the forfeiture action;

   B.      Appellants' interest in this litigation is indirect, remote and at best entirely contingent; and

   C.      The Receivers in the liquidation proceedings adequately protect any interest Appellants may have in the defendant properties.

2.      Whether the district court abused its broad discretion in denying Appellants' motion for permissive intervention.

3.      Whether the proposed intervention violates the McCarran-Ferguson Act.

## STATEMENT OF THE CASE

As the result of a massive financial fraud investigation, the United States filed civil forfeiture complaints pursuant to Title 18, United States Code, Section 981 in connection with the illegal activities of MartinFrankel (hereinafter "Frankel"). The complaints followed the indictment ofFrankel and several of his associates for a scheme organized and executed by Frankel. The scheme looted hundreds of millions of dollars from seven insurance companies (hereinafter collectively referred to as the "Thunor Insurance Companies") controlled by Frankel through an entity known as

the Thunor Trust.  The scheme caused the Thunor Insurance Companies to become insolvent, such that Insurance Commissioners ("Receivers") in five states are now acting as liquidators or receivers for the seven companies.

Following the institution of liquidation proceedings for two of the seven Thunor Insurance Companies, Appellants filed proofs of claim with the state courts overseeing the liquidation estates in Mississippi and Tennessee.

In December 1999, the United States sought forfeiture of assets allegedly acquired through funds traceable to Frankel's illegal conduct. Pursuant to the Supplementary Rules of Civil Procedure, the Receivers of the Thunor Insurance Companies filed their claims in the forfeiture actions as innocent owners.  Appellants did not file a claim in the forfeiture proceedings, but rather sought to intervene pursuant to Rule 24 of the Federal Rules of Civil Procedure.

The district court, in denying intervention, found that Appellants failed to meet any of the conditions for Rule 24 intervention.  Not only did they fail to file a verified claim in either of the forfeiture actions, they failed to show a direct and independent interest in the subject property.  The court found that if the money Appellants claim was stolen from them was stolen at all, the Thunor Insurance Companies, not Appellants, were the victims.  The

district court noted that Appellants recognized this fact by filing claims in the Mississippi and Tennessee receivership actions, and that those actions served to adequately protect their interests.

Following the district court's denial of their motion to intervene, Appellants filed this appeal as to both pending forfeiture cases, which are currently consolidated for review.

## STATEMENT OF FACTS

From at least 1991 through approximately May 10, 1999, Martin Frankel devised and operated a scheme by which he purchased insurance companies, looted the assets by purporting to invest them, but instead converted them for his own and others' personal use. (A-53, A-54.)  Two of the Thunor Insurance Companies were the Franklin American Life Insurance Company, ("FALIC"), an insurer domiciled in Tennessee, and First National Life Insurance Company or America, ("FLNIC"), an insurer domiciled in Mississippi.

In June 1998, Appellants Peoples Benefit Life Insurance Company and Veterans Life Insurance Company (hereinafter collectively referred to as "Peoples") negotiated first with FALIC and then with FNLIC regarding a reinsurance deal by which Peoples would cede certain risks it had underwritten, along with the premium dollars it had collected on those risks,

to FNLIC. (A70 – A-71.) By October 1998, Peoples and FNLIC completed their negotiations and entered into a two-phase transaction. In the first phase, Peoples was to cede the subject risks and their associated premium dollars to FNLIC under a "quota share" reinsurance contract. (Id.) This phase of the agreement was not conditioned upon regulatory approval. In the second phase, FNLIC would be substituted in as the insurer on the risks, through a practice known in the industry as "assumption reinsurance." (Id.) The terms of the assumption reinsurance agreement did require regulatory approval. This latter contract, if approved, was to have superceded the quota share reinsurance contract.

Acting under the terms of the quota share contract, Peoples voluntarily transferred $14.7 million of premium dollars to a bank account controlled by FNLIC. (Id.) The money was neither labelled as a "Reserve Fund" nor segregated by FNLIC in any way. It was instead commingled with other FNLIC money and with money stolen from Frankel's other Thunor Insurance Companies. (A-56 – A-61.) Frankel moved the funds (including the funds transferred to FNLIC) through his shell corporations and, ultimately, to various financial accounts in the United States and abroad. (A-56 – A-62.)

By May 1999, Frankel's illegal activities were discovered by investigators and, in the following months, each of the Thunor Insurance Companies was placed into receivership or liquidation under the insurance insolvency statutes of the five applicable states. (A-183 – A-255.) These proceedings are ongoing in the respective state courts. The Receivers of the looted companies, charged with marshaling whatever assets can be found, are undertaking activities associated with the liquidation of insolvent insurance companies, working with guaranty associations, policyholders and creditors to maximize recovery of the assets.

Following the federal criminal indictment of Frankel and several of his co-conspirators on a host of fraud-based charges, the United States instituted civil forfeiture actions. (A-16, A-41.) The actions seek the forfeiture of property obtained through the use of the Thunor Insurance Companies' funds in the course of the scheme perpetrated by Frankel and his associates. (Id.) On February 15, 2000, the Receivers filed Verified Claims in the subject forfeiture actions in accordance with the procedures set out by Rule C(6) of the Supplemental Rules of Civil Procedure. (A9a, A9.)

While Peoples filed proofs of claim for their losses in the FALIC and FNLIC state liquidation proceedings (A-172, A-122.), they failed to file verified claims in the forfeiture actions. On May 30, 2000, Peoples instead

moved to intervene in the forfeiture actions. On October 31, 2000, the district court denied the motions to intervene, finding the interest asserted to be indefinite and any interest at stake to be adequately protected by the existing parties to the action. Peoples filed a notice of appeal and this action now comes before this Honorable Court.

## SUMMARY OF ARGUMENT

The district court correctly denied Peoples' motion to intervene because Peoples failed to comply with the requirements of Rule 24, and any interest it maintains is wholly indirect, remote and entirely contingent. Moreover, Peoples' indirect, remote interest will be protected following disposition of this action. As Peoples has persistently failed to fail to file a verified claim in the forfeiture proceedings, it is evident that Peoples' motion to intervene is a transparent attempt to subvert the clear rules of procedure for forfeiture actions and the statutory priority schemes for insolvent insurance companies in the various states. In addition, Peoples' intervention in this case would circumvent the state insurance code provisions for the liquidation of insolvent insurance companies in violation of the McCarran-Ferguson Act.

## ARGUMENT

I.    **The District Court Properly Exercised its Discretion in Denying Peoples' Motion to Intervene as of Right.**

Pursuant to Federal Rule of Civil Procedure 24(a)(2), in order to intervene as of right the applicant must: "(1) file a timely motion; (2) show an interest in the litigation; (3) show that its interest may be impaired by the disposition of the action; and (4) show that its interest is not adequately protected by the parties to the action." In re Holocaust Victim Assets Litigation, 225 F.3d 191, 197 (2d Cir. 2000). As pointed out by the district court, "[f]ailure to satisfy any of these requirements is a sufficient ground to deny the application." Farmland Dairies v. Comm'r of N.Y. State Dept. Agriculture and Markets, 847 F.2d 1038, 1043-44 (2d Cir. 1988). See also Catanzano by Catanzano v. Wing, 103 F.3d 223, 232 (2d Cir. 1996). See also New York News, Inc. v. Khell, 972 F.2d 482, 485 (2d Cir. 1992).

Courts have recognized that "[o]nly the district judge has the 'feel of the case' necessary to 'weigh the advantages to be derived from appellants' participation as intervenors.'" U.S. v. Pitney Bowes, Inc., 25 F.3d 66, 69 (2d Cir. 1994). See also American Lung Ass'n v. Reilly, 962 F.2d 258, 261 (2d Cir. 1992). As such, the district court's denial of intervention as of right is reviewed under an abuse of discretion standard. In re Holocaust Victim Assets Litigation, 223 F.3d at 197.